# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| | ) | |
| **SPECIALTY PACKAGING HOLDINGS, INC.**, *et al.*,[1] | ) | **Case No. 10-10142 (KG)** |
| | ) | |
| **Debtors.** | ) | **(Joint Administration Requested)** |
| | ) | |

## DECLARATION OF MICHAEL J. MUSSO IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND APPLICATIONS

I, Michael J. Musso, declare as follows:

1.      I am the Chief Restructuring Officer and the Interim Chief Executive Officer of Specialty Packaging Holdings, Inc. ("**SPH**"), together with its direct and indirect debtor subsidiaries, The Specialty Packaging Group, Inc. ("**SPG**"), Cosmetics Specialties, Inc. ("**CSI**"), Cosmolab, Inc. ("**Cosmolab**"), Cosmetics Specialties East, LLC ("**CSE**"), and Cosmolab New York, Inc. ("**CNY**") (collectively, the "**Debtors**"). I am authorized by the Debtors to submit this Declaration.

2.      I have been employed by the Debtors as their Chief Restructuring Officer and Interim Chief Executive Officer for all relevant times for purposes of this Declaration. In my capacity as Chief Restructuring Officer and Interim Chief Executive Officer of the Debtors, I am familiar with the business affairs and books and records of the Debtors. In addition, I am familiar with the Debtors' negotiations with their secured lender.

---

[1]     The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Specialty Packaging Holdings, Inc. (7942), The Specialty Packaging Group, Inc. (6668), Cosmetics Specialties, Inc. (0826), Cosmolab, Inc. (1367), Cosmetics Specialties East, LLC (0313), and Cosmolab New York, Inc. (2222). The primary mailing address for the Debtors is: 1100 Garrett Parkway, Lewisburg, TN 37091

3. I submit this Declaration in support of the Debtors' voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**) and first day motions and applications filed concurrently herewith on January 20, 2010 (the **"Petition Date"**). Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion based upon personal experience and knowledge of the Debtors' businesses and its financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4. Part I of this Declaration describes the business of the Debtors and the developments which led to the Debtors' filing of these chapter 11 bankruptcy cases. Part II sets forth the relevant facts in support of the various first day motions (**"First Day Motions"**) and applications (**"Applications"**) filed by the Debtors concurrently herewith.

## I. BACKGROUND

### B. General Overview of the Debtors' Businesses

5. The Debtors, collectively, are an industry-leading global developer and manufacturer of color cosmetics. The Debtors' primary manufacturing facilities are located in Lewisburg, Tennessee. Prior to the commencement of these chapter 11 cases, the Debtors provided products through three separate business segments: (a) the color cosmetics segment, (b) the injection molding segment and (c) the packaging and assembly segment. The Debtors are devoted to supplying quality color cosmetics and innovative packaging solutions to customers belonging, for the most part, to the global cosmetics industry.

6. Driven by its manufacturing and research & development department, the Debtors are highly regarded for their ability to bring new products to the marketplace on behalf of blue chip cosmetic brands. The Debtors are also reputed for the quality of their products and their

outstanding customer service. The Debtors provide their customers with a complete, turnkey solution from concept development to market introduction. The Debtors' customers focus on marketing and selling the Debtors' products to end-consumers. Some of the companies to which the Debtors act as a supplier of outsourced services include Procter & Gamble, L'Oreal, Jordana, Estée Lauder, Arbonne and Avon.

7.    The Debtors provide a number of manufacturing and development services. Among the manufacturing and development services conducted are those for mechanical, wood case and tri extruded pencils, including compounding, extrusion and molding, painting, finishing, filling, plastic pencil co-extrusion, squeeze tube filling, crème & liquids filling, pencil filling, and plastic injection molding. These processes are used in the manufacturing of eyebrow, eyeliner, lip liner, lip color, eye shadow, blush, fragrance and touch-up pencils, as well as filled products such as lip gloss, concealer, foundation, mascara and skin care. These services are made possible and individualized per customer through the services provided by the research and development department (the "**R&D Department**"). The R&D Department provides new product development, custom color formulation, color matching, stability testing, analytical quality control, quality assurance, micro testing and CAD drawing services, among other services. In addition, the Debtors offer secondary packaging and assembly services such as blister packing, boxing, bagging, auto bundling, and shrink wrapping.

8.    In 2003, Oryx Capital International, Inc. ("**Oryx**") purchased Cosmolab, Inc. from Newell Rubbermaid. Following the purchase, Oryx integrated a cosmetic pencil and plastic injection molding company, Cosmetic Specialties, Inc., into the business. Oryx originally purchased Cosmetic Specialties, Inc. in 2001 from its founders.

3

9.     Pursuant to an Asset Purchase Agreement, dated as of October 22, 2009, Asparron Cosmetics Holdings, LLC, purchased substantially all of the assets of the injection-molding portion of the Cosmetic Specialties, Inc. business.    The purchase price for the transaction was an initial cash payment of $4,500,000 at closing, the assumption of certain liabilities (including accounts payable), and a deposit of $500,000 cash in an escrow account pursuant to the terms of and escrow agreement.  Cosmetic Specialties, Inc. recently moved its cosmetic pencil manufacturing business to the Lewisburg, Tennessee facility.

10.     The Debtors have built a strong position in the wholesale sector of the global retail color cosmetics market.  Within the Debtors' lip and eye categories, the global market for wholesale sales is approximately $300,000,000, with Cosmolab being ranked as a Top 10 supplier in terms of sales.

11.     The Debtors believe the following are its main strengths:

(a)     The Debtors enjoy well established relationships with some of the largest color cosmetics marketers, including Procter & Gamble, L'Oreal, Jordana, Mary Kay, Estée Lauder, Arbonne, Avon and Oriflame.  The Debtors are a certified vendor for several of its customers;

(b)     The Debtors have built a robust quality system and have extensive laboratory capabilities.  Cosmolab is widely recognized as a fully capable turnkey developer with superior manufacturing controls and numerous customer quality audits have derived top scores;

(c)     The Debtors have strong reputation for product innovation. Their R&D Department consists of multi-disciplined professionals who collaborate with customers daily to develop new product formulations and innovative packaging;

(d)     The Debtors' laboratories have the capability to assay formulations for actives levels.  Further, manufacturing processes are in place to accurately record OTC drug production; and

(e)     The Debtors have a senior management team with an average of thirty years of relevant experience, a cross-trained workforce and a strong corporate culture that strongly promotes new product development, customer service and collaboration.

## C. The Debtors' Pre-Petition Credit Facility

12. As of the Filing Date, the aggregate amount of approximately $16,239,148 was due and owing in respect loans and other financial accommodations made by the Pre-Petition Lenders (the "**Prior Bank Obligations**") and consisted of, among other things, revolving credit, term loans, capital expenditure loans, letters of credit, and cash loans with Bank of America, N.A., as Administrative Agent (in such capacity, the "**Pre-Petition Agent**"), and as Lender (in such capacity (the "**Pre-Petition Lender**," and together with the Pre-Petition Agent, the "**Pre-Petition Secured Parties**").

13. *The Pre-Petition Credit Agreement*. On February 17, 2005, the Debtors, the Pre-Petition Lenders and the Pre-Petition Agent entered into that certain Amended and Restated Credit Agreement (as amended, restated, or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**"). Among other financial accommodations, the Pre-Petition Credit Agreement provided for a revolving credit facility of up to $15,750,000, subject to a borrowing base, a term loan of $5,700,000, and capital expenditure loans of up to $2,000,000. SPH and certain direct and indirect subsidiaries of SPG are guarantors (the "**Guarantors**") under the Pre-Petition Credit Agreement. The Prior Bank Obligations owing under, or in connection with the Pre-Petition Credit Agreement, are secured by valid, perfected, enforceable, first priority liens and security interests (collectively, the "**Pre-Petition Liens**") granted by the Debtors to the Pre-Petition Secured Parties, which liens and security interests which the Debtors do not believe are subject to subordination, defense, disallowance or otherwise avoidable, upon what is believed to be substantially all of the property of the Debtors, including, but not limited to, all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, intellectual property, inventory, investment property, leases, letter-of-credit rights, money and supporting obligations and certain real estate (all of the

5

foregoing collateral generally described above, and all proceeds thereof, shall be referred to herein collectively as the "**Pre-Petition Encumbered Assets**"). Among other documents, (a) the Revolving loans are evidenced by a revolving loan promissory note, (b) the term loan is evidenced by a term loan promissory note, and (c) the capital expenditure loans are evidenced by a capital expenditure promissory note.

### D.    Events Leading to These Bankruptcy Filings

14.    In additional to external factors, the filing of these chapter 11 cases has been brought about by internal factors, including, efforts to expand into new market segments, pricing and margin difficulties, lack of expense management, inadequate working capital planning, and initiatives that were not balanced with cash flow requirements. These issues were magnified by the current economic climate worldwide. Collectively, these factors caused extreme liquidity pressures for the Debtors.

15.    In April of 2009, the Debtors retained Morris-Anderson as crisis managers to provide an assessment of the Debtors' overall business, finances and operations. At this time, the Debtors were in default under the Bank of America credit facility due to an estimated $2.2 million over-advance in the borrowing base and covenant violations. The Debtors' gross margin had significantly eroded as cost of goods sold increased and price concessions intensified. At the same time, overhead expenses were rising significantly without adequate planning. Therefore, while overall operating results were improving compared to forecasted operating results for 2008 and the start of 2009, the Debtors' earnings before income, taxes, depreciation and amortization were below historical levels.

DEL1 73696-1

16.     The overall summary of the situation was a significant decline in profitability from 2006 to early 2009. As a result, the Debtors were unable to fill customer orders in a timely manner due to a lack of working capital, causing a severe order backlog and rising customer confusion. This led to covenant defaults under the secured credit facility.

17.     The Debtors faced severe liquidity issues in the period immediately preceding the commencement of these chapter 11 cases due to the factors set forth above. While the efforts of the Debtors' crisis managers and current management helped the Debtors begin to decrease the Debtors' bank debt, pay down the Debtors' accounts payable and stabilize the Debtors' balance sheet, the Debtors have no availability in their existing bank facility from Bank of America and were unable to obtain additional capital or loans from any other entity out of chapter 11. Again, there was no single cause for the Debtors' liquidity issues; rather, a confluence of the factors set forth above led to the Debtors' being left with insufficient funds to carry on the Debtors' business operations outside of chapter 11.

18.     Based on the factors set forth above, it became clear under these facts and circumstances that the commencement of these chapter 11 cases and a going-concern sale of the Debtors' assets would best maximize the value of the Debtors' assets for the benefit of the Debtors' creditors and other parties in interest. During the time period immediately preceding the filing of these chapter 11 cases, the Debtors identified certain potential buyers of the Debtors and began discussions and negotiations with certain of these potential buyers. After significant marketing efforts, on January 15, 2010 the Debtors entered into a purchase agreement with All4 Cosmetics, Inc. (the **"Buyer"**) for the sale of substantially all assets of CSI, Cosmolab and CNY (collectively, the **"Selling Debtors"**), free and clear of all liens, claims, interests and encumbrances, and to assume and assign certain of the Selling Debtors' executory contracts and

unexpired leases (the "**Sale**"). The Debtors intend to move aggressively to sell the Selling Debtors' assets to the Buyer, or such other successful bidder as may be selected in accordance with the bidding procedures proposed by the Debtors. The sale encompasses all the operating assets of the Debtors. The Debtors hope to conclude the Sale during the first quarter of 2010.

## II.    **FIRST DAY MOTIONS**

19.    I have reviewed each of the First Day Motions and Applications (including the attached exhibits and schedules), and I believe that the relief sought in the First Day Motions is critical and necessary to enable the Debtors to operate as debtors-in-possession and to the Debtors' ultimate goal of reorganizing under chapter 11 of the Bankruptcy Code. The factual background and support for each of the Debtors' First Day Motions is provided below.[2]

### A.    **Motion for Entry of an Order Pursuant to Rule 1015(B) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases**

20.    The Debtors submit that their chapter 11 cases should be administered jointly because the business operations and organization of the Debtors are closely related. As reflected on the organizational chart attached hereto and incorporated herein as **Exhibit A**, each of the Debtors is a direct or indirect wholly-owned subsidiary of Specialty Packaging Holdings, Inc. In addition to common-ownership ties, each of the operating Debtors provides related cosmetic goods and services.

21.    As a result of the commonalities between these Debtors, many of the motions, hearings and orders that will arise in these chapter 11 cases will jointly affect each and every Debtor. By jointly administering the Debtors' chapter 11 cases, the Debtors will be able to reduce fees and costs resulting from the administration of these chapter 11 cases and ease the

---

[2]  Capitalized terms not defined in this section shall have the same meaning ascribed in the respective First Day Motions and Applications.

onerous administrative burden of having to file multiple documents, thereby saving time, labor and expense for the Debtors and this Court. Finally, supervision of the administrative aspects of the chapter 11 cases by the Office of the United States Trustee will be simplified. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**B.** **Motion for Entry of an Order Granting the Debtors Additional Time Within Which to File Schedules and Statements**

22.    On the Petition Date, the Debtors filed with this Court a list of their unsecured creditors holding the 40 largest claims (on a consolidated basis). The Debtors estimate that they have over 1,000 unsecured creditors and other parties in interest. Due to the size of the Debtors' cases, the Debtors have been unable, as of the Petition Date, to prepare a complete list of the names and addresses of all creditors and equity security holders, their schedules of assets and liabilities, their statements of financial affairs and their statements of executory contracts as required under section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure.

23.    To prepare the required lists, schedules and statements, the Debtors must gather information from books, records and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires an expenditure of substantial time and effort on the part of the Debtors' employees. In view of the enormous burdens already imposed on the Debtors' management personnel emanating from the Debtors' distressed financial condition and the negotiations and preparations for the filing of these chapter 11 cases, the Debtors will require additional time to file the required lists, schedules and statements.

24.    The Debtors are currently assembling the necessary information to file the lists of creditors and equity security holders, schedules and statements of financial affairs and executory

DEL1 73696-1

contracts and expect that they will be in a position to file same within 45 days of the Petition Date. Accordingly, I believe that the requested extension of time to file schedules and statements is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**C.** **Motion of the Debtors For Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Liens and Superpriority Claims; and (IV) Grating Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; of the Bankruptcy Code, and (V) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis Pursuant to Bankruptcy Rule 4001**

25. The Debtors have determined that, under the current circumstances, the post-petition financing proposal made by the Bank most clearly satisfies the Debtors' urgent financing needs. The Debtors engaged in extensive arm's length negotiations, in good faith, with the Bank.

26. The Debtors and the Bank engaged in lengthy negotiations over the terms of the Debtor-In-Possession Credit Agreement (the **"DIP Credit Agreement"**) and the Interim and the Final Financing Orders. Those negotiations were extensive, comprehensive, at arm's length and in good faith. The Debtors used their best efforts to negotiate the elimination, or narrowing of those provisions implicating issues that are the subject of Bankruptcy Rule 4001(c)(l)(B). Nevertheless, there remain provisions in the Interim Financing Order and the DIP Loan Documents that are required to be highlighted by Local Bankruptcy Rule 4001-2 (the **"Highlighted Provisions"**). The Bank has requested Court approval of the Highlighted Provisions as a condition for providing the financing to the Debtors. Based upon the totality of the circumstances, the Debtors submit that such protections are appropriate and in the best interest of the creditors of these estates and should be approved by this Court. Moreover, the

10

Highlighted Provisions are by no means uncommon to debtor-in-possession financing of the nature that is before this Court in the current economic climate.

27.     The Debtors submit that the Highlighted Provisions are appropriate because of the Debtors' inability to obtain post-petition financing on equal or better terms. In conjunction with the Pre-petition Credit Agreement, all or substantially all of the Debtors' assets are believed to be encumbered by liens in favor of the Pre-petition Lenders under the Pre-petition Credit Agreement. The Debtors' discussions with other potential lenders did not yield terms more favorable than those offered to the Debtors in the Interim Financing Order and in the Final Financing Order. The Bank therefore, when considering the restructuring as a whole, offered the Debtors the most attractive terms upon which to obtain post-petition financing. Without such financing, the Debtors will be unable to operate on a post-petition basis and will be unable to consummate a sale of their assets as a going concern at an auction sale. The Debtors therefore believe that the terms of the DIP Credit Agreement and the Interim and Final Financing Orders are fair and justified under the circumstances and should be approved by this Court.

28.     Prior to the Petition Date, the Debtors attempted to obtain post-petition financing proposals from other lenders, but were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code, or secured credit pursuant to section 364(c)(l) of the Bankruptcy Code. In addition, due to their urgent financial constraints, the Debtors are presently unable to obtain, in the ordinary course of business or otherwise, credit allowable under sections 364(c) or 364(d) of the Bankruptcy Code, except from the Lenders on the terms and conditions contained in the Interim and Final Financing Orders.

29. Before deciding to obtain post-petition financing from the Bank, the Debtors and the Bank engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law. The Debtors were unable to obtain proposals for post-petition financing on terms and conditions more favorable to the Debtors' estates than those set forth in the DIP Credit Agreement, the Interim Financing Order and the Final Financing Order. Any credit extended by the Bank on or after the Petition Date pursuant to the terms of the DIP Credit Agreement, the Interim Financing Order and Final Financing Order should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

30. Accordingly, the Debtors have determined, in the exercise of their respective best and reasonable business judgment, that the financing to be provided by the Bank is the most favorable funding available under the circumstances and addresses the Debtors' immediate necessary financing needs during their chapter 11 efforts. The financing available under the DIP Credit Agreement, the Interim Financing Order and the Final Financing Order will enable the Debtors, among other things, to avoid the cessation of their operations, maintain the continuity of their operations pending a sale of their assets, and maximize the value of their businesses as a going concern and their related properties.

31. Unless the Debtors are authorized to obtain the financing requested herein, the Debtors will not have sufficient available sources of working capital to operate their business in the ordinary course after the Petition Date and to consummate a sale of their assets as a going concern. The Debtors' ability to maintain business relationships with vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations, is essential to the Debtors' continued viability and preservation and maintenance of the going concern value of the Debtors' business and vital to the consummation of a sale. Further, Debtors employ

12

approximately 243 employees and the jobs that Debtors provide are critical to the economic health of a town the size of Lewisburg, Tennessee.

32.     The Debtors are unable to obtain credit that is not both secured and entitled to superpriority administrative claim status from any other financing source and, in fact, have been unable to obtain credit on even a secured and superpriority administrative basis from any other source. As noted above, the Debtors' obligations under the Pre-petition Credit Agreement are believed to be secured by substantially all of the Debtors' assets. Under these circumstances, and given the Debtors' current financial status and after the Debtors were unable to locate any third party lender to provide financing to the Debtors, the Debtors had no choice but to negotiate with its only financing option. Accordingly, the Debtors believe that the financing arrangement proposed under herein represent the only available option.

33.     The Debtors believe that the terms of the Interim Financing Order and the Final Financing Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Credit Agreement, the Interim Financing Order and Final Financing Order have been negotiated in good faith and at arms' length by and among the Debtors and the Bank, with all parties represented by counsel. Accordingly, the Debtors believe that any credit extended under the terms of the Interim Financing Order and Final Financing Order is extended in good faith by the Bank.

34.     Given the Debtors' current financial status, the Debtors are unable to obtain credit that is not secured with a priming lien above that of the Pre-petition Lender. Accordingly, after

13

appropriate investigation and analysis, the Debtors have concluded that the post-petition financing set forth herein is the best alternative available under the circumstances.

35.     In addition, the fees and charges required by the Bank are appropriate and reasonable under the circumstances of these chapter 11 cases.

36.     In the instant case, the Debtors have exercised sound business judgment by seeking advice from their legal advisors and crisis managers in making the determination that the post-petition financing is fair and reasonable and in the best interest of the Debtors' estates.

37.     The Pre-petition Lender consents to the adequate protection and the priming provided for herein; provided, however, the Pre-petition Lender's consent to the priming, and the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of an Interim Financing Order and, ultimately, a Final Financing Order (both in form and substance satisfactory to them) relating to the post-petition loans.

38.     In consideration for the post-petition use of Pre-Petition Encumbered Assets, the Debtors propose to protect the interests of the Pre-petition Lender in the Pre-Petition Encumbered Assets in a variety of manners.  Specifically, in consideration for the use of Pre-Petition Encumbered Assets in which the Pre-petition Lender has an interest, including Cash Collateral, the Debtors will provide the Pre-petition Lender with the Adequate Protection Liens and the Adequate Protection Claims.

39.     By allowing the Debtors to continue to operate and an orderly sale process, the Debtors submit that the post-petition financing will increase the value of the Pre-petition Lender's interest in the Pre-Petition Encumbered Assets.  Therefore, the requested post-petition financing, if approved, will itself adequately protect the Pre-petition Lender's interests.

14

40. The Roll-Up of the Prior Bank Obligations is supported by the sound business judgment of the Debtors. Understanding the extraordinary nature of roll-ups, the Debtors carefully considered the terms of the DIP Facility. The Debtors believe the Roll-Up is justified and was necessary to induce the infusion of additional liquidity into the Debtors, who otherwise would not have been able to secure the post-petition financing needed to maintain and stabilize their businesses absent the Roll-Up. Specifically, the Roll-Up is an express condition to the Pre-Petition Lender's consent to the priming of the Pre-Petition Agent's Pre-Petition Liens, to the Carve-Out, and numerous other provisions of the Interim Financing Order. Indeed, the Bank was unwilling to provide post-petition financing without the Roll-Up, a condition that has been the subject of extensive negotiations.

41. The Debtors' inability to utilize the funds made available pursuant to the post-petition financing will immediately cause the cessation of their operations and result in a disastrous ripple effect that will have far reaching negative ramifications. Such negative consequences include but are not limited to: (i) a complete shut down of the Debtors' operations and (ii) the dismissal of the Debtors' approximately 243 employees. The effect of such events is the value of the Debtors' assets as a going concern will plummet overnight. Accordingly, the only way to protect the value of the Pre-Petition Encumbered Assets to the fullest extent possible is for the Debtors to obtain the debtor in possession financing provided by the Interim Financing Order and the Final Financing Order.

42. The Debtors, in the exercise of their prudent business judgment and consistent with their fiduciary duties, have concluded that the terms of the Interim and Final Financing Orders are reasonable under the circumstances, competitive in today's marketplace, and address the Debtors' working capital and liquidity needs. The terms of the Interim Financing Order and

15

the Final Financing Order were negotiated in good faith and at arms' length by all parties. The negotiations lasted over several weeks. The Debtors were assisted in the negotiations by sophisticated and experienced crisis managers and counsel.

43.     It is critical to the success of these Chapter 11 cases that the Debtors be able to obtain debtor in possession financing. Based on the current status of the Debtors' business, it is also critical that the Debtors be permitted to enter into such financing facilities and to draw funds thereunder sooner than the 14 days' notice required under Bankruptcy Rule 4001 for a final hearing on this Motion in order to operate their business and preserve value at this critical juncture. The Debtors believe that they will suffer immediate and irreparable harm in the absence of an interim hearing and approval of interim borrowings under the Interim Financing Order and the Final Financing Order.

44.     The Debtors are requesting an immediate injection of $1,200,000 upon the Court's approval of the Interim Order. This amount is calculated as the least amount necessary for the Debtors to continue their operations until a Final Hearing consistent with the budget filed with Motion.

D.      **Motion of Debtors For Entry of an Order (I) Approving Continued Use of Existing Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving Certain Requirements of the United States Trustee, and (IV) Waiving the Requirements of 11 U.S.C. §345(B) (the "Cash Management Motion")**

45.     The Debtors' businesses and financial affairs are complex, requiring the collection, disbursement and movement of funds through multiple bank accounts in the ordinary course of the Debtors' businesses (the "**Cash Management System**"). To lessen the disruption caused by these Chapter 11 cases and maximize the value of the Debtors' estates, it is essential that they be allowed to maintain their well-developed system for managing cash. The Cash Management System is an integrated system that provides well-established mechanisms for the

16

collection, distribution, and management of funds used in the Debtors' business operating throughout the United States and internationally. The following is a summary of the Cash Management System describing the flow of funds through each bank account.

46.     Prior to the Commencement of these Chapter 11 cases and in the ordinary course of business, the Debtors maintain six accounts at Bank of America ("**BoA**"), including three operating accounts and three disbursement accounts, as described below.

(a)     The Debtors maintain an operating account (the "**Cosmolab Operating Account**") at BoA for the daily receipts of Cosmolab, Inc. (Account No. XXXXXXX151). Customers of Cosmolab, Inc. remit payments directly to this account and any funds sent to the lockbox at BoA are deposited daily into this account. Funds are periodically transferred from this account to the three disbursement accounts. The Debtors also perform wire transfers from this account to suppliers and other parties. Payroll and insurance benefits are automatically deducted from this account. Occasionally, the Debtors also transfer funds from this account to the CSI Operating Account.

(b)     The Debtors maintain a disbursement checking account for Cosmolab, Inc. (the "**Cosmolab Disbursement Account**") at BoA (Account No. XXXXXXX370). Funds are periodically transferred from the Cosmolab Operating Account to this account. Payments made by Cosmolab, Inc. to vendors, suppliers, and other various parties are made from this account.

(c)     The Debtors maintain an operating account for Cosmetic Specialties, Inc. (the "**CSI Operating Account**") at BoA (Account No. XXXXXXX384). Customers of Cosmetic Specialties, Inc. remit payments directly to this account. Funds are periodically transferred from this account to the CSI Disbursement Account. The Debtors also perform wire transfers from this account to suppliers and other parties. Occasionally, the Debtors also transfer funds from this account to the Cosmolab Operating Account.

(d)     The Debtors maintain a disbursement account for Cosmetic Specialties, Inc. (the "**CSI Disbursement Account**") at BoA (Account No. XXXXXXX821). Funds are periodically transferred from the CSI Operating Account into this account. Checks are written and funds are transferred from this account to cover the ordinary course expenses of Cosmetic Specialties, Inc.

(e)     The Debtors also maintain a disbursement account for Cosmetic Specialties East, LLC (the "**CSE Disbursement Account**") at BoA (Account No. XXXXXXX984). Funds are periodically transferred from

the Cosmolab Operating Account into this account. The Debtors perform wire transfers from this account to pay retail vendors.

(f)     The Debtors maintain an operating account for Specialty Packaging Holdings, Inc. (the **"SPH Operating Account"**) at BoA (Account No. XXXXXXX392).

47.     A schematic setting forth the Debtors' Cash Management System, as described above, is annexed to the Cash Management Motion as **Exhibit A** and a list of accounts (the "**Bank Accounts**") comprising the Cash Management System is annexed thereto as **Exhibit B**.

48.     The Debtors must be able to continue using the Cash Management System as described above so that they can consolidate and coordinate management of cash and transfers of funds to operate their businesses efficiently and effectively. The current Cash Management System allows the Debtors to collect, transfer and disburse funds as needed throughout the Debtors' business operations and provides significant benefits to the Debtors, including the ability to: (a) closely track all corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of up-to-date status reports and account balance information. Any disruption in the Cash Management System could delay the collection and disbursement of funds and threaten the orderly operation of the Debtors' businesses.

49.     Under these circumstances, maintaining the Debtors' Cash Management System is both essential and in the best interests of the Debtors' respective estates and creditors. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' chapter 11 efforts. As they have historically, the Debtors will continue to maintain records with respect to transfers of cash, so that the Debtors, as well as their creditors and this Court, can trace funds through the Cash

18

Management System and ensure that all transactions are adequately documented and readily ascertainable. For these reasons, the Debtors request the authority to continue to use their Cash Management System.

50.     In conjunction with the authority to continue to use their Cash Management System, the Debtors request that no bank participating in the Cash Management System (the "**Cash Management Banks**") that honors a prepetition check or other item drawn on any account that is the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that this Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored post-petition. The Debtors believe that such flexibility accorded the Cash Management Banks is necessary to induce the Cash Management Banks to continue providing cash management services without additional credit exposure.

51.     In accordance with the United States Trustee Guidelines, I understand that the Debtors are required to close all existing pre-petition bank accounts and open new post-petition bank accounts at depositories authorized by the United States Trustee. If strictly enforced in these chapter 11 cases, these requirements would cause substantial disruption in the Debtors' activities and would impair the Debtors' ability to preserve the value of their assets during these chapter 11 cases.

52.     Maintaining the Bank Accounts would greatly facilitate the Debtors' "seamless transition" to postpetition operations. To avoid delays in paying debts incurred postpetition and to ensure as smooth a transition into chapter 11 as possible, the Debtors seek authority to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing

accounts in the normal course of their business operations with the prior consent of the Debtors' prepetition lenders and/or the proposed debtor in possession lenders, and in accordance with the procedures set forth in the proposed order filed concurrently herewith, but without further application to this Court.

53.     Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed debtor in possession accounts and that the Debtors be authorized to maintain and continue to use the Bank Accounts in the same manner and with the same account numbers, styles and document forms as those used prepetition.

54.     If the relief requested herein is granted, I firmly believe that the Debtors will be able to implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by this Court, the Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

55.     Although the Debtors seek authorization to utilize and retain their existing checks and bank accounts, the Debtors will maintain their books and records so as to provide a clear line of demarcation between prepetition and post-petition transactions and operations. If the relief requested in this motion is granted, the Debtors do not intend to pay, and each of the Banks will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

56. To minimize expense to their estates, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks, without reference to their "debtor in possession" status.

57. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as chapter 11 debtors in possession from both the bankruptcy notice that will be sent to all known creditors and the publicity of the filing. Changing correspondence and business forms would be unnecessary and burdensome to the Debtors' estates, as well as expensive and disruptive to the Debtors' business operations. Indeed, the Debtors deal with a large number of suppliers of goods and services and issue a large number of accounts payable checks and payroll checks every month. Changing business forms would cause a severe strain on these operations. For these reasons, the Debtors request that they be authorized to use their existing checks and business forms without placing the label "debtor in possession" on each such check or form.

58. The Debtors are requesting that this Court waive the requirements of Section 345(b) and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices. Given the complexity of the Debtors' Cash Management System and the security of the Cash Management System, the Debtors also submit that cause exists to grant a waiver of the requirements of Section 345(b) of the Bankruptcy Code to the extent necessary.

59. Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

E. **Motion of the Debtors for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to Pay (A) Prepetition Employee and Independent Contractor Wages, Salaries and Related Items; (B) Prepetition Employee and Independent Contractor Business Expenses; (C) Prepetition Contributions to and Benefits Under Employee Benefit Plans; (D) Prepetition Employee Payroll Deductions and Withholdings; (E) Additional Outsource**

**Workforce Costs; (F) Workers' Compensation Premiums, and (G) All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing and Directing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing (the "Wage Motion")**

60.     The Debtors' workforce currently includes approximately 243 full-time hourly and salaried employees located in Tennessee and New York (the "**Employees**").

61.     The Debtors' hourly Employees are paid on a weekly basis, every Friday for the week ended the previous Saturday.  The Debtors' salaried Employees are paid current, on a semi-monthly basis, on the 15th and the last day of every month.  The Employees perform a variety of critical functions for the Debtors' businesses and their skills and specialized knowledge and understanding of the Debtors' infrastructure and operations, as well as their relationships with customers, vendors and other third parties, are essential to the success of the Debtors' continuing operations and their ability to maximize the value of their assets.

62.     In addition to their Employees, the Debtors currently engage two independent contractors to perform essential employee functions on a cost-effective basis (collectively, the "**Independent Contractors**").  The Independent Contractors provide critical services to the Debtors in connection with the day-to-day operation of the Debtors' business relating to sales management, customer relations, and forecasting and scheduling.  The Independent Contractors have acquired substantial knowledge regarding the Debtors' infrastructure, business systems and particularized needs. The Debtors believe that the Independent Contractors will cease providing services to the Debtors, to the direct detriment of the Debtors' businesses, if they are not paid amounts owing to them as of the Petition Date.  The replacement of any of the Independent Contractors at this juncture would be difficult and would likely require a retraining period and result in increased cost to the Debtors.  As a result, the payment of amounts owing to the Independent Contractors is essential to the success of the Debtors' continuing operations and

22

their ability to maximize the value of their assets. The Debtors estimate that the total amounts owing to the Independent Contractors as of the Petition Date is $7,228.00.

63.     In addition to the Employees and the Independent Contractors, the Debtors also rely on other individuals to provide essential employee services (collectively, the "**Outsource Workforce**"). The Outsource Workforce is comprised of employees of Ledford Employee Exchange and other various agencies from time to time as demand requires (collectively, the "**Outsource Agencies**"). The number of individuals that make up the Outsource Workforce varies from time to time contingent upon demand, but typically ranges from one employee to eighty employees. At the present time, the Outsource Workforce consists of approximately 45 employees.

64.     The Debtors believe that if they are not permitted to pay the Outsource Agencies on account of the Outsource Workforce (the "**Outsource Workforce Costs**"), the Outsource Agencies may withdraw the Outsource Workforce and refuse to provide the Debtors with replacement employees, to the direct detriment of the Debtors' businesses. Although the Debtors potentially could replace the Outsource Workforce, the Debtors believe that: (a) the abrupt departure of the Outsource Workforce necessarily would cause disruptions in the Debtors' operations and could severely impact the Debtors' relationships with their customers at a time when the importance of maintaining such relationships is paramount; and (b) the costs associated with identifying and training replacement employees, including the costs associated with the disruption to the Debtors' businesses caused by the loss of the Outsource Workforce, would exceed any amounts owing to the Outsource Agencies. The Debtors estimate that the total amounts owing as Outsource Workforce Costs as of the Petition Date is $6,190.08.

65.     As described above, the continued and uninterrupted support of the Employees, the Independent Contractors and the Outsource Workforce is essential to the Debtors' ongoing operations and their ability to maximize the value of their assets. As of the Petition Date, the Debtors have attempted to pay all amounts owing to independent contractors and Outsource Agencies. To the extent this has not taken place, Debtors request permission to pay them post-petition.

66.     Many Employees and Independent Contractors were owed or had accrued various sums for Prepetition Compensation and Prepetition Business Expenses. In addition, as of the Petition Date, the Debtors had obligations in respect of Prepetition Compensation for deductions from Employees' paychecks used to make payments on behalf of the Employees for or with respect to, among other things: (a) child support payments, garnishments, 401(k) savings plans, health benefit premium payments, voluntary life insurance programs, and other similar programs on account of which the Debtors deduct a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "**Deductions**"); and (b) withholdings from Employees' paychecks on account of various federal, state and local income, FICA, Medicare and other taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"). In addition, as of the Petition Date, to the extent not already paid, the Debtors had obligations to the Outsource Workforce Agencies with respect to the Outsource Workforce. Prepetition Compensation, Prepetition Business Expenses, Deductions, Withholdings and Outsource Workforce Costs were due and owing as of the Petition Date because, among other things:

>     (a)     the Debtors filed their chapter 11 petitions in the midst of certain of their regular and customary payroll periods, as well as in the midst of their regular reimbursement cycle for Employee and Independent Contractor and Outsource Workforce business expenses;

24

(b)     certain checks issued to the Employees and Independent Contractor and Outsource Workforce Agencies prior to the Petition Date (including expense reimbursement checks) have not yet been presented for payment or have not yet cleared the banking system and, accordingly, were not honored and paid as of the Petition Date;

(c)     certain Employees and Independent Contractor and Outsource Workforce Agencies have not yet been paid portions of their salaries, contractual compensation and wages for services previously rendered to the Debtors and/or have not yet been reimbursed for business expenses previously advanced on behalf of the Debtors; and

(d)     certain other forms of compensation (including vacation pay) related to prepetition services have not yet been paid to, or for the benefit of, the Employees because such amounts, although accrued in whole or in part prior to the Petition Date, were not payable at such time, but rather will become payable in the future in the ordinary course of the Debtors' businesses.

67.     The Debtors seek authority to pay all Prepetition Compensation, Prepetition Business Expenses, Deductions, Withholdings and Outsource Workforce Costs attributable to the period prior to the Petition Date. The Debtors estimate of the amounts and principal categories of the Prepetition Compensation, Prepetition Business Expenses, Deductions, Withholdings and Outsource Workforce Costs are attached to the Wage Motion as **Exhibit A** and incorporated herein by reference.

68.     The Debtors maintain a number of employee benefit programs, including but not limited to: health, dental, vision, prescription drug, life and disability insurance, 401(k) savings plans, vacation plans, and other similar programs (collectively, and as described in more detail below, the "**Benefit Programs**"). These Benefit Programs are fully insured, with the exception of the short-term disability plan, which is self-funded by the Debtors. A nonexclusive schedule of Benefit Programs under which prepetition Benefits are owed is attached to the Wage Motion

25

as **Exhibit B** and incorporated herein by reference. The contributions to or benefits paid under the various Benefit Programs are referred to herein collectively as the "**Benefits**."

69.     As of the Petition Date, certain Benefits were either: (i) presently due and owing under the Debtors' self-funded short-term disability program; or (ii) owed but unpaid because certain obligations under the Benefit Programs accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of the Debtors' businesses until a later date. The Debtors estimate that the amount owing under the Debtors' self-funded short-term disability program was approximately $7,100.00 as of the Petition Date. The Debtors seek authority to pay amounts owing under the Benefit Programs as of the Petition Date.

70.     The Debtors use ADP for payroll processing and related services. The Debtors incur costs incident to Prepetition Compensation and Deductions, such as processing costs, payroll administration costs and the employer portion of payroll-related taxes, as well as accrued but unpaid prepetition charges for administration of the Benefit Programs (collectively, the "Prepetition Processing Costs"). The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid, as of the Petition Date, was approximately $11,183.40. Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services of third-party providers with respect to Prepetition Compensation, Deductions and Benefits. By paying the Prepetition Processing Costs, the Debtors may avoid even temporary disruptions of such services and thereby ensure that the Employees obtain all compensation and benefits without interruption.

71.     In Tennessee, the Debtors maintain the mandated level of workers' compensation insurance through Berkley Regional Insurance Company ("**Berkley**"). The Debtors are billed monthly by Berkley for the workers' compensation premiums. On average, the Debtors pay

26

approximately $19,300.00 monthly in arrears for workers' compensation premiums in Tennessee (the "**Tennessee Workers' Compensation Premium**").

72.     In New York, the Debtors maintain the mandated level of workers' compensation insurance through The Phoenix Insurance Company ("**Phoenix Insurance**"). The Debtors are billed annually by Phoenix Insurance for the workers' compensation premiums. On average, the Debtors pay approximately $3,024.00 annually for workers' compensation premiums in New York (the "**New York Workers' Compensation Premium**") and together with the Tennessee Workers' Compensation Premium, the "**Workers' Compensation Premiums**"). The Debtors seek authority to pay all Workers' Compensation Premiums presently due and owing and future Workers' Compensation Premiums as they come due in the ordinary course of business.

73.     The Debtors seek authority of this Court in the Wage Motion to pay Prepetition Compensation, Prepetition Business Expenses, Outsource Workforce Costs, Deductions, Withholdings, Benefits, Prepetition Processing Costs and Workers Compensation Premiums. The Debtors submit that such payment is essential for the Debtors' reorganization, represents an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors' estates and creditors.

74.     In addition, the Debtors request that all applicable banks and other financial institutions be authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor and pay any and all checks and electronic payment requests presented for payment of, and to honor all fund transfer requests made by the Debtors related to Prepetition Compensation, Prepetition Business Expenses, Outsource Workforce Costs, Deductions, Withholdings, Benefits, Prepetition Processing Costs, and Workers' Compensation Premiums, whether such checks were presented or electronic payment requests were submitted

DEL1 73696-1

prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments. The Debtors represent that all checks or electronic payments drawn on the Debtors' payroll accounts relate directly to the requested payment of Prepetition Compensation, Prepetition Business Expenses, Outsource Workforce Costs, Deductions, Withholdings, Benefits, Prepetition Processing Costs, and Workers' Compensation Premiums. The Debtors represent that those checks or electronic payments drawn on the Debtors' disbursement accounts other than the Debtors' payroll accounts can be readily identified as relating directly to the authorized payment of Prepetition Compensation, Prepetition Business Expenses, Outsource Workforce Costs, Deductions, Withholdings, Benefits, Prepetition Processing Costs, and Workers' Compensation Premiums and the Debtors will provide a list of such checks or electronic payments to the Debtors' banks. Accordingly, the Debtors believe that checks and electronic payment requests other than those relating to authorized payments will not be honored inadvertently.

75.     The relief sought in the Wage Motion is essential to the Debtors' reorganization. Any delay or disruption in the provision of employee benefits or payment of compensation (including the payment of Prepetition Compensation, Prepetition Business Expenses, Outsource Workforce Costs, Deductions, Withholdings, Benefits and Prepetition Processing Costs) will destroy the Debtors' relationships with the Employees, the Independent Contractors and Outsource Agencies and irreparably impair workforce morale at the very time when the dedication, confidence and cooperation of the Employees, Independent Contractors and the Outsource Workforce are most critical. The Debtors face the risk that their operations may be severely impaired if authority is not granted immediately for the Debtors to make the payments described above.

28

76.     In addition, bolstering the morale of the Employees, Independent Contractors and the Outsource Workforce and ensuring the uninterrupted availability of their services will assist the Debtors in (a) maintaining a "business as usual" atmosphere, and (b) preserving the Debtors' relationships with customers and vendors, as well as the general public, with which the Employees and Independent Contractors are the Debtors' primary interface.  Finally, the Debtors must continue their corporate policies of permitting certain Employees and Independent Contractors to incur business related expenses and thereafter seek reimbursement by submitting appropriate invoices or vouchers to maintain necessary oversight and quality control and to enable many key Employees and Independent Contractors to perform their jobs effectively.

77.     Because the amounts represented by Prepetition Compensation, Prepetition Business Expenses and Deductions are needed to enable the Employees and Independent Contractors to meet their own personal obligations, the Employees and Independent Contractors will suffer undue hardship and, in many instances, serious financial difficulties absent the relief requested herein.  Moreover, without the requested relief, the stability of the Debtors' businesses would be undermined by the threat that otherwise loyal Employees at all levels, as well as Independent Contractors, would seek other employment.

78.     The Debtors also have anticipated access to sufficient debtor in possession financing to pay all Prepetition Compensation, Prepetition Business Expenses, Outsource Workforce Costs, Deductions, Withholdings, Benefits, Prepetition Processing Costs and Workers' Compensation Premiums, to the extent described herein, as such amounts become due in the ordinary course of their businesses.

79.     To avoid the serious disruption of the Debtors' reorganization efforts that could result from the nonpayment of any withholding taxes, the Debtors seek authority to remit all

Withholdings, including prepetition Withholdings collected on behalf of the Employees, to the applicable taxing authorities to the extent that the Withholdings have not already been remitted. The Withholdings are held in trust for the benefit of the appropriate federal, state or local taxing authority for employees on behalf of whom such payment is being made.

80.    Accordingly, I believe that the relief requested in the Wage Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**F.**    **Motion of the Debtors for Entry of an Order Under 11 U.S.C. §§ 105(A) and 366(I) Prohibiting Utilities from Discontinuing, Altering, or Refusing Service, (II) Establishing Procedures for Determining Adequate Assurances of Payment, and (III) Establishing Procedures for Utilities to Opt Out of the Debtors' Proposed Procedures for Adequate Assurance (the "Motion to Establish Adequate Assurance for Utilities")**

81.    In the operation of their facilities, the Debtors incur utility expenses for, among other things, water, sewer service, electricity, natural gas, and telephone service in the ordinary course of business.   These utility services are provided by approximately four providers (collectively, the "**Utility Providers**").   A list of all, or substantially all, of the Utility Providers that were providing utility services to the Debtors' as of the Petition Date is attached as **Exhibit A** to the Motion to Establish Adequate Assurance for Utilities.   The relief requested by the Motion to Establish Adequate Assurance for Utilities is intended to apply to all Utility Providers, whether or not listed on Exhibit A to Motion to Establish Adequate Assurance for Utilities. Based on a historical average over the last twelve months, the Debtors spend approximately $71,500 each month on utility costs.

82.    Uninterrupted utility services are essential to the Debtors' ongoing business operations and, therefore, to the success of their chapter 11 efforts.  Should the Utility Providers refuse or discontinue service to the Debtors' manufacturing or administrative facilities, even for a brief period, the Debtors' business operations would be severely disrupted.

30

83.     Simply put, without utility service, the Debtors' operations will shut down. Continuity of services is particularly critical in this case because the Debtors' manufacturing facility relies on various utilities for continued operation. Failure to maintain continuously operating facilities will inevitably harm customer relations. Indeed, an interruption of utility services would negatively impact the Debtors' business operations, customer relationships, revenue, and profits, seriously jeopardizing the Debtors' chapter 11 efforts. It is, therefore, critical that utility services continue uninterrupted.

84.     Pursuant to section 366(c)(2) of the Bankruptcy Code, I understand that a utility may alter, refuse or discontinue a chapter 11 debtor's utility service if the utility does not receive from the debtor or the trustee adequate "assurance of payment" within 30 days of the commencement of the debtor's chapter 11 case. To comply with the requirements of section 366 of the Bankruptcy Code, the Debtors seek an order of this Court authorizing them to provide a deposit to any requesting Utility Provider in an amount equal to 50% of the Debtors' estimated monthly cost of its utility service, based on the historic average over the past 12 months, as set forth on **Exhibit A** to the Motion to Establish Adequate Assurance For Utilities. In addition, if any Utility Provider believes additional assurance is required, it may request such assurance, pursuant to the Adequate Assurance Procedures set forth in the Motion to Establish Adequate Assurance For Utilities. Moreover, because some Utility Providers might assert that the Adequate Assurance Procedures are not strictly in compliance with section 366 of the Bankruptcy Code, and because a final hearing on adequate assurance may not be conducted within the first 30 days of these chapter 11 cases under the proposed procedures, the Debtors are proposing certain "opt out" procedures to resolve disputes with the Utility Providers in the first 30 days of these chapter 11 cases.

31

85. The Debtors anticipate access to sufficient debtor-in-possession financing to pay all postpetition obligations to the Utility Companies, to the extent described in the Motion to Establish Adequate Assurance For Utilities, as such amounts become due in the ordinary course of their businesses.

86. The Debtors submit that the availability of the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance of future payment to the Utility Companies. Nonetheless, if any Utility Provider believes additional assurance is required, they may request such assurance pursuant to the Adequate Assurance Procedures set forth in the Utility Motion, or may opt-out pursuant to the opt-out procedures set forth in the Motion to Establish Adequate Assurance For Utilities.

87. The uninterrupted services of the Utility Companies are vital to the Debtors' ongoing operations and to the Debtors' ability to maximize the value of the Debtors' assets for the benefit of the Debtors' creditors and their estates. Accordingly, I believe that the relief requested in the Motion to Establish Adequate Assurance For Utilities is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**G.** **Motion of the Debtors for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Claims of Essential Suppliers ("Essential Supplier Motion")**

88. Certain of the Debtors' suppliers (the "**Essential Suppliers**") have claims for (i) providing essential goods to the Debtors that were received by the Debtors prior to the Petition Date, (ii) providing essential services that were rendered to, or on behalf of, the Debtors before the Petition Date and/or (iii) the remaining amount owed for the purchase of a mold, created by and in the possession of the vendor, for which mold is critical to the Debtors' business (collectively, the "**Essential Supplier Claims**").

32

89.     Debtors seek authorization, in their sole discretion, to pay certain prepetition claims of such Essential Suppliers in an aggregate amount not to exceed $1,000,000 (the "**Essential Supplier Cap**"). The Debtors seek to pay Essential Suppliers a negotiated amount of their respective claims in two separate payments at the following times: 50% of such negotiated amount upon entry of a Final Order granting the relief requested by this Motion and 50% three days prior to the closing on the proposed sale of substantially all of the assets of certain Debtors (the "**Sale**"). The Debtors also request entry of an Interim Order authorizing the Debtors, in their sole discretion, to pay certain pre-petition claims of Essential Suppliers in an aggregate amount not to exceed $350,000, for which the Debtors are unable to negotiate acceptable terms allowing payment after a Final Order.[3]

90.     I firmly believe that payment of the Essential Supplier Claims is vital to the operations of the Debtors' businesses because each of the Essential Suppliers (a) is a "sole source provider," and as such is the only source from which the Debtors can procure certain goods, (b) is in possession of or owns the tooling and/or molds necessary to engineer and produce certain goods pursuant to the needs of the Debtors, (c) supplies goods for which a change in supplier would detrimentally affect the timeframe and price at which the Debtors could provide their customers with goods and services (d) is a supplier requested or required by the Debtors' customers; and/or (e) is a supplier that has met stability testing requirements and a change in suppliers would require further stability testing, which would detrimentally affect the timeframe at which the Debtors could provide their customers with goods. A failure to pay the Essential Supplier Claims is likely to result in the Essential Suppliers being unable or unwilling

---

[3] For the avoidance of doubt, the Debtors' are requesting authority in the Essential Supplier Motion to pay Essential Supplier Claims up to an aggregate amount of $1,000,000 (not $1,350,000), with $350,000 available on an interim basis and $1,000,000 on a final basis.

to provide goods and services to the Debtors post-petition, may force the Debtors to obtain such goods and services, if available, elsewhere at a higher price, or may preclude the Debtors from obtaining the quantity or quality required by the Debtors.

91. The Debtors have reviewed their accounts payable and undertaken a process to identify those vendors who are absolutely essential to the Debtors' operations. The Debtors have further developed procedures (for which they seek this Court's approval) that, when implemented, will help the Debtors receive trade credit necessary to the Debtors' operations on a post-petition basis from certain of the vendors receiving payment of Essential Supplier Claims.

92. The Debtors, along with their management team and their professionals, have identified those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole source provider"; (b) whether certain customizations or other unique factors prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; (c) whether the tooling or molds necessary to create the Debtors' goods are in the possession of or owned by the vendor; (d) whether a customer directs the use of a certain supplier as a condition of their purchasing; (e) whether a replacement vendor would require stability testing; (f) if a supplier is not a sole source or customer directed provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement supplier is secured; and (g) whether a supplier in one of the aforementioned categories is likely to refuse to continue providing goods or services to the Debtors post-petition if its pre-petition balances are not paid or reduced.

93. After carefully assessing the universe of suppliers against the foregoing criteria, the Debtors identified certain parties as Essential Suppliers and estimated the total payments that

34

would be necessary to ensure the continued supply of critical goods and services to the Debtors in calculating the Essential Supplier Cap.

94.     The Essential Suppliers provide the Debtors with, among other things, specialized raw materials or inventory necessary to the Debtors' ongoing manufacturing operations. Failure to continue to obtain the products will have a severe effect on the Debtors' ability to operate post-petition. In many instances, these products are custom designed and the expense and time associated with identifying alternative suppliers and getting new suppliers up to speed would prove highly disruptive and have substantial negative effects on the Debtors. Other Essential Suppliers are the only supplier of the specific products or services they provide, and finding an alternative supplier would prove impossible.

95.     Of the suppliers identified by the Debtors as Essential Suppliers, approximately 25% are suppliers located in foreign jurisdictions (the "**Foreign Suppliers**"). In fact, the amounts owed to Foreign Suppliers constitute approximately 60% of the amounts owed to all Essential Suppliers. Many of these entities may be unfamiliar (or uncomfortable) with the U.S. bankruptcy process, and there is significant risk that bankruptcy filings could cause a Foreign Supplier to stop shipping goods to the Debtors on a timely basis and/or to sever completely its business relationship with the Debtors. Additionally, nonpayment of certain pre-petition claims may cause certain Foreign Suppliers to refuse to ship or delay shipment, resulting in costly delays or unavailability of products. The Debtors can ill afford delays of this nature.

96.     Furthermore, if Foreign Suppliers are not paid, they may take precipitous action against the Debtors based upon an erroneous belief that they are not subject to the jurisdiction of the Court and, thus, not subject to the automatic stay.

35

97.     Pursuant to the terms of the Debtors' proposed financing order, the Debtors will condition payment to Essential Suppliers upon agreement to continue supplying goods and services to the Debtors on any terms that are acceptable to the Debtors. Such terms shall be in consideration of industry trade terms and existing contractual obligations between the parties, and shall be in any event no worse than the most favorable trade terms in effect before the Petition Date or such other trade terms that are acceptable to the Debtors (the "**Customary Trade Terms**"). The Debtors reserve the right to negotiate trade terms with any supplier demanding terms less favorable to the Debtors (to the extent the Debtors determine such terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates or demanded by the facts and circumstances). The Debtors also propose to condition payment of any Essential Supplier Claim upon a commitment, in writing, to waive, discharge, and release the Debtors or the buyer at the Sale (the "**Buyer**") from any and all claims, causes of action, defenses, setoff, recoupment or other offset rights, whether arising at law or equity, with respect to any and all debts or obligations incurred by the Debtors to such Essential Supplier prior to the Petition Date.

98.     If an Essential Supplier refuses to supply goods or services to the Debtors or the Buyer on the specified Customary Trade Terms following payment of any portion of its Essential Supplier Claim, the Debtors, on their behalf and on behalf of the Buyer (after the closing of the Sale) need authority, in their discretion and without further order of the Court, to deem any payments made to such Essential Supplier on account of its Essential Supplier Claim to have been in payment of then-outstanding postpetition claims of such Essential Supplier (the "**Terminated Essential Supplier**") without further order of the Court. If, however, the Debtors or Buyer (after the closing of the Sale) choose not to terminate the Essential Supplier status of a

36

given Essential Supplier immediately upon a refusal by the participating Essential Supplier party to provide goods and/or services in accordance with Customary Trade Terms, the Debtors or Buyer (after the closing of the Sale) shall not be deemed to have waived the ability to terminate such Essential Supplier.

99.     In the event the Debtors or Buyer exercise the rights set forth in the preceding paragraph, the Debtors request that the Terminated Essential Supplier be required to immediately return any payments made on account of its Essential Supplier Claim to the extent that such payments exceed the postpetition amounts then owed to such Terminated Essential Supplier, without giving effect to any rights of setoff or reclamation.

H.     **Motion of the Debtors for Entry of an Order Authorizing the Debtors to (I) Pay in the Ordinary Course of Business Prepetition Claims of Shippers and Warehousemen and (II) Satisfy the United States Customs Duties Imposed on Shipments from Foreign Suppliers and Prepetition Obligations of Service Providers in the Debtors' Foreign Supply Chain ("Motion to Pay Shippers, Warehousemen, and Foreign Suppliers")**

100.     The Debtors seek the authority to continue to pay, in the ordinary course of business, prepetition claims of shippers and warehouseman who have (or may have) state law remedies available to secure payment of their claims.     Additionally, the Debtors seek authorization, pursuant to Sections 105(a) and 507(a)(8)(F) of the Bankruptcy Code, to pay prepetition obligations related to the foreign duties, freight forwarders, ocean cargo, foreign inspection and inland freight for shipments and to vendors that may have remedies to secure such payments. The Debtors propose payment of such claims when, in the Debtors' sole discretion, a creditors' exercise of such remedies would unduly disrupt the Debtors' business. The Debtors further seek authorization that all banks and other financial institutions on which checks were drawn or electronic payment requests made with respect to prepetition Shipping, Warehousing, and Foreign Supply Charges (as defined below) may honor all such checks and payment requests

when presented for payment; provided that sufficient funds are available in the Debtors' bank accounts to cover such payments; and provided, further, that all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved under the Order. The Debtors also seek authority to reissue any check, electronic payment, or otherwise, which was drawn in payment of any prepetition Shipping, Warehousing, and Foreign Supply Charge (as defined below).

101. In order to maintain the Debtors' going concern value, the Debtors must be deemed reliable and dependable among their customers. Indeed, many of the Debtors' contractual obligations, pricing policies, and marketing strategies revolve around that reliability and dependability. Maintaining this reputation depends in substantial part on the timely delivery of product to the Debtors' customers. In turn, the Debtors' ability to make such timely deliveries depends on a successful and efficient system for the shipment and warehousing of the Debtors raw materials and finished goods. The Debtors' supply and delivery system depends upon the use of reputable common carriers, shippers, and truckers (collectively, the "**Shippers**"), a network of third-party warehouses to store goods in transit (the "**Warehousemen**"), and a foreign supply chain that permits the Debtors to import materials and export materials and goods.

102. It is essential for the Debtors' businesses, and their efforts to maximize value for all creditors, that they maintain a reliable and efficient supply and distribution system. Because the Debtors are in many cases dependent on third parties, it is essential that their bankruptcy cases not be a reason or excuse for any third party to cease performing timely services or to retain products or goods. For example, if the Debtors are unable to provide finished goods to customers on a timely basis, the Debtors will likely suffer, at a minimum, a significant loss of

credibility and customer goodwill, thereby causing substantial harm to the value of the Debtors' businesses and their chapter 11 efforts.

103.    Furthermore, the Debtors seek to undertake appropriate efforts to cause Shippers and Warehousemen to acknowledge in writing that payment of such claims is conditioned upon the Shipper and Warehouseman continuing to supply goods and services to the Debtors on trade terms that, at a minimum, such Shipper or Warehouseman provided to the Debtors on a historical basis prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect during such time. The Debtors reserve the right to negotiate new trade terms with any Shipper or Warehouseman as a condition to payment of any such claim.

104.    The Debtors reserve the right to contest, without prejudice, in their sole discretion, the validity and amounts of the Shipping, Warehousing, and Foreign Supply Charges (as defined below) owed to Shippers and Warehousemen. The Debtors also expressly reserve the right to contest the validity, extent, perfection, or possible avoidance of any liens alleged by Shippers or Warehousemen, whether contractual, common law, statutory, or otherwise, even to the extent the Debtors pay such liens pursuant to the Order.

105.    The Debtors seek to prevent the breakdown of their supply and delivery network. They request authority to pay certain prepetition claims relating to shipping and warehousing in amounts, in their business judgment, the Debtors determine necessary or appropriate to: (a) obtain release of critical or valuable goods that may be subject to liens, (b) maintain a reliable, efficient and smooth distribution system, (c) induce critical Shippers and Warehouseman to continue to carry goods and make timely deliveries, and (d) be able to import and export goods as necessary in the ordinary course of business. The Debtors propose payment of such claims,

when, in the Debtors' sole discretion, a creditor's exercise of such state law rights would unduly disrupt the Debtors' businesses.

106.    The Debtors' ability to produce goods depends on the frequent, and often daily, deliveries of materials and goods.  As a result, the Debtors employ third parties, including Shippers and Warehousemen, to ensure that their supply and delivery system runs smoothly, and their inventory and shipments arrive on time.

107.    The Shippers are contracted by the Debtors, and ship, transport, store, and deliver raw materials as well as finished product to the Debtors and their customers.  Further, the Debtors contract with independent Warehousemen to store goods which are in transit.  Generally, the Debtors pay the Shippers and Warehousemen upon agreed upon terms.

108.    Under some state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which could secure the charges or expenses incurred in connection with the transportation or storage of the goods.

109.    The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices or have accrued but unbilled charges for goods that were delivered to the Debtors or the Debtors' customers prior to the Petition Date.  As a result, the Shippers and Warehousemen could argue that they are entitled to possessory liens for transportation and storage, as applicable, on the goods in their possession and may refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed.  Indeed, even if the Shippers and Warehousemen did not have a valid lien, their possession (and retention) of the Debtors' goods and materials would severely disrupt, and potentially cripple, the Debtors' operations.

110. The value of the goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released, is likely to greatly exceed the amount of the shipping and warehousing charges. The Debtors, thus, believe that it is necessary and essential to the value of their estates that they be permitted to make payments on account of certain shipping and warehousing charges.

111. Accordingly, the Debtors seek an order authorizing them, *inter alia*, to make non-disputed prepetition payments to the Shippers and Warehousemen relating to the shipping and warehousing charges as the Debtors, in their business judgment, determine is necessary or appropriate in order to obtain the release of goods held by such Shippers and Warehousemen.

112. The Debtors submit that the total amount to be paid to the Shippers and Warehousemen if the requested relief is granted is minimal compared to the importance and necessity of the Shippers and Warehousemen and the losses the Debtors may suffer if their operations are disrupted. Moreover, the Debtors do not believe that there are viable timely alternatives to the Shippers or the Warehousemen they have used prior to the Petition Date.

113. In connection with the operation of their businesses, the Debtors receive products from a number of foreign suppliers. After their manufacture, the products are processed and moved through the Debtors' supply chain by a number of different entities (the "**Foreign Supply Chain Service Providers**"). Each of these Foreign Supply Chain Service Providers performs a vital service in connection with the products ultimate delivery from the manufacturing facility in the foreign country to the Debtors in the United States. Each service performed by a Foreign Supply Chain Service Provider is necessary and critical to the Debtors' continued receipt of the products, which itself is critical to the continued operation of the Debtors' businesses.

41

114.    The foreign supply chain for the Debtors' products operates substantially as follows.  After the products are manufactured they are stored in the foreign jurisdiction until delivered by the various shippers to the port in the country of origin, to be shipped to the United States.  At such port, the freight forwarder prepares the necessary paperwork for shipment of the products from the country of origin to the United States.  The products then are forwarded to the ocean freight companies which ship the products to the United States as ocean freight.  Before the Debtors take possession of the products from their country of origin, however, the shipment must be reviewed for United States customs and duties.  For products not being delivered to a foreign trade zone, the products must comply with the United States Customs Service ("**U.S. Customs**").  The Debtors retain brokers to process the documentation needed to clear U.S. Customs and to pay the necessary duties and other fees.  The brokers invoice the Debtors on a daily basis for the amount of the duties and other fees.  The products are then released from U.S. Customs to be moved to the Debtors' facility in Lewisburg, Tennessee.

115.    Upon arrival at the Debtors' facility in Lewisburg, Tennessee, the products are unloaded from the ocean containers, and are then stored, packed and inventory is taken.  Finally, upon receipt of an order from the Debtors' customer, the products are placed in production and eventually routed for shipment via inland freight carriers pursuant to the purchase orders received from the Debtors' customers.

116.    The Debtors also receive shipments of products by air freight.  The process for receiving shipments via air freight is substantially similar to the process for receiving shipments via ocean freight, except that the U.S. Customs clearing process is expedited for air fright shipments.  The U.S. Customs clearance process begins when the air carrier departs from the

country of origin, and is completed by the time the air carrier arrives in the United States. The Debtors retain the same brokers to satisfy U.S. Customs requirements for air freight.

117.     The services provided by each Foreign Supply Chain Service Provider are critical to the continued operation of the Debtors' business. If any of the Foreign Supply Chain Service Providers were to refuse service to the Debtors, the resulting disruption to the Debtors' business would be devastating and seriously threaten if not prevent the Debtors' chapter 11 efforts.

118.     It is essential to the Debtors' chapter 11 efforts that the Debtors be permitted to continue to receive the product shipments without interruption. Any disruption in the flow of these products to the Debtors will significantly diminish the going concern value of the Debtors' businesses to the detriment of all the Debtors' shareholders. Each Foreign Supply Chain Service Provider is a vital link in the chain supplying the Debtors with these products.

119.     The aggregate amount the Debtors seek to pay to Shippers, Warehousemen and Foreign Supply Chain Service Providers is not expected to exceed $24,000 (which includes amounts for both domestic and foreign supply charges (collectively, the "**Shipping, Warehousing, and Foreign Supply Charges**"). The Debtors represent that they will only pay Shipping, Warehousing, and Foreign Supply Charges where they believe, in their business judgment, benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods, and (b) the delays associated with such actions. Furthermore, the Debtors assert that the expense of satisfying the unpaid Shipping, Warehousing, and Foreign Supply Charges is justified in order to avoid the potential harm that could befall the Debtors' businesses due to disruption in product shipments.

DEL1 73696-1

120.    In addition, in furtherance of their obligations related to bond the payment of their customs duties, the Debtors maintain a customs import bond with V. Alexander in the amount of $50,000 which secures duty payments on imported goods and allows the goods to leave the port upon arrival (the "**U.S. Customs Bond**"). In view of the importance of securing such payment, the Debtors believe it is in their best interest, and the best interest of the parties in interest to maintain the U.S. Customs Bond and honor all obligations they supports.

121.    Paying the Shipping, Warehousing, and Foreign Supply Charges that accrued before the Petition Date is critical to their efforts in these Chapter 11 Cases. In order to maximize the value of the Debtors' business and maintain operations, the Debtors must be able to maintain their highly effective supply and delivery system in which each of the Shippers and Warehousemen are a vital link. Indeed, if they cannot, the Debtors' supply and delivery system would be drastically disrupted and their chapter 11 efforts jeopardized.

122.    Additionally, if the unpaid Shipping, Warehousing, and Foreign Supply Charges are not satisfied, a strong likelihood exists that the Debtors may not be able to take possession upon arrival in the United States of the products that are currently in transit to the Debtors. The Debtors would have no recourse to demand the turnover of such products from the ocean freight carriers if such ocean freight carriers refused to deliver the products unless paid. The Debtors' Shippers and Warehousemen may allege that they are entitled to possessory liens for transportation and storage, as applicable, of the products in their possession as of the Petition Date, and may refuse to deliver or release such products until their claims have been satisfied and their liens redeemed. Moreover, pursuant to Section 363(e) of the Bankruptcy Code, a carrier, as bailee, might assert a right to adequate protection of a valid possessory lien. Finally, if the Foreign Supply Chain Service Providers remain unpaid they could refuse to continue to

conduct business with the Debtors, thereby critically impairing and disrupting the Debtors' supply of product.

123. Finally, the unpaid customs duties which the Debtors seek authority to pay are necessary to preserve the Debtors' operations and the value of the Debtors' estates.

**I.** **Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue in the Ordinary Course of Business Their Customer Programs and Practices ("Motion to Continue Customer Programs")**

124. The Debtors' established customer base includes some of the largest color cosmetics marketers in the world, including Procter & Gamble, L'Oreal, Oriflame, Jordana, Mary Kay and Avon. The Debtors' focus on customer service has resulted in a customer-focused company that fosters long-term partnerships. In fact, the Debtors' top five customers have been customers since 1973 or earlier, which is evidence of the success of the Debtors' customer-focused approach. Several of the Debtors' customers have paid deposits or advances to the Debtors at the time of ordering (the "**Customer Programs**"). The Debtors in each instance have agreed to apply the advances to the customer's invoice at a later date. In other words, the advances will offset the Debtors' accounts receivable at a future specified time. Customer advances range from 25% to 50% of a customer's order. Currently, the Debtors hold approximately $277,000 in customer advances for undelivered orders.[4] The Debtors seek authorization to honor their customer advance obligations in the ordinary course of business by applying the customer advances toward payment of the orders or refunding deposits in cases where, for whatever reason, the orders cannot be fulfilled.

---

[4] The Debtors expect to receive an additional customer advance either on the Petition Date or soon thereafter. The amount of the advance is $59,669.52. In the event that the advance is received by the Debtors pre-petition, the Debtors ask that the advance become part of the Customer Programs and the Debtors seek to honor that customer advance obligation in the ordinary course of business. The Debtors seek to honor this Customer Program to prevent a significant threat to the Debtors' business.

DEL1 73696-1

125.     The continued loyalty of the Debtors' existing customers and the Debtors' ability to attract new customers is critical to their continued operations and the success of the Chapter 11 Cases. If the Debtors are prohibited from honoring and maintaining the Customer Programs consistently not only with their past business practices, but with the common business practice of the Debtors' competitors, then customers' lost confidence in the Debtors will damage the Debtors' businesses to an extent that far exceeds the cost associated with honoring and continuing such practices. The Debtors believe that some current customers will become dissatisfied and may seek to terminate their relationship with the Debtors, and prospective customers will decline to purchase from the Debtors, if the Debtors do not honor their Customer Programs. At this critical time, the Debtors cannot afford to lose their loyal customer base or to be placed at a competitive disadvantage with respect to prospective customers. The requested order will protect the Debtors' goodwill and going concern value during these Chapter 11 Cases and enhance the Debtors' ability to generate revenue, thereby directly benefiting all of the Debtors' creditors. Accordingly, I believe that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**J.      Motion of Debtors to Set Expedited Hearing on Sale Motion to Establish Auction Procedures**

126.     On or about January 15, 2010, the Selling Debtors and All4 Cosmetics, Inc. (the "Buyer") entered into an asset purchase agreement (the "Purchase Agreement"), whereby the Buyer proposes to purchase the assets of certain Debtors that are used in connection with the manufacturing and selling of cosmetic products (the "Purchased Assets"), free and clear of all of liens, claims, interests and encumbrances, and to potentially assume certain of executory contracts and unexpired leases of the Selling Debtors (the "Assumed Contracts").

127.    Debtors have filed a *Motion of Debtors For Order: (A) Authorizing the Sale of Substantially All Assets of Certain Debtors Pursuant to 11 U.S.C. § 363, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, (C) Establishing Auction Procedures for Sale and Assignment/Assumption, (D) Approving Bid Protections; (E) Setting Date of Auction and Date of Sale Hearing; and (F) Approving Form of Notice and Related Relief* (the "Sale Motion"). Debtors are requesting that the Court expedite the hearing to set the bidding procedures on the Sale Motion.

128.    In the Purchase Agreement, Debtors have agreed to ask that the Court set a hearing within 15 days of the filing of the Sale Motion regarding entry of the Bidding Procedures Order, and the setting of auction procedures, including approval of bid incentives. The Purchase Agreement further requires that the Bidding Procedures Order be entered no later than 30 days after the Sale Motion is filed.

129.    The Debtors are at an important point in the life-cycle of their business, with significant customer and vendor relationships that have substantial potential value to purchasers. These relationships with customers and vendors need to be maintained, and a clear exit strategy is important to sustaining value through those relationships. In addition, a reasonable level of certainty as to the Debtors' success in these cases is important to maintaining employee morale.

130.    The prospective buyer, All4 Cosmetics, Inc., is an affiliate of Schwan-STABILO Cosmetics GmbH & Co. KG, a well-recognized and strong player in the cosmetics manufacturing industry. Debtors have also done significant marketing of their assets, and believe that the timelines set out in the Purchase Agreement are reasonable and are sufficient to maximize the value of the assets under the circumstances. The timelines strike the important

balance between maintaining a stalking horse for the sale of Debtors businesses and allowing other potential purchasers the opportunity to compete in an active auction.

131.    Accordingly, the Debtors believe that establishing auction procedures in this case early is important to the ultimate success of the process, and have requested that the Court set a hearing related to the bid procedures at the earliest practicable time.

**K.    Motion of Debtors for Entry of Order Authorizing Debtors and Debtors-in-Possession to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims, and Solicitation Agent to the Debtors and Debtors-in-Possession And Authorizing the Appointment of Kurtzman Carson Consultants LLC as Notice, Claims, and Solicitation Agent to the Office of the Clerk of the Court _nunc pro tunc_ to the Petition Date**

132.    The Debtors expect to seek Court approval of the (i) appointment of KCC as notice, solicitation and claims agent to the Clerk's Office in these Chapter 11 cases and (ii) retention of KCC by the Debtors to serve as notice, claims and solicitation agent pursuant to the terms and conditions of the Retention Agreement.  As the notice, claims and solicitation agent, KCC will, among other things, (i) distribute required notices to parties in interest, (ii) receive, examine, maintain and docket all proofs of claim and proofs of interest filed in these Chapter 11 cases and maintain the associated claims registers, (iii) if necessary, solicit, collect, and tabulate acceptances and rejections of the Debtors' plan of reorganization from parties entitled to vote thereon and (iv) provide such other administrative services that this Court, the Clerk's Office, and the Debtors may require in connection with these Chapter 11 cases.

133.    The Debtors have thousands of creditors, potential creditors and parties in interest to whom certain notices, including notice of these Chapter 11 cases, will be sent. Although the office of the Clerk of the United States Bankruptcy Court for the District of Delaware ordinarily would serve certain notices on the Debtors' creditors and other parties

in interest and administer claims against the Debtors, engagement of KCC will take a significant burden off of the Clerk's Office.

134.    Accordingly, the Debtors propose to engage KCC to act as the Debtors' notice, claims and solicitation agent. This retention is the most effective and efficient manner of noticing the thousands of creditors and parties in interest of the filing of these Chapter 11 cases and other developments in these Chapter 11 cases. In that capacity, KCC will transmit, receive, docket and maintain proofs of claim filed in connection with these Chapter 11 cases.

135.    KCC is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services including noticing, claims processing, solicitation and other related services critical to the effective administration of chapter 11 cases. The Debtors expect that KCC will work with the Clerk's Office to ensure that such methodology conforms to all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court. The Debtors believe that such assistance will expedite service of notices, streamline the claims administration process and permit the Debtors to focus on their reorganization efforts. Furthermore, by appointing KCC as the claims, solicitation and noticing agent in these Chapter 11 cases, the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

136.    The Debtors obtained proposals from two potential claims agents, and based on those proposals chose KCC. I understand that KCC has substantial experience in matters of this size and complexity and has acted as the official notice, claims and solicitation agent in many large bankruptcy cases in this District and other districts nationwide. Based on

KCC's considerable experience and expertise, the Debtors believe that KCC is well-qualified to perform these services.

**L.**    **Conclusion**

137.    I believe that the relief requested in the First Day Motions and Applications is in the best interests of the Debtors' estates, their creditors and other parties in interest. I hereby declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge, information and belief and respectfully request that all of the relief requested in the First Day Motions and Applications be granted, together with such other and further relief as is just.

DEL1 73696-1

I declare under penalty of perjury that the foregoing is true and correct. Executed on the

___ day of _____, 2010.

By: _____

Michael J. Musso
Chief Restructuring Officer & Interim Chief
Executive Officer

# EXHIBIT A

# ORGANIZATION CHART



Specialty Packaging Holdings, Inc.
(Delaware corporation)

The Specialty Packaging Group, Inc.
(Delaware corporation)

Cosmetics Specialties, Inc.
(California corporation)

Cosmolab, Inc.
(Delaware corporation)

Cosmetics Specialties East, LLC
(Delaware limited liability corporation)

Cosmolab New York, Inc.
(Delaware corporation)