**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 10-10142 (KG) |
| SPECIALTY PACKAGING HOLDINGS, | ) | (Joint Administration Requested) |
| INC., *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C.
§§ 105, 361, 362 AND 364; (II) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (III) GRANTING LIENS AND SUPERPRIORITY
CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES PURSUANT TO 11 U.S.C. § 361, 362, 363 AND 364, AND (V) SCHEDULING
FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON
A PERMANENT BASIS PURSUANT TO BANKRUPTCY RULE 4001**

**("MOTION TO APPROVE DIP FINANCING AND USE OF CASH COLLATERAL")**

The above-captioned debtors and debtors-in-possession (collectively the "**Debtors**"),

hereby move this Court (the "**Motion**") for entry of an interim and, subject to final approval, a

final order in substantially the form attached hereto as **Exhibit A** (the "**Interim Financing**

**Order**" and, subject to final approval, the "**Final Financing Order**"):[2]

    (i)    Authorizing the Debtors to obtain credit and incur debt pursuant to sections 105,
362, 363 and 364 of the Bankruptcy Code in accordance with the Interim
Financing Order and the Final Financing Order, among the Debtors and Bank of
America, N.A., as agent (the "**Agent**"), for the Debtors' post-petition secured
lenders (each a "**Bank**" and, collectively with the Agent, and solely in their

---

[1]    The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in
parentheses): Specialty Packaging Holdings, Inc. (7942), The Specialty Packaging Group, Inc. (6668),
Cosmetics Specialties, Inc. (0826), Cosmolab, Inc. (1367), Cosmetics Specialties East, LLC (0313), and
Cosmolab New York, Inc. (2222). The primary mailing address for the Debtors is: 1100 Garrett Parkway,
Lewisburg, TN 37091

[2]    Capitalized terms not defined herein shall have the meaning set forth in the Interim Financing Order or the DIP
Credit Agreement.

respective capacities as Agent and Bank and not in their capacity as Agent or Lender under any other facility, the **"DIP Secured Parties"**) subject to the terms and conditions set forth herein;

(ii)    Granting first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code) and superpriority claims to the Agent, for the benefit of the Bank, against all property of the Debtors' estates pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(iii)    Authorizing the Debtors to use "cash collateral" as the term is defined section 363(a) of the Bankruptcy Code and, pursuant to sections 361 and 363 of the Bankruptcy Code, grant security interests, mortgages and other liens and superpriority claims in order to provide adequate protection to the Pre-Petition Agent for the benefit of the Pre-Petition Lender;

(iv)    Modifying the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to implement and enforce the terms and provisions of the DIP Credit Agreement (as defined below) and the Interim Financing Order; and

(v)    Scheduling a final hearing for entry of the Final Financing Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing (as defined below) pursuant to Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

## CONCISE STATEMENT OF RELIEF REQUESTED AND SUMMARY OF TERMS OF PROPOSED DIP FACILITY DOCUMENTS AS REQUIRED PURSUANT TO BANKRUPTCY RULE 4001(C)(1)(B)

2.    Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtors set forth herein a concise statement of the requested relief and a summary of the key terms of the proposed Interim Financing Order and the locations within the relevant documents of certain material provisions of same[3]:

---

[3] This summary is not intended to set forth all of the material terms and conditions of the proposed DIP Facility (as such term is defined in the Interim Financing Order) and reference is made to the Interim Financing Order, DIP Credit Agreement and those certain other documents comprising the DIP Loan Documents (as such term is defined in the Interim Financing Order).

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| The Borrower | The Specialty Packaging Group, Inc. | DIP Credit Agreement: Introductory paragraph |
| Guarantors | Specialty Packaging Holdings, Inc., Cosmetics Specialties, Inc., Cosmolab, Inc., Cosmolab New York, Inc., Cosmetics Specialties East, LLC, together with other parties | DIP Credit Agreement: Introductory paragraph |
| Agent/Bank | The financial institutions that are or may from time to time become parties to the DIP Credit Agreement (together with their respective successors and assigns) and Bank of America, N.A., in its individual capacity and as Agent for the Bank | DIP Credit Agreement: Introductory paragraph |
| Borrowing Limit | Revolving Commitment Amount means, (x) with respect to the period prior to entry of the Final Financing Order, $1,200,000 and (y) with respect to the period on and after entry of the Final Financing Order, $15,400,000 [i.e., the estimated minimum fair market value of the Pre-Petition Lender's interest in the Pre-Petition Encumbered Assets as of the Filing Date]. | DIP Credit Agreement: § 1 |
| Events of Default | Events of Default include, among other provisions, payment violations, the bankruptcy or insolvency of a Foreign Reporting Company, financial covenant violations, the dismissal or conversion of these Chapter 11 cases, an order from this Court granting relief from stay to the holder of any claim exceeding $250,000, an order from this Court modifying the Interim Financing Order or Final Financing Order, the Debtors' support of a contest of the Bank's claims, the Debtors' failure to comply with the terms of the DIP Loan Documents, Interim Financing Order or Final Financing Order, and the failure to meet sale process deadlines. | DIP Credit Agreement: § 12 |
| Use of Cash Collateral | Prior to the entry of the Final Financing Order and the partial payment of the Prior Bank Obligations in the "Roll-Up Amount" of $12,900,000 (the "**Roll-Up Amount**"), the Debtors are authorized and directed to remit the Cash Collateral, including, without limitation, all collections on accounts receivable received after the Filing Date, to the Pre-Petition Agent to be applied in partial satisfaction of Prior Bank Obligations owing under the Pre-Petition Loan Documents. The Debtors' remitting of such Cash Collateral to the Pre-Petition Agent (and the payment of the Roll-Up Amount contemplated to be authorized pursuant to the Final Financing Order) is an express condition to the consent of the Pre-Petition Lenders to the priming of the Pre-Petition Agent's Pre-Petition Liens, to the Carve-Out (as set forth in Paragraph 22 of the Interim Financing Order), and the other provisions of the Interim Financing Order. Except as authorized and permitted herein, the Debtors shall not use the Cash Collateral as may from time to time be in their possession or control. After the payment of the Roll-Up Amount to the Pre-Petition Agent, the Debtors are contemplated to be authorized in the Final Financing Order to remit the Cash Collateral on a daily basis to the Agent for application against the outstanding DIP Facility, to be available for re-borrowing | Interim Financing Order: ¶ 8 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | to the extent, and under the circumstances, otherwise permitted pursuant to the provisions of the DIP Credit Agreement. | |
| DIP Budget/ Permitted Uses | Cash Collateral or funds borrowed under the DIP Credit Agreement, to the extent otherwise permitted under the DIP Loan Documents, may be used to pay only Critical Vendor line items, post-petition operating expenses, and post-petition professional fees and expenses as set forth in an Operating Budget that has been approved in writing by the Agent (an **"Approved Budget"**), provided, however, that no Cash Collateral or funds borrowed under the DIP Credit Agreement shall be used to make any payment to a Critical Vendor unless such Critical Vendor has committed, in writing, to waive, discharge, and release the Stalking Horse Bidder (or similar purchaser) from any and all claims, causes of action, defenses, setoff, recoupment or other offset rights, whether arising at law or equity, with respect to any and all debts or obligations incurred by the Debtors to such Critical Vendor prior to the Filing Date. | Interim Financing Order: ¶ 9 |
| Termination Date | The Banks' obligation to make the DIP Facility Commitments terminates on the earliest of the following (the **"Termination Date"**): (i) six (6) months after the commencement of the Chapter 11 Cases, (ii) the consummation of a sale of substantially all of the assets of the Debtors, (iii) the effective date of a plan of reorganization in respect of a Debtor in the Chapter 11 Cases, (iv) the date the DIP Facility becomes due and payable, whether at stated maturity, upon an Event of Default, or otherwise, and (v) this Bankruptcy Court shall fail to have entered the Final Financing Order on or before February 5, 2010. | Interim Financing Order: ¶ 35 |
| Interest Rate | The Debtors promise to pay interest on the unpaid principal amount of each Loan for the period commencing on the date of such Loan until such Loan is paid in full at a rate per annum equal to the sum of the Base Rate from time to time in effect plus the Base Rate Margin (4%); provided that at any time an Event of Default exists, the interest rate applicable to each overdue amount shall be increased by 2% per annum (definitions provided in the DIP Credit Agreement). | DIP Credit Agreement: § 4 |
| Liens/Security | The DIP Liens granted the Bank include the following: (i) valid, binding, continuing, enforceable, first priority and fully perfected liens in the all of the Collateral that was unencumbered as of the Filing Date; (ii) valid, binding, continuing, enforceable, first priority and fully perfected liens on all of the Collateral that was encumbered as of the Filing Date, junior only to the Other Pre-Petition Liens; and (iii) valid, binding, continuing, enforceable, first priority and fully perfected liens on all of the Collateral that constitutes Pre-Petition Encumbered Assets (for the benefit of the Bank, and insofar as the priority of the liens of the Pre-Petition Agent, for the benefit of the Pre-Petition Lender). In addition to the DIP Liens granted, but subject to the Carve-Out, all DIP Facility Obligations shall constitute allowed, super-priority, administrative expense claims under section 503(b) of the Bankruptcy Code and under section 364(c)(1) of the Bankruptcy Code (the **"DIP Super-Priority Claims"**). | Interim Financing Order: ¶ 13 and ¶ 14 |
| Granting of liens on claims or causes of | Actions asserted by any Debtor or any subsequently appointed trustees or representatives of that Debtors' estates under sections 544, 545, | Interim Financing Order: ¶ 11 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | 547, 548, 549, 550, 553(b), and 724(a) of the Bankruptcy Code (collectively, the "**Bankruptcy Actions**") are excluded from the Collateral for purposes of the Interim Financing Order. The Final Financing Order requested to be entered at the Final Hearing is contemplated to contain provisions expressly including the Bankruptcy Actions as part of the Collateral, at least with respect to the up to $2,500,000 to be provided as incremental funding under the DIP Facility. | |
| Adequate Protection | In order to provide, pursuant to section 361(2) of the Bankruptcy Code, the Pre-Petition Lender with adequate protection against any diminution in the value of their interest in the Pre-Petition Encumbered Assets (existing as of the Filing Date) resulting to the extent of any diminution in the value of the Pre-Petition Encumbered Assets (including Cash Collateral) from and after the Filing Date, including but not limited to any diminution in value resulting from: (i) the imposition of the automatic stay; (ii) the priming of the Pre-Petition Liens in favor of the DIP Facility Obligations; (iii) the use of the Pre-Petition Lender's Cash Collateral; (iv) the use, sale or lease of Pre-Petition Encumbered Assets; or (v) the subordination of the Pre-Petition Liens of the Pre-Petition Agent in and to the Pre-Petition Encumbered Assets to the extent of the DIP Facility Obligations, and the Carve-Out (as set forth in Paragraph 22 of the Interim Financing Order), the Pre-Petition Agent, on behalf of the Pre-Petition Lender, shall continue to have and be granted to the extent not heretofore granted, liens (the "**Adequate Protection Liens**") against and in all presently owned and hereafter acquired property, assets, and rights, of any kind or nature, of the Debtors, wherever located, including, without limitation, any and all rights, claims, and causes of action of such Debtors' estates (excluding only the Bankruptcy Actions) (the "**Adequate Protection Collateral**").<br><br>To the extent that the liens provided in the Interim Financing Order are insufficient to secure any adequate protection claim of the Pre-Petition Lender with respect to the Debtors' use, sale, lease, or further encumbrance of the Pre-Petition Encumbered Assets, the Pre-Petition Agent, on behalf of the Pre-Petition Lender, shall be granted allowed, super-priority claims under sections 364(c)(1) and 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"); provided, however, that such priority, consistent with the other provisions of the Interim Financing Order, shall be subordinate only to the DIP Liens and the Carve-Out Amount (as set forth in Paragraph 22 of the Interim Financing Order, and *pari passu* with section 507(b) claims allowed in favor of any of the holders of any Other Pre-Petition Liens). Except as provided in the Interim Financing Order as to the superpriority status of the DIP Liens or the Carve-Out Amount (as set forth in Paragraph 22 of the Interim Financing Order), no costs or expenses of administration which have been or may be incurred in these chapter 11 proceedings, or in any other proceeding related hereto, and no priority claims, are or will be prior to or on a parity with the Adequate Protection Claims of the Pre-Petition Lender (provided, however, that any administrative claimant who is a professional shall be entitled to retain such payment only to the extent of the Carve-Out and that | Interim Financing Order: ¶¶ 15, 16 and 17 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | allowed section 507(b) claims of any of the holders of any Other Pre-Petition Liens may be granted on such a parity). | |
| Fees | <u>Non-Use Fee:</u> The Debtors agree to pay to the Agent for the account of each Bank a non-use fee, for the period from the Effective Date to the Termination Date, at the Non-Use Fee Rate (one-half of one percent (0.50%) per annum) of such Bank's Pro Rata Share (as adjusted from time to time) of the unused amount of the Revolving Commitment Amount. For purposes of calculating usage under this Section, the Revolving Commitment Amount shall be deemed used to the extent of the aggregate principal amount of all Revolving Outstandings. Such non-use fee shall be payable in arrears on the last day of each calendar quarter and on the Termination Date for any period then ending for which such non-use fee shall not have previously been paid. The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.<br><br><u>Facility Fee:</u> The Debtors agree to pay on the Effective Date to the Agent for the account of the Banks a nonrefundable facility fee of fifty (50) basis points (.50%) of $2,500,000 of the Revolving Commitment Amount (or $12,500), to be shared ratably among the Banks pro rata according to their respective Pro Rata Shares of the Revolving Commitment Amount.<br><br><u>Exit Fee:</u> The Company agrees to pay on the Termination Date to the Agent for the account of the Banks a nonrefundable exit fee of one hundred fifty (150) basis points (1.50%) of $2,500,000 of the Revolving Commitment Amount (or $37,500), to be shared ratably among the Banks pro rata according to their respective Pro Rata Shares of the Revolving Commitment Amount.<br><br><u>Agent's Fees:</u> The Company agrees to pay to the Agent such agent's fees as are mutually agreed to from time to time by the Company and the Agent. | DIP Credit Agreement: § 5 |
| Carve-Out | The Interim Financing Order provides for a **"Carve-Out"** for: (i) the payment of fees pursuant to 28 U.S.C. § 1930, (ii) in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Documents) (or where the concept of such an Event of Default is no longer applicable because there has been a prior payment in full of the DIP Facility Obligations, a Cash Collateral Event of Default (as such term is defined below)), or an event that would constitute such an Event of Default with the giving of notice or lapse of time, the determination of materiality or any of the foregoing, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors and any Committee appointed in these Chapter 11 cases after the date of such Default or Event of Default (and regardless of when such fees and expenses become allowed by order of the Bankruptcy Court), in an aggregate amount not in excess of $175,000 (the **"Post-Default Fees and Expenses"**) (plus, all unpaid professional fees and disbursements incurred prior to | Interim Financing Order: ¶ 22 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | the occurrence of such Default or Event of Default (and regardless of when such fees and expenses are allowed) to the extent (A) such fees and expenses do not exceed the amounts budgeted therefor on the pertinent Approved Budgets for the period prior to such Default or Event of Default (the "**Budgeted Amounts**") and (B) such fees and expenses have been or are subsequently allowed by the Bankruptcy Court. | |
| 506(c) Waiver | The Agent, the Bank, the Pre-Petition Agent, and/or the Pre-Petition Lender do not consent (nor shall they be deemed to have consented) in any manner whatsoever (whether through affirmative participation in these Cases, lack of objection, inaction, or otherwise) to the imposition of any surcharge against any of their collateral for any cost or expense of administration pursuant to section 506(c) of the Bankruptcy Code. The Final Financing Order incorporates a waiver by the Debtors, on behalf of themselves and their bankruptcy estates, of any and all claims, rights, and powers under section 506(c) of the Bankruptcy Code against the Collateral and Pre-Petition Encumbered Assets (including as the result of the Adequate Protection Lien of the Pre-Petition Secured Parties), and any other properties or assets of the Debtors subject in any manner whatsoever to the liens of the Agent, the Bank, and the Pre-Petition Secured Parties which claims, rights or powers arise during or are related to the period from and after the Filing Date through repayment in full of the Prior Bank Obligations and DIP Facility Obligations. | Interim Financing Order: ¶ 21; Appendix I, ¶ B |
| Waiver or modification of applicable non-bankruptcy law relating to the perfection of a lien on property, on the foreclosure or other enforcement of the lien | The liens and security interests granted to the Bank and the Pre-Petition Lender pursuant to the Interim Financing Order shall be valid, enforceable and perfected, as of the date of the commencement of the Cases, without the need for the execution or filing of any further document or instrument otherwise required to be executed or filed under applicable non-bankruptcy law. | Interim Financing Order: ¶ 19 |
| Release, waiver, or limitation on claims or other causes of action belonging to the estate or the trustee | Each and every Debtor, on behalf of themselves and their bankruptcy estates, shall be deemed to have waived, discharged, and released the Pre-Petition Secured Parties, together with their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors, and employees (all of the foregoing, the "Pre-Petition Releases") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment or other offset rights against any and all of the Pre-Petition Releases, whether arising at law or equity, including, without limitation (i) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or any other similar provisions of applicable state or federal law, and (ii) any right or basis to challenge or object to the amount, validity, | Interim Financing Order: Appendix I, ¶¶ C and D (to become ¶¶ 10 and 26 of the Final Financing Order) |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | priority, or non-avoidability of the Pre-Petition Liens securing the Prior Bank Obligations.

The Pre-Petition Releases shall be binding unless (a) such party in interest obtains the requisite standing to commence, and commences, within the Challenge Period (60 days following the appointment of the first Committee or if no Committee is appointed, 75 days following the entry of the Interim Financing Order) or the Confirmation Date, (i) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (ii) a contested matter or adversary proceeding against the Pre-Petition Secured Parties in connection with or related to the Prior Bank Obligations (including, without limitation, the roll-up of such Prior Bank Obligations into the DIP Facility Obligations), or the actions or inactions of the Pre-Petition Secured Parties arising out of or related to the Prior Bank Obligations or otherwise, including, without limitation, any claim against the Pre-Petition Secured Parties in the nature of a "lender liability" causes of action, setoff, counterclaim or defense to the Prior Bank Obligations (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Pre-Petition Secured Parties) (the objections, challenges, actions and claims referenced in clauses (a)(i) and (ii), collectively, the "Claims and Defenses"), and (b) there is a final order in favor of such party in interest sustaining any such Claims and Defenses in any such timely filed contested matter or adversary proceeding prior to the Confirmation Date; provided that as to the Debtors, for themselves and not their estates, all such Claims and Defenses are irrevocably waived and relinquished as of the Filing Date. | |

## JURISDICTION

3.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are Sections 105, 361, 362, 363, and 364(c), (d)(1) and (e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

5.    On the date hereof (the "**Filing Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

6.    Debtors, collectively, are an industry-leading global developer and manufacturer of color cosmetics. The Debtors' primary manufacturing facility is located in Lewisburg, Tennessee. For a more detailed description of the Debtors' business operations and the events leading up to the chapter 11 filing, see the *Declaration of Michael J. Musso in Support of the Chapter 11 Petitions and First Day Motions and Applications* (the "**Musso Declaration**").

## PREPETITION CAPITAL STRUCTURE

7.    As of the Filing Date, the aggregate amount due and owing in respect to loans and other financial accommodations made by the Pre-Petition Lenders (the "**Prior Bank Obligations**") and consisted of, among other things, revolving credit, term loans, capital expenditure loans, letters of credit, and cash loans with Bank of America, N.A., as Administrative Agent (in such capacity, the "**Pre-Petition Agent**"), and as Lender (in such capacity (the "**Pre-Petition Lender**," and together with the Pre-Petition Agent, the "**Pre-Petition Secured Parties**") is not less than $16,239,148. The major components of the Debtors' consolidated funded debt obligations are described in greater detail below.

8.    *The Pre-Petition Credit Agreement.* On February 17, 2005, the Debtors, the Pre-Petition Lenders and the Pre-Petition Agent entered into that certain Amended and Restated Credit Agreement (as amended, restated, or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**"). Among other financial accommodations, the Pre-Petition Credit Agreement provided for a revolving credit facility of up to $15,750,000, subject to a borrowing base, a term loan of $5,700,000, and capital expenditure loans of up to $2,000,000. SPH and certain direct and indirect subsidiaries of SPG are guarantors (the "**Guarantors**") under the Pre-Petition Credit Agreement. The Prior Bank Obligations owing under, or in connection with the

Pre-Petition Credit Agreement, are secured by valid, perfected, enforceable, first priority liens and security interests (collectively, the "**Pre-Petition Liens**") granted by the Debtors to the Pre-Petition Secured Parties, which liens and security interests are not subject to subordination, defense, disallowance or otherwise avoidable, upon substantially all of the property of the Debtors, including, but not limited to, all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, intellectual property, inventory, investment property, leases, letter-of-credit rights, money and supporting obligations and certain real estate, including all additions, substitutions, replacements, products, and proceeds thereof (all of the foregoing collateral generally described above, and all proceeds thereof, shall be referred to herein collectively as the "**Pre-Petition Encumbered Assets**"). Among other documents, (a) the Revolving loans are evidenced by a revolving loan promissory note, (b) the term loan is evidenced by a term loan promissory note, and (c) the capital expenditure loans are evidenced by a capital expenditure promissory note.

### REQUESTED RELIEF

9.      As noted above, the Debtors seek entry of an Interim Financing Order substantially in the form attached hereto as Exhibit A:

    (i)    Authorizing the Debtors to obtain credit and incur debt pursuant to sections 105, 362, 363 and 364 of the Bankruptcy Code in accordance with the the DIP Credit Agreement substantially in the form attached as Exhibit B to this Motion, the DIP Loan Documents, the Interim Financing Order and the Final Financing Order, among the Debtors, the Bank and the Agent, subject to the terms and conditions set forth therein;

    (ii)    Granting first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code) (the "**DIP Liens**") and superpriority claims to the Agent and the Bank, against all property of the Debtors' estates pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

    (iii)    Authorizing the Debtors to use "cash collateral" as the term is defined section 363(a) of the Bankruptcy Code and, pursuant to sections 361 and 363 of the Bankruptcy Code ("**Cash Collateral**"), grant security interests, mortgages and other liens and superpriority claims in order to provide adequate protection to the Pre-Petition Agent, for the benefit of the Pre-Petition Lender;

(iv)    Modifying the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to implement and enforce the terms and provisions of the DIP Loan Documents and the Interim Financing Order;

(v)    Scheduling a final hearing for entry of the Final Financing Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing (as defined below) pursuant to Rules 2002, 4001 and 9014 of the Bankruptcy Rules; and

(vi)    Granting such further and related relief as the Court deems just and equitable.

## THE POSTPETITION CREDIT AGREEMENT

10.    The Debtors have determined that, under the current circumstances, the postpetition financing proposal made by the Lenders most clearly satisfies the Debtors' urgent financing needs. The Debtors engaged in extensive arm's length negotiations, in good faith, with the Lenders.

11.    The Debtors and the Lenders engaged in lengthy negotiations over the terms of the Superpriority Debtor-In-Possession Credit Agreement (the **"DIP Credit Agreement"**) and the Interim and the Final Financing Orders. Those negotiations were extensive, comprehensive, at arm's length and in good faith. The Debtors used their best efforts to negotiate the elimination, or narrowing of those provisions implicating issues that are the subject of Bankruptcy Rule 4001(c)(l)(B). Nevertheless, there remain provisions in the Interim Financing Order and the DIP Loan Documents that are required to be highlighted by Local Bankruptcy Rule 4001-2 (the **"Highlighted Provisions"**). The Lenders have requested Court approval of the Highlighted Provisions as a condition for providing the financing to the Debtors. Based upon the totality of the circumstances, the Debtors submit that such protections are appropriate and in the best interest of the creditors of these estates and should be approved by this Court. Moreover, the Highlighted Provisions are by no means uncommon to debtor-in-possession financing of the nature that is before this Court in the current economic climate.

## LOCAL RULE 4001-2 DISCLOSURES

12.     The Debtors believe the following provisions of the DIP Credit Agreement and/or Interim Financing Order are Highlighted Provisions pursuant to Local Rule 4001-2:

   a.     **Cross-Collateralization**.  The Roll-Up (as such term is defined in herein) will result in cross-collateralization of the Prior Bank Obligations under the Pre-Petition Credit Agreement.  (Interim Financing Order at ¶ 8; DIP Credit Agreement at § 1.1, 10.13; Motion at ¶ 39–42)

   b.     **Binding the Estate to Validity, Perfection, or Amount of Secured Debt**.  Although certain stipulations by the Debtors relate to the validity, amount and perfection of the Pre-Petition Liens, the Interim Order includes, for purposes of notice, certain additional provisions with respect to claims regarding the validity, perfection or amount of the Prior Bank Obligations or Pre-Petition Liens which comply with the timing provisions of Local Rule 4001-2(a)(i)(B).  (Interim Financing Order at Finding D; Appendix I, Sec. C & D)

   c.     **Waiver of Rights Under Section 506(c)**.  Included in the Interim Financing Order for purposes of notice, the Final Financing Order is contemplated to include the Debtors' waiver of the estate's rights under section 506(c) of the Bankruptcy Code.  (Interim Financing Order at Appendix I, Sec. B).

   d.     **Provisions that Deem Prepetition Secured Debt to be Postpetition Debt**.  The DIP Credit Agreement contemplates the roll-up of approximately $12,900,000 of Prior Bank Obligations into a corresponding amount of DIP Facility Obligations (the "**Roll-Up**").  While further justification is provided in Paragraphs 39 to 42 herein, the Roll-Up is an express condition to the consent of the Pre-Petition Lenders to the priming of the Pre-Petition Agent's Pre-Petition Liens, to the Carve-Out, and the other provisions of the Interim Financing Order.  (Interim Financing Order at ¶ 8; DIP Credit Agreement at § 1.1, 10.13; Motion at ¶ 39–42).

   e.     **Grant of Liens on Avoidance Actions.**  The DIP Credit Agreement contemplates the grant of postpetition liens to the DIP Lenders on certain avoidance actions, solely as to those obligations relating to only $2,500,000 of the funding to be provided by the DIP Lenders and solely upon entry of the Final Order. (Interim Financing Order at ¶ 11).

13.     The Debtors submit that the Highlighted Provisions are appropriate because of the Debtors' inability to obtain postpetition financing on equal or better terms.  In conjunction with

the Pre-Petition Credit Agreement, the Debtors' assets are completely encumbered by liens in favor of the Pre-Petition Lenders under the Pre-Petition Credit Agreement. The Debtors' discussions with other potential lenders did not yield terms more favorable than those offered to the Debtors in the Interim Financing Order and the Final Financing Order. The Bank, therefore, when considering the restructuring as a whole, offered the Debtors the most attractive terms upon which to obtain postpetition financing. Without such financing, the Debtors will be unable to operate on a post-petition basis and will be unable to consummate a sale of their assets as a going concern at an auction sale. The Debtors therefore believe that the terms of the DIP Credit Agreement and the Interim and Final Financing Orders are fair and justified under the circumstances and should be approved by this Court.

## DEBTORS' ATTEMPTS TO OBTAIN CREDIT

14.    Prior to the Filing Date, the Debtors attempted to obtain postpetition financing proposals from other lenders, but were unable to obtain postpetition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code, or secured credit pursuant to section 364(c)(l) of the Bankruptcy Code. In addition, due to their urgent financial constraints, the Debtors are presently unable to obtain, in the ordinary course of business or otherwise, credit allowable under sections 364(c) or 364(d) of the Bankruptcy Code, except from the Bank on the terms and conditions contained in the Interim and Final Financing Orders.

15.    Before deciding to obtain post-petition financing from the Bank, the Debtors and the Bank engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law. The Debtors were unable to obtain proposals for postpetition financing on terms and conditions more favorable to the Debtors' estates than those set forth in the DIP Credit Agreement, the Interim Financing Order and the Final Financing Order. Any credit extended by the Bank on or after the Filing Date pursuant to the terms of the DIP Credit Agreement, the Interim Financing Order and Final Financing Order should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

16.     Accordingly, the Debtors have determined, in the exercise of their respective best and reasonable business judgment, that the financing to be provided by the Bank is the most favorable funding available under the circumstances and addresses the Debtors' immediate necessary financing needs during their chapter 11 efforts. The financing available under the DIP Credit Agreement, the Interim Financing Order and the Final Financing Order will enable the Debtors, among other things, to avoid the cessation of their operations, maintain the continuity of their operations pending a sale of their assets, and maximize the value of their businesses as a going concern and their related properties.

## APPROVAL OF THE DIP FACILITY IS WARRANTED UNDER THE CIRCUMSTANCES AND APPLICABLE LAW

**A.     Approval Pursuant to 11 U.S.C § 364(c)**

17.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. In re Simasko Production, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtors' best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); see also Collier on Bankruptcy, ¶ 364.05 (15th ed. rev.). Section 364(c) of the Bankruptcy Code provides in pertinent part:

> (c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)     with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

18.     In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source but should make a reasonable effort to seek other sources of credit available of the type set forth in Sections 364(a) and (b) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (11th Cir. 1986) (trustee demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); see also Ames, 115 B.R. at 40 (debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions); In re Plabell Rubber Prods., Inc., 137 B.R. 897,900 (Bankr. N.D. Ohio 1992) (same); In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

19.     Courts have articulated a three-part test to determine whether a debtor in possession is entitled to financing under section 364(c) of the Bankruptcy Code: (i) whether the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim; (ii) whether the credit transaction is necessary to preserve the assets of the estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. See, e.g., In re Farmland Indus., Inc., 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003); In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa, 1991); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987); In re Secured Storage Systems, No. 91-14262S, 1992 WL 109064, at *1 (Bankr. E.D. Pa. May 15, 1992).

## NEED FOR FINANCING

20.     Unless the Debtors are authorized to obtain the financing requested herein, the Debtors will not have sufficient available sources of working capital to operate their business in the ordinary course of business after the Filing Date and to consummate a sale of their assets as a going concern. The Debtors' ability to maintain business relationships with vendors, suppliers,

and customers, to pay their employees, and to otherwise fund their operations, is essential to the Debtors' continued viability and preservation and maintenance of the going concern value of the Debtors' business and vital to the consummation of a sale.

## NO MORE FAVORABLE ALTERNATIVE FINANCING IS AVAILABLE IN LIGHT OF THE DEBTORS' CURRENT FINANCIAL STATUS

21.     The Debtors are unable to obtain credit that is not both secured and entitled to superpriority administrative claim status from any other financing source and, in fact, have been unable to obtain credit on even a secured and superpriority administrative basis from any other source. As noted above, the Debtors' obligations under the Pre-Petition Credit Agreement are secured by substantially all of the Debtors' assets. Under these circumstances, and given the Debtors' current financial status and after the Debtors were unable to locate any third party lender to provide financing to the Debtors, the Debtors had no choice but to negotiate with its only financing option. Thus, the Debtors can show "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. Snowshoe, 789 F.2d at 1088. Accordingly, the Debtors believe that the financing arrangement proposed under herein represent the only available option.

## THE FINANCING IS FAIR AND REASONABLE

22.     The Debtors believe that the terms of the Interim Financing Order and the Final Financing Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Credit Agreement, the Interim Financing Order and Final Financing Order have been negotiated in good faith and at arms' length by and among the Debtors and the Bank, with all parties represented by counsel. Accordingly, the Debtors believe that any credit extended under the terms of the Interim Financing Order and Final Financing Order is extended in good faith by the Lenders as that term is used in section 364(e) of the Bankruptcy Code.

23.     Given the Debtors' current financial status, the Debtors are unable to obtain credit that is not secured with a priming lien above that of the Pre-Petition Lender. Accordingly, after

appropriate investigation and analysis, the Debtors have concluded that the post-petition financing set forth herein is the best alternative available under the circumstances. Bankruptcy Courts routinely defer to the Debtors' business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not this Court"); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially."); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

24.     In addition, the fees and charges required by the Bank are appropriate and reasonable under the circumstances of these chapter 11 cases. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing such lender enhancement fees). Unless the decision is arbitrary and capricious, a bankruptcy court should defer to a debtor's business judgment regarding the need for, and the proposed use of, the requested funds. In re Curlew Valley Assoc., 14 B.R. 507, 511-13 (Bankr. D. Utah 1981). Bankruptcy Courts will generally not second guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Id. at 513-14 (footnotes omitted).

25.     In the instant case, the Debtors have exercised sound business judgment by seeking advice from their legal advisors and crisis managers in making the determination that the post-petition financing is fair and reasonable and in the best interest of the Debtors' estates. Accordingly, the Debtors should be granted authority under section 364(c) of the Bankruptcy Code to enter into the Interim Financing Order and the Final Financing Order and borrow funds from the Bank on the basis described herein and in the DIP Credit Agreement, on a senior secured super-priority basis.

**B.     Approval Pursuant to 11 U.S.C §364(d)**

26.     Section 364(d) of the Bankruptcy Code provides that:

(d)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

    (1)     the trustee [or debtor in possession] is unable to obtain such credit otherwise; and

    (2)     there is adequate protection of the interest of the holder so the lien on the property of the estate on which such senior or equal line is proposed to be granted.

11 U.S.C. § 364(d).

27.     Hence, absent consent, in order to obtain what is commonly referred to as a "priming lien," the Debtors are required to establish that (i) there was no other alternative to the post-petition financing described herein and (ii) the interests of the senior lien holders being "primed" will be adequately protected in the face of the proposed loan. In re First South Sav. Ass'n., 820 F.2d 700 (5th Cir. 1987); In re W&W Protection Agency, Inc., 200 B.R. 615, 623 (Bankr. S.D. Ohio 1996). In re Levitt & Sons, LLC, 384 B.R. 630, 640-41 (Bankr. S.D. Fla. 2008).

28.     The Pre-Petition Lender consents to the adequate protection and the priming provided for herein; provided, however, the Prepetition Lender's consent to the priming, and the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of an Interim Financing Order and, ultimately, a Final Financing Order (both in form and substance satisfactory to them) relating to the DIP Facility.

## 11 U.S.C. § 361 - ADEQUATE PROTECTION

29.     In consideration for the postpetition use of Pre-Petition Encumbered Assets, the Debtors propose to protect the interests of the Pre-Petition Lender in the Pre-Petition Encumbered Assets in a variety of manners. The Debtors respectfully submit that these protections adequately protect those interests and meet all requirements of 11 U.S.C. § 361.

30.     Specifically, in consideration for the use of Pre-Petition Encumbered Assets in which the Pre-Petition Lender has an interest, including Cash Collateral, the Debtors will provide the Pre-Petition Lender with the Adequate Protection Liens and the Adequate Protection Claims.

31.     The term "adequate protection" is not expressly defined by the Bankruptcy Code. See In re Estes, 185 B.R. 745 (Bankr. W.D. Ky. 1995); In re Carter, 1994 U.S. Dist. LEXIS 20573 at *11 (W.D. Ky., June 17, 1994). However, when adequate protection is required under Sections 362, 363, or 364 of the Bankruptcy Code of an interest of an entity in property, adequate protection may be provided by:

    a.     requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

    b.     providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

    c.     granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the "indubitable equivalent" of the entity's interest.

11 U.S.C. § 361.

32.     Since the Bankruptcy Code does not expressly define "adequate protection," the methods listed under Section 361 by which adequate protection may be provided to a secured creditor are neither exclusive nor exhaustive; hence, a bankruptcy court may accept a method of adequate protection that does not fall under any of the methods set forth in Section 361. See In re Estes, 185 B.R. 745 (Bankr. W.D. Ky. 1995); In re Carter, 1994 U.S. Dist. LEXIS 20573 at *11 (W.D. Ky., June 17, 1994) (the methods of compensation listed in Section 361 are neither exclusive nor exhaustive).

33.     In fact, what constitutes adequate protection is a question of fact that is to be determined by the court on a case-by-case basis. In re Rocco, 319 B.R. 411 (Bankr. W.D. Pa. 2005). It was the intent of Congress in Section 361 to give courts flexibility to fashion relief in light of each case in general equitable principals. In re Wilson, 30 B.R. 371 (Bankr. E.D. Pa. 1983). As a result, courts have developed general principles to guide the adequate protection determination. What constitutes adequate protection is determined on a case-by-case basis, and the equitable factors which the court might consider include: (1) whether the claim is over- or

under-secured, (2) the parties reasonable expectations, (3) the quality of the collateral, (4) the length of the stay, (5) whether the lien value is stable, depreciating or appreciating, (6) whether taxes and other payments are being made on the collateral and (7) whether the debtor has a high or low chance of reorganization. See In re Briggs Transp. Co., 780 F.2d 1339 (8th Cir. 1985).

34.　　"The purpose of adequate protection is to provide a secured creditor the benefit of its bargain while enabling the debtors to use the secured property; it is not intended as an 'after the fact' method of allowing creditors to obtain the full amount of secured claims." In re Carter, 1994 U.S. Dist. LEXIS 20573 at *12 (W.D. Ky., June 17, 1994). Furthermore, "'[w]hile an equity cushion is generally considered prima facie evidence of adequate protection, the absence of an equity cushion does not establish the converse.'" Id. A "'creditor's right to adequate protection is limited to the lesser of the value of the collateral or the amount of the secured claim . . . [and] to the extent that the [creditor's] lien claims exceeded the value of the Debtor's collateral on the day of filing, the claim was an unsecured claim . . . one which was not entitled to adequate protection.'" In re Delbridge, 104 B.R. 824 (E.D. Mich. 1989) (internal citations omitted).

35.　　Further, there are two recognized policies underlying Chapter 11, "preserving going concerns and maximizing property available to satisfy creditors." Bank of America National Trust and Savings Assoc. v. North LaSalle Street Partnership, 526 U.S. 434, 453 (1999). Preserving the going concern value of a business essentially ensures additional adequate protection to creditors in most cases; as the going concern value is typically always higher than the piecemeal liquidation of assets. In fact, experience has demonstrated that the sale of a business as an operating unit enhances value more than the piecemeal sale of particular assets. Texaco, for example, filed for bankruptcy in the face of a $10.53 billion judgment to Pennzoil. In re Texaco, Inc., No. 87-20142 (HS) (Bankr. S.D.N.Y. 1987). When Texaco filed for bankruptcy, no one thought for a moment that the giant oil company would be shut down and its assets scattered to the winds. Parties realized that the going concern value would bring about a higher recovery to creditors. See also In re WorldCom, Inc., No. 02-13533 (AJG) (Bankr. S.D.N.Y. 2002) (fraud); Enron Corp., No. 01-16034 (fraud); In re Bethlehem Steel Corp., No. 01-15288 (BRL) (Bankr. S.D.N.Y. 2001) (pension liability); In re Owens Corning, No. 00-3837 (JKF) (Bankr. D. Del. 2000) (asbestos claims). In each case, it was recognized that the going

concern value of the business preserved value for the benefit of the creditors. "The preservation and maintenance of the going concern value of the Debtor is integral to a successful reorganization of the Debtor pursuant to the provisions of the Chapter 11 and the Bankruptcy Code." In re Western Pacific Airlines, Inc., 223 B.R. 567, 568 (Bankr. Co. 1997). Such is the case in this instant matter.

36.     A debtor has the burden of establishing that the holder of a lien to be subordinated, or whose cash collateral will be used, has adequate protection. See In re Swedeland Devel. Co., 16 F.3d 552, 564 (3d Cir. 1994). The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case ... but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

37.     Although adequate protection can be provided in a number of ways, a secured creditor is entitled to protection against diminution in value of its interest in its collateral during the period of use and on account of the priming lien. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (purpose of adequate protection is "to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization"). The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process. see, e.g., Swedeland, 16 F.3d at 564; In re 848 Brickell Ltd., 243 B.R. 142, 148 (S.D. Fla. 1998). This is true whether the prepetition creditor is oversecured or undersecured. The protection to which the secured creditor is entitled is protection against any subsequent decrease in such creditor's interest in collateral that may be occasioned by the debtor's use thereof. See 11 U.S.C. § 361. Accordingly, it follows that if the value of the prepetition creditor's interest in collateral is not being diminished by the priming of its liens by debtor in possession financing, the creditor is not entitled to adequate protection. See In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (prepetition creditors only entitled to adequate protection to the extent of the decline in value of their interests in collateral); see also In re Integrated Health Services, Inc., 260 B.R. 71, 74 (Bankr. D. Del. 2001) (same).

38. By allowing the Debtors to continue to operate and an orderly sale process, the Debtors submit that the post-petition financing will increase the value of the Pre-Petition Lender's interest in the Pre-Petition Encumbered Assets. Therefore, the requested post-petition financing, if approved, will itself adequately protect the Prepetition Lender's interests. See In re Sky Valley, Inc., 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("[A]n increase in the value of the collateral ... resulting from the superpriority financing could constitute adequate protection.") (citing In re First South Sav. Ass'n., 820 F.2d 700, 710 (5th Cir. 1987)).

## THE ROLL-UP OF THE PREPETITION INDEBTEDNESS SHOULD BE APPROVED

39. The Roll-Up of the Prior Bank Obligations is supported by the sound business judgment of the Debtors. Understanding the extraordinary nature of roll-ups, the Debtors carefully considered the terms of the DIP Facility. The Debtors believe the Roll-Up is justified and was necessary to induce the infusion of additional liquidity into the Debtors, who otherwise would not have been able to secure the postpetition financing needed to maintain and stabilize their businesses absent the Roll-Up. Specifically, the Roll-Up is an express condition to the Pre-Petition Lender's consent to the priming of the Pre-Petition Agent's Pre-Petition Liens, to the Carve-Out, and numerous other provisions of the Interim Financing Order. Indeed, the Bank was unwilling to provide postpetition financing without the Roll-Up, a condition that has been the subject of extensive negotiations.

40. Bankruptcy courts have recently granted similar relief under similar circumstances in several cases. See e.g., In re Milacron Inc., Case No. 09-11235 (JVA) (Bankr. S.D. Ohio March 17, 2009); In re Vertis Holdings, Inc., Case No. 08-11460 (CSS) (Bankr. D. Del. July 16, 2008); LandSource Cmty. Dev. LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. June 10, 2008); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008); In re Hoop Holdings Inc., Case No. 08-10544 (BLS) (Bankr. D. Del. Apr. 16, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006); In re Radnor Holdings Corp., Case No. 06-10894 (PIW) (Bankr. D. Del. Sept. 22, 2006); In re Ultimate Electronics, Inc., Case No. 05-10104 (PIW) (Bankr. D. Del. Feb. 14, 2005); In re Comdial Corp., Case No.

05-11492 (MFW) (Banler. D. Del. Jun. 29, 2005); and In re Lyondell Chemical Company, Case No. 09-10023 (REG) (Bankr. S.D.N.Y.) (March 1, 2009). Consequently, the Debtors submit that approval of the Roll-Up is appropriate in these Chapter 11 cases.

41.     Courts routinely approve cross-collateralization clauses where such protection was necessary to obtain vital postpetition financing and the proposed financing inures to the best interests of the creditors as a whole. See In re Ames, 115 B.R. at 40-41; In re Vanguard Diversified, Inc., 31 B.R. 364, 366 (Bankr. E.D.N.Y.) 1983) ("In seeking to grant cross-collateralization, the debtor-in-possession must demonstrate that: (1) absent the proposed financing, its business operations will not survive; (2) it is unable to obtain alternative financing on acceptable terms; (3) the proposed lender will not accede to less preferential terms; and (4) the proposed financing is in the best interests of the general creditor body.") (citations omitted); In re Gen. Oil Distrib., Inc., 20 B.R. 873, 877 (Bankr. E.D.N.Y. 1982) (cross-collateralization appropriate where "necessary for the debtor-in-possession to obtain financing").

42.     Under the circumstances of these Cases, approval of the Roll-Up is appropriate and justified. As the sum of the DIP Facility extended pursuant to the DIP Credit Agreement, including the Roll-Up Amount, is not intended to exceed the value of the Pre-Petition Lender's interest in the Pre-Petition Encumbered Assets, the rolling up of Prior Bank Obligations into DIP Facility Obligations would only affect the timing of the repayment of the Prior Bank Obligations, not their ultimate disposition. Given the Debtors' immediate need for postpetition financing to avoid the harms discussed below, the Pre-Petition Lender's express conditioning of consents upon the existence of the Roll-Up, and the Bank's unwillingness to provide the DIP Facility absent the Roll-Up, approval of the Roll-Up is both warranted and appropriate.

## FAR REACHING NEGATIVE EFFECT OF FAILURE TO OBTAIN APPROVAL OF DIP FACILITY

43.     The Debtors' inability to utilize the funds made available pursuant to the post-petition financing will immediately cause the cessation of their operations and result in a disastrous ripple effect that will have far reaching negative ramifications. Such negative consequences include but are not limited to: (i) a complete shut down of the Debtors' operations

and (ii) the dismissal of the Debtors' approximately 243 employees. The effect of such events is the value of the Debtors' assets as a going concern will plummet overnight. Accordingly, the only way to protect the value of the Pre-Petition Encumbered Assets to the fullest extent possible is for the Debtors to obtain the debtor in possession financing provided by the Interim Financing Order and the Final Financing Order.

**C.    The Post Petition Financing Was Negotiated in Good Faith**

44.    The Debtors, in the exercise of their prudent business judgment and consistent with their fiduciary duties, have concluded that the terms of the Interim and Final Financing Orders are reasonable under the circumstances, competitive in today's marketplace, and address the Debtors' working capital and liquidity needs. The terms of the Interim Financing Order and the Final Financing Order were negotiated in good faith and at arms' length by all parties. The negotiations lasted over several weeks. The Debtors were assisted in the negotiations by sophisticated and experienced crisis managers and counsel. Based on the good faith efforts of the Debtors and the Lenders in negotiating a financing arrangement that will benefit the Debtors, their estates and their creditors, the Debtors respectfully request that the DIP Secured Parties receive the protections of Bankruptcy Code Section 364(e) with respect to the DIP Facility.

## FINAL HEARING AND NOTICE

45.    Pursuant to Bankruptcy Rule 4001(b), the Final Hearing on this emergency Motion to borrow funds from the Lenders may not be commenced earlier than fourteen days after the service of this Motion. Upon request, however, the Bankruptcy Court is empowered to conduct a preliminary expedited hearing on this Motion and authorize the obtaining of credit necessary to avoid immediate and irreparable harm to the Debtors' estates. Fed. R. Bankr. Proc. 4001(b)(2).

46.    As noted above, it is critical to the success of these Chapter 11 cases that the Debtors be able to obtain debtor in possession financing. Based on the current status of the Debtors' business, it is also critical that the Debtors be permitted to enter into such financing facilities and to draw funds thereunder sooner than the 14 days' notice required under Bankruptcy Rule 4001 for a final hearing on this Motion in order to operate their business and preserve value at this critical juncture. The Debtors believe that they will suffer immediate and

irreparable harm in the absence of an interim hearing and approval of interim borrowings under the Interim Financing Order and the Final Financing Order.

47.    The Debtors request that this Court (a) conduct an expedited hearing with respect to the Interim Financing Order (as described herein), and (b) schedule the Final Hearing on the Final Financing Order at the earliest possible date in accordance with Bankruptcy Rule 4001(b), but in no event later than February 8, 2010.

## NOTICE

48.    No trustee or examiner has been appointed in these cases. Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' 40 largest unsecured creditors on a consolidated basis; (iii) counsel for Bank of America; and, (iv) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors. Because of the exigencies of the circumstances and the irreparable harm to the Debtors that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

## NO PRIOR REQUEST

49.    No prior motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Order, substantially in the form attached hereto as **Exhibit A,** (a) authorizing the Debtors to obtain postpetition secured and superpriority financing on an interim basis as set forth in the Interim Financing Order; (b) scheduling the Final Hearing; (c) approving the form and manner of notice of the Final Hearing; and (D) granting such other and further relief as this Court deems appropriate.

Dated:    January 20, 2010               Respectfully submitted,

By:   */s/ Domenic E. Pacitti*

Domenic E. Pacitti (Bar No. 3989)
Michael Yurkewicz (Bar No. 4165)
KLEHR HARRISON HARVEY BRANZBURG LLP
919 North Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone: 302.426.1189
Facsimile: 302.426.9193
E-mail: dpacitti@klehr.com
E-mail: myurkewicz@klehr.com

- *and* -

Robert A. Guy, Jr.*
J. Matthew Kroplin*
FROST BROWN TODD LLC
424 Church Street, Suite 1600
Nashville, Tennessee 37219
Telephone: 615.251.5550
Facsimile: 615.251.5551
E-mail: bguy@fbtlaw.com
E-mail: mkroplin@fbtlaw.com

- *and* -

Ronald E. Gold*
Beth A. Buchanan*
Lindsey F. Baker*
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone: 513.651.6800
Facsimile: 513.651.6981
E-mail: rgold@fbtlaw.com
E-mail: bbuchanan@fbtlaw.com
E-mail: lbaker@fbtlaw.com
*\*Pro Hac Vice* Motion Pending

**PROPOSED CO-COUNSEL FOR
DEBTORS AND DEBTORS-IN-
POSSESSION**