# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| | ) | |
| **SPECIALTY PACKAGING HOLDINGS, INC., *et al.*,**[1] | ) | **Case No. 10-10142 (KG)** |
| | ) | |
| Debtors. | ) | **(Joint Administration Requested)** |
| | ) | |

**MOTION OF DEBTORS FOR ORDER: (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF CERTAIN DEBTORS PURSUANT TO 11 U.S.C. § 363, (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365, (C) ESTABLISHING AUCTION PROCEDURES FOR SALE AND ASSIGNMENT/ASSUMPTION, (D) APPROVING BID PROTECTIONS; (E) SETTING DATE OF AUCTION AND DATE OF SALE HEARING; AND (F) APPROVING FORM OF NOTICE AND RELATED RELIEF**

## ("SALE MOTION")

Specialty Packaging Holdings, Inc. (**"SPH"**), together with its direct and indirect debtor subsidiaries, The Specialty Packaging Group, Inc. (**"SPG"**), Cosmetics Specialties, Inc. (**"CSI"**), Cosmolab, Inc. (**"Cosmolab"**), Cosmetics Specialties East, LLC (**"CSE"**), and Cosmolab New York, Inc. (**"CNY"**) (collectively, the **"Debtors"**), as debtors and debtors-in-possession in the above-captioned chapter 11 cases, by their undersigned attorneys, respectfully request that this Court enter an order, pursuant to 11 U.S.C. §§ 105(a), 363(b), (f) and (m), 364(c)(1), 365, 1107 and 1108, and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**): (i) authorizing the sale of substantially all of the assets of

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Specialty Packaging Holdings, Inc. (7942), The Specialty Packaging Group, Inc. (6668), Cosmetics Specialties, Inc. (0826), Cosmolab, Inc. (1367), Cosmetics Specialties East, LLC (0313), and Cosmolab New York, Inc. (2222). The primary mailing address for the Debtors is: 1100 Garrett Parkway, Lewisburg, TN 37091.

CSI, Cosmolab, and CNY (collectively, the **"Selling Debtors"**), free and clear of liens, claims, interests and encumbrances, and authorizing the assumption and assignment of certain of the Selling Debtors' executory contracts and unexpired leases (the **"Sale"**), (ii) establishing auction procedures (the **"Bidding Procedures"**) for the Sale, (iii) establishing certain bid protections in connection therewith; (iv) approving the form of notice and related relief (the **"Sale Motion"**); (v) scheduling an auction (the **"Auction"**) in connection with the Sale; (vi) scheduling the Sale Hearing (the **"Sale Hearing"** or the **"Sale Approval Hearing"**); and (vi) granting other related relief. In support of their Motion, the Debtors respectfully state:

## I.    INTRODUCTION

1.    On the date hereof (the **"Petition Date"**), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**). The Debtors are continuing to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    The Debtors, collectively, are an industry-leading global developer and manufacturer of color cosmetics. The Debtors' primary manufacturing facility is located in Lewisburg, Tennessee. For a more detailed description of the Debtors' business operations and the events leading up to the chapter 11 filing, see the Declaration of Michael J. Musso in Support of the Chapter 11 Petitions and First Day Motions and Applications (the **"Musso Declaration"**).

## II.    JURISDICTION

3.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicates for the relief sought herein are sections §§ 105(a), 363(b), (f) and (m), 365, 503, 507(b), 364(c)(1) and (d), 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

### III.     RELIEF REQUESTED

5.     On or about January 15, 2010, the Selling Debtors and All4 Cosmetics, Inc. (the "**Buyer**") entered into an asset purchase agreement (the "**Purchase Agreement**"),[2] whereby the Buyer proposes to purchase the assets of the Selling Debtors that are used by the Selling Debtors in connection with the manufacturing and selling of cosmetic products (the "**Purchased Assets**"),[3] free and clear of all of liens, claims, interests and encumbrances, and to potentially assume certain of executory contracts and unexpired leases of the Selling Debtors (the "**Assumed Contracts**").     A copy of the Purchase Agreement is attached hereto as **Exhibit A**.[4]     The consideration for the purchase of the Purchased Assets and assumption of the Assumed Contracts is  (i) Thirteen Million Dollars ($13,000,000) in cash minus (ii) any Accounts Shortfall[5] plus (iii) Buyer's obligations to pay up to One Million Dollars ($1,000,000) under Article III of the Purchase Agreement relating to certain payments to suppliers, plus (iv) any Assumed Liabilities. (collectively, the "**Purchase Price**").

---

[2]   A copy of the Purchase Agreement is attached to the Sale Motion as Exhibit A and incorporated herein. Capitalized terms not otherwise defined herein shall have the respective meaning ascribed to them in the Purchase Agreement.

[3]  The description of Purchased Assets is qualified in its entirety by the Purchase Agreement. To the extent that any statements in this Motion differ from the Purchase Agreement, the Purchase Agreement shall control.

[4]   The exhibits to the Purchase Agreement are not attached to this Motion because the exhibits to the Purchase Agreement are voluminous.  Copies of the exhibits may be obtained from counsel to the Debtors upon written request.

[5] "**Accounts Shortfall**" is defined in the Purchase Agreement as the amount, if any, by which the sum of all Eligible Accounts as of the Closing Date is less than Three Million Dollars ($3,000,000).

6.     By this Motion, the Debtors seek relief in two forms.  First, Debtors seek entry, on an expedited basis, of an order (the **"Bidding Procedures Order"**), substantially the form of **Exhibit B** attached hereto and made a part hereof: (a) approving the Bidding Procedures for the Sale; (b) approving certain bid protections in connection therewith; (c) scheduling a date for the Auction; (d) scheduling the Sale Hearing; and, (e) approving the form and manner of notice of the Sale.  The proposed form of Notice of the Sale is attached hereto as **Exhibit C** (the **"Notice of Bidding Procedures"**).  Consistent with the Purchase Agreement, Debtors ask that the Court set a hearing within 15 days of the filing hereof related to the relief requested in the Bidding Procedures Order.  Second, Debtors seek approval of the Sale, and the assignment and assumption of certain executory contracts and unexpired leases, to Buyer or the Successful Bidder determined at the Auction (the **"Sale Approval Order"**), substantially in the form of **Exhibit D** attached hereto.  As required by the Purchase Agreement, Debtors request that the Court enter the Sale Approval Order by the earlier of 50 days after the entry of the Bidding Procedures Order or April 15, 2009, so that Debtors can then move forward with consummation of the Sale to the Buyer or the Successful Bidder.

## IV.     SUMMARY OF THE BIDDING PROCEDURES

7.     The following is a brief summary of certain provisions of the Bid Procedures and matters to be disclosed in accordance with Local Rule 6004-1(c), and is qualified entirely by reference to the Purchase Agreement and the Bid Procedures Order:

| Provisions Governing Qualification of Bidders and Qualified Bidders | Any competing bid for the Purchased Assets must: |
|---|---|
| | (A)     be in writing; |
| | (B)     be received by Debtors no later than 5:00 p.m. (Eastern Time) on the day that is three (3) business days prior to the Auction; |
| | (C)     be accompanied by a clean duly |

executed asset purchase agreement (the "Modified Purchase Agreement") and a marked Modified Purchase Agreement reflecting the variations from the Purchase Agreement;

(D)     be accompanied by a cash deposit equal to at least the greater of One Million Dollars ($1,000,000.00) or 7.5% of the amount of the competing bid;

(E)     identify the assets that the bidder offers to purchase and the liabilities the bidder proposes to assume;

(F)     not contain any due diligence or financing contingencies;

(G)     demonstrate that the bidder is able to consummate the transaction (financially and otherwise) on the terms of the Modified Purchase Agreement;

(H)     include evidence of authorization and approval from the bidder's board of directors (or comparable governing body);

(I)     identify each executory contract or unexpired lease upon which closing is conditioned, and

(J)     be for substantially all the Purchased Assets and contain a proposed cash purchase price at least in the amount of (i) the Purchase Price offered by the Buyer plus (ii) cash in the amount of the $400,000 Break-Up Fee plus (iii) an additional cash overbid of at least $200,000.

Prior to obtaining financial information from Debtors, any proposed purchaser must execute a confidentiality agreement.

Any non-qualifying bid may be modified to become a Qualifying Bid prior to the Auction in the event Debtors, in consultation with Bank of America and the Committee, determine to extend the deadline

| | |
|---|---|
| | for submission for bids; provided, however, that no extension shall be made to such deadline beyond the deadline set forth in the Purchase Agreement without the written consent of Buyer or further order of the Court. |
| **Deposits, Binding Nature of Bid, and Back-Up Bidders** | Bids shall be binding on all Qualified Bidders until the earlier of (i) 24 hours after the Closing of the Sale transaction or (ii) 30 days after the Auction. The bids of all parties other than the Successful Bidder shall serve as back-up bids. If the Successful Bidder fails to consummate an approved Sale pursuant to the Sale Approval Order and within the time period specified therein, the Back-Up Bidder with the highest and best back-up bid will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court; provided, however, that in the event that the Back-Up Bidder is the Buyer, then the Debtors will be obligated to consummate the sale as set forth in the Purchase Agreement. Should such Back-Up Bidder fail to close, the Debtors will be authorized, but not required, to consummate the sale to the next Back-Up Bidder, and so on; provided, however, that in the event that the Back-Up Bidder is the Buyer, then the Debtors will be obligated to consummate the Sale as set forth in the Purchase Agreement. |
| | If the sale proposed by the Successful Bidder or the Back-Up Bidder (as applicable) does not close due to the breach by the Successful Bidder or any Back-Up Bidder (as applicable) of its Purchase Agreement, then the Earnest Money Deposit shall be paid to the Debtors (subject to the security interest therein of the DIP and Pre-Petition Secured Parties). No such Earnest Money Deposit paid to Debtors shall be credited against the obligations of any Back-Up Bidder. |
| | All Earnest Money Deposits shall be |

| | returned to each bidder not selected by the Debtors as the Successful Bidder by the earlier of (i) two (2) business days after the Closing of the Sale transaction or (ii) thirty-two (32) days after the Auction, unless such bidder is obligated to close as a Back-Up Bidder. If the Successful Bidder's or any Back-Up Bidder's (as applicable) proposed sale does not close for any reason other than a breach by the Successful Bidder or such Back-Up Bidder (as applicable), then the Earnest Money Deposit shall be released to the Successful Bidder or the Back-Up Bidder (as applicable) within five (5) business days after termination of such party's Purchase Agreement, if earlier than the period set-out in the first sentence of this subsection. |
|---|---|
| **Bid Protections – "No Shop"** | There is no provision preventing the Debtors from soliciting competing offers. The Debtors were subject to a no shop provision for approximately 2 weeks in December 2009 only pursuant to a letter of intent that is now superseded. |
| **Bid Protection - Break-Up Fee** | Buyer is entitled to a break-up fee of $400,000, which is just over 3% of the purchase price. Buyer is not requesting a separate expense reimbursement, so the break-up fee size is justified and fully reasonable. |
| **Bid Protection – Bidding Increments, and Treatment of Break-Up Fee at Auction** | Each overbid must be in steps of at least two-hundred-thousand dollars ($200,000). Buyer will get credit for the Break-Up Fee in any topping bids that it makes, and submitting a bid at the auction will not waive Buyer's right to the Break-Up Fee. |
| **Modifications** | After consulting with Bank of America and the Committee, the Debtors may: (a) determine, in their business judgment, which bid or bids, if any, constitute the highest and best offer for the Purchased Assets; and (b) reject, at any time before entry of the Sale Order by this Court approving any bid as the Successful Bid, any bid that, in the Debtors' sole discretion, is (i) inadequate or insufficient; (ii) not in |

| | conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale set forth in the Purchase Agreement; or (iii) contrary to the best interests of the Debtors and their estates and creditors. The Debtors may extend or alter any requirement or deadline contained herein that the Debtors determine, in their business judgment, will better promote the goals of the Bidding Process; provided, however, that no extension or alteration shall be made to any such requirement or deadline that conflicts with the provisions set forth in the Purchase Agreement without the written consent of the Buyer or further order of the Court. |
|---|---|
| **Compliance with Other Delaware Requirements** | The Bid Procedures and Order provide: (i) for notice of the date, time, and place of the Auction and the method for adjourning, (ii) that each bidder must state that it has not engaged in collusion, (iii) the auction will be conducted openly and all creditors are permitted to attend, and (iv) the bidding will be transcribed or videotaped. |

The Debtors have determined that the proposed structure for the Bidding Procedures is the one most likely to maximize the realizable value of the Purchased Assets together with the Assumed Contracts the benefit of the Debtors' estates, creditors and other interested parties, consistent with the need to expedite the process. The Debtors assert that the relief requested related to the Bidding Procedures Order is appropriate and proper, and have set out appropriate legal authorities supporting the bid procedures below, following the summary of the Sale.

## V. SUMMARY OF THE PURCHASE AGREEMENT AND THE SALE

8. The following is a brief summary of certain provisions of the Purchase Agreement and matters to be disclosed in accordance with Local Rule 6004-1, and is qualified entirely by reference to the Purchase Agreement and the Sale Order:

| | |
|---|---|
| **Purchased Assets** | **"Purchased Assets"** means all assets of Selling Debtors owned on the Closing Date other than the Excluded Assets. Purchased Assets include, without limitation, Debtors: (a) the facilities; (b) the Assumed Contracts; (c) equipment; (d) intangible assets; (e) inventory; (f) miscellaneous assets; (g) all accounts receivable (subject to a downward price adjustment at the time of Closing if the accounts are less than $3 million, and subject to an upward adjustment if ultimate collections are over the Accounts Threshold (as defined in the Purchase Agreement)[6] so that all collections above that threshold are remitted to Sellers); (h) all goodwill associated with the Selling Debtors, the Business and the Purchased Assets; and (i) all other property, other than the Excluded Assets, of every kind, character or description owned by the Selling Debtors and used in connection with the Business, whether or not reflected on the Selling Debtors' financial statements, wherever located and whether or not similar to the items specifically set forth above. See Section 1.67 of the Purchase Agreement.<br><br>Excluded Assets, retained by Debtors, include (a) all cash and cash equivalents, (b) all assets related to employee benefit plans, (c) all minute books, corporate records, and certain books and records, (d) all insurance policies, (e) all tax refunds and rebates, (f) all deposits or prepaid expenses related to Excluded Assets or Excluded Liabilities, (g) all claims against third-parties not directly related to a Purchased Asset, (l) all avoidance actions, (m) inventory and receivables related to a certain consumer product line previously produced by Debtors. |
| **Assumed Liabilities** | Buyer shall assume, pay, perform and discharge all of the Selling Debtors' undischarged obligations incurred or arising under the Assumed Contracts listed in |

---

[6] Pursuant to Section 1.67 of the Purchase Agreement, the Accounts Threshold is $3 million.

| | Schedule 3.1 to the Purchase Agreement, with respect to the period commencing on the day following the Closing Date, except for $25,000 of cure costs. See Section 3.1 of the Purchase Agreement. |
|---|---|
| **Contracts and Leases** | Those executory contracts or unexpired leases (if any) identified by the Buyer on Schedule 3.1 of the Purchase Agreement. The Debtors and the Buyer, or such other Successful Bidder, reserve the right to add or delete contracts or leases from the list of Assumed Contracts. |
| **Purchase Price** | The consideration for the purchase of the Purchased Assets and assumption of the Assumed Contracts is (i) Thirteen Million Dollars ($13,000,000) in cash minus (ii) any Accounts Shortfall[7] plus (iii) pay up to One Million Dollars ($1,000,000) under Article III of the Purchase Agreement relating to certain payments to suppliers, plus (iv) any Assumed Liabilities. See Section 2.2 of the Purchase Agreement. |
| **Conditions to Closing** | Closing is subject to various conditions to be set forth in the Purchase Agreement, including, without limitation, the following:<br><br>(i) accuracy of Buyer's and the Selling Debtors' representations and warranties and performance of all covenants and obligations in the Purchase Agreement;<br><br>(ii) Buyer either (a) shall have obtained documentation or other evidence satisfactory to Buyer in its reasonable discretion that Buyer has received confirmation from all applicable Governmental Bodies that upon the Closing all Governmental Authorizations required to operate the Business as currently operated will be transferred to, or issued or reissued |

---

[7] "Accounts Shortfall" is defined in the Purchase Agreement as the amount, if any, by which the sum of all Eligible Accounts as of the Closing Date is less than Three Million Dollars ($3,000,000).

in the name of, Buyer, or (b) shall be able to operate the Business in all material respects pursuant to the Limited Power of Attorney and the Interim Management Agreement;

(iii)    there must not have been commenced and be continuing against Buyer or any Selling Debtor, or against any Person affiliated with Buyer or any Selling Debtor, any Proceeding (other than the Bankruptcy Case and any objections or proceedings pending therein which have been overruled or denied) (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions;

(iv)    neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, any applicable Legal Requirement or Order;

(v) any and all defaults arising prior to the Closing with respect to any Assumed Contract shall have been cured or waived without any material modifications to the subject Assumed Contract unless expressly authorized by Buyer to the full extent required by Section 365(b)(1)(A) and other applicable provisions of the Bankruptcy Code and any order of the Bankruptcy Court, *provided*, however, that this condition shall be deemed satisfied in full if Seller has satisfied or provided for the satisfaction at Closing of its obligation to pay cure costs as required by Section 3.1 of

| | the Purchase Agreement; and, |
|---|---|
| | (vi)    entry of the Sale Order not subject to any stay, and finding that the Buyer has acted in good faith pursuant to Section 363(m). |
| | <u>See</u> Sections 8.1 through 8.9 and 9.1 through 9.5 of the Purchase Agreement. |
| **Sale to Insiders** | The Buyer is an entity that is unrelated to that of Debtors. |
| **Agreements With Management** | It is the Buyer's current intention to retain (hire) the current employees of the Selling Debtors.  Some of the existing management team may remain, but no formal agreements have been reached with management and Buyer is not assuming employment agreements. |
| **Releases** | No releases have been entered into in connection with the Sale of the Purchased Assets.  The parties have no prior relationship, so there is no basis for releases of prior acts; a closing will act as a waiver and release of any breaches of the purchase agreement.  <u>See</u> Section 11.3. |
| **Private Sale/No Competitive Bidding** | There is no provision preventing the Debtors from soliciting competing offers. The Debtors were subject to a no shop provision for approximately 2 weeks in December 2009 only pursuant to a letter of intent that is now superseded. |
| **Closing and Other Deadlines** | <u>Entry of the Bidding Procedures Order</u>:  No later than 30 days after the filing of this Motion.  <u>See</u> Section 11.1(c) of the Purchase Agreement.<br><br><u>Entry of Sale Order</u>:  The earlier of: (i) fifty |

DEL1 73730-1

| | |
|---|---|
| | (50) days after the entry of the Bid Procedures Order or (ii) April 15, 2010. <u>See</u> Section 7.10(c) of the Purchase Agreement.<br><br><u>Closing Date</u>: May 15, 2010 or earlier. <u>See</u> Section 7.10(f) of the Purchase Agreement. |
| **Good Faith Deposit** | Buyer is required to deposit One Million Dollars ($1,000,000) into an escrow account as the deposit. |
| **Interim Arrangements with Proposed Buyer** | In the event that Buyer has not obtained all Governmental Authorizations required to operate the Business by the Closing Date, Buyer and Sellers agree to enter into a Limited Power of Attorney and Interim Management Agreement so that Buyer can operate under Debtors' governmental approvals, if any. <u>See</u> Section 7.11 of the Purchase Agreement.<br><br>As part of the purchase price, the Buyer has also agreed to reimburse Debtors for payments made to essential suppliers, up to One Million Dollars ($1,000,000), subject to certain approval and verification conditions. |
| **Use of Proceeds** | Bank of America (BOA) is believed to have a lien on all or substantially all of the assets of Debtors to secure its Prior Bank Obligations (as defined in the Interim Financing Order) and, further, is providing the DIP Facility. The proceeds will go to BOA to repay the DIP Facility Obligations, and/or the Prior Bank Obligations. |
| **Tax Exemption** | No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Purchase Agreement. |
| **Record Retention** | Debtors will retain certain corporate records. Most business records will be transferred, however, and Buyer is obligated to give access to those records to Debtors, their Representatives, any Official Committee of Unsecured Creditors, any trustee or |

DEL1 73730-1

| | Representative acting on behalf of the Debtors' estates or any trusts created therefrom and representatives of federal and state Taxing authorities. <u>See</u> Section 7.7(b) of the Purchase Agreement. |
|---|---|
| **Sale of Avoidance Actions** | Avoidance Actions are specifically excluded from the sale, and are listed as an Excluded Asset. See Schedule 1.41 to the Purchase Agreement. |
| **Requested Findings as to Successor Liability** | Title to the Purchased Assets shall vest in Buyer free and clear of all Claims and Encumbrances of any type or nature including any Claims against Debtors and all Encumbrances on the Purchased Assets for, and Buyer shall not be liable for, any and all liabilities or Claims related to Debtors' pre-closing operations of any type or nature whatsoever, except for the Assumed Liabilities, to the maximum extent permitted by applicable law. Buyer shall not be liable for any claims or debts of Debtors, except the Assumed Liabilities. Buyer is not intended to be and shall not be deemed to be a successor to any Debtor. <u>See</u> Section 7.10(b) of the Purchase Agreement. |
| **Sale Free and Clear of Unexpired Leases** | Debtors do not believe the sale will be free and clear of any unexpired leases. |
| **Credit Bid** | BOA has consented to the sale, and it is not believed that BOA will credit bid at the sale. Nevertheless, BOA retains the right to credit bid at the sale. |
| **Relief from Bankruptcy Rule 6004(h)** | The Purchase Agreement contemplates that the sale be effectuated immediately, so that relief from the fourteen-day stay imposed by Rule 6004(h) is requested and necessary. |

-14-

DEL1 73730-1

The Debtors assert that the relief requested related to the sale is appropriate and proper, and have set out appropriate legal authorities supporting the sale below.

## VI.   THE BID PROCEDURES ORDER:

### NECESSITY OF AND AUTHORITY TO APPROVE THE BID PROCEDURES AND FORM OF NOTICE; THE BID PROCEDURES ARE IN THE BEST INTERESTS OF THE DEBTORS

9.      A debtor in possession may sell property of the estate outside of the ordinary course of business, subject to the approval of the court after notice and a hearing. 11 U.S.C. §363(b)(1).[8]  In accordance with Rule 6004(f)(1) of the Federal Rules of Bankruptcy Procedure, sales of property outside of the ordinary course of business may occur by private sale or by public auction.

10.     Based upon the totality of the facts and circumstances, the Debtors reasonably believe that the Sale of the Purchased Assets pursuant to the Bidding Procedures will enable the Debtors to obtain the highest and best offer for the Purchased Assets and maximize the value for the Debtors' estates.   Based upon the totality of the facts and circumstances, the Debtors reasonably believe the Bidding Procedures provide the best opportunity for the Debtors to sell the Purchased Assets.  Accordingly, it is in the best interests of the Debtors' estates to implement the Bidding Procedures.

11.     Prior to the commencement of these chapter 11 proceedings, the Debtors identified certain potential buyers and began discussions and negotiations with certain of these potential buyers.

---

[8] Section 363(b)(1) of the Bankruptcy Code provides that the "[debtor in possession] after notice and a hearing may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

12.     Substantial information concerning the Purchased Assets has been or will be provided to each interested party, along with an opportunity to conduct additional reasonable due diligence. The Debtors believe that the solicitation of bids through the Bidding Procedures will maximize the chances of receiving bids for the Purchased Assets in the short term and that the Auction will enhance the opportunity to generate competitive bidding.

13.     The Debtors further seek approval of the Sale Notice, substantially in the form attached hereto and incorporated herein as **Exhibit B**. The Debtors propose to serve the Sale Notice, within three (3) business days of entry of the Bidding Procedures Order, upon (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for Bank of America; (iii) counsel for the Committee; (iv) counsel for the Buyer; (v) all parties who have filed a notice of appearance or otherwise requested notice in these chapter 11 proceedings in accordance with local rules and procedures or orders of this Court; (vi) all persons or entities with a lien on, or security interest in, any of the Purchased Assets known to the Debtors; (vii) the counterparty to each executory contract and unexpired lease of the Selling Debtors; (viii) all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (ix) all potential buyers known by the Debtors, (x) Attorneys General in the States where the Purchased Assets are located; (xi) federal and applicable state environmental protection agencies; (xii) the Office of the United States Attorney; (xiii) any department, agency or instrumentality of the United States to which the Selling Debtors are indebted; and, (xiv) those entities listed on the Debtors' Creditor Matrix and the list of the Debtors' equity interest holders of record submitted to this Court. The Sale Notice, Bidding Procedures Motion, Sale Motion and Purchase Agreement will also be available on www.kccllc.net/sph.

-16-

14. Accordingly, for all the reasons set forth herein, the Debtors submit that this Court should approve the Bidding Procedures and the form and manner of notice of the Sale Notice.

## A. APPROVAL OF CERTAIN BID PROTECTIONS

15. The Purchase Agreement and requested Bid Procedures provide for a Break-Up Fee of Four-Hundred Thousand Dollars ($400,000) in favor of Buyer. The Break-Up Fee is inclusive of any of Buyer's expenses. The Purchase Agreement and Bid Procedures also provide that bidding will be in increments of Two-Hundred Thousand Dollars ($200,000) (the **"Bid Increment"**), and that the minimum overbid is the Purchase Price, plus the Break-Up Fee, plus the Bid Increment. No person, other than the Buyer, shall be entitled to any expense reimbursement, break up fees, "topping," termination or similar fee or payment.

16. Bidding protections are mechanisms employed by corporations to encourage potential buyers to make bids to purchase the corporation or the corporation's assets. The protections corporations typically offer include a combination of various incentives such as break up fees and overbid protections. In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2nd Cir. 1993).

17. Outside of the bankruptcy context, target corporations often employ bid protections to attract bidders. See Integrated Resources, 135 B.R. at 750; In re Hupp Indus., Inc., 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992). Similarly, numerous bankruptcy courts have approved motions by debtors requesting bid protections. See Integrated Resources, 135 B.R. at 751 (citing several instances of bankruptcy court approval of bid protections). A selling

corporation's rationale for granting bid protections is to encourage an initial bid, often referred to as a "stalking horse" offer.

18.    If a debtor accepts a higher bid from a party other than the "stalking-horse" bidder, a break-up fee customarily is paid to the "stalking-horse" bidder to compensate the "stalking-horse" bidder for costs, including lost opportunity costs, incurred as a result of its role as a "stalking-horse" bidder. In re EWI, Inc., 208 B.R. 885, 888 (Bankr. N.D. Ohio 1997) (noting that break-up fees customarily are paid to an unsuccessful "stalking-horse" bidder); In re Hupp Indus., Inc., 140 B.R. at 195 (noting that an unsuccessful "stalking-horse" should be entitled to a reasonable break-up fee).

19.    A proposed bidding incentive to be paid to a "stalking horse", such as the Break-Up Fee, should be approved when it is in the best interests of the estate. S.N.A. Nut Co., 186 B.R. at 104; see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 195. Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context) (hereinafter, "O'Brien").

20.    The Debtors submit that the proposed Bid Protections are reasonable and customary for sales of this size and properly calculated to maximize the value of the Purchased Assets. The Third Circuit Court of Appeals in O'Brien has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more

-18-

competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

21.    In O'Brien, the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

    a.   the presence of self-dealing or manipulation in negotiating the break-up fee;

    b.   whether the fee harms, rather than encourages, bidding;

    c.   the reasonableness of the break-up fee relative to the purchase price;

    d.   whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

    e.   the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

    f.   the correlation of the fee to a maximization of value of the debtor's estate;

    g.   the support of the principal secured creditors and creditors (h) committees of the break-up fee;

    h.   the benefits of the safeguards to the debtor's estate; and

    i.   the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

O'Brien, 181 F.3d at 536.

DEL1 73730-1

22.     The Bid Protections satisfy the factors articulated O'Brien and will enhance the bidding process.  Specifically, the Bid Protections allows the Debtors to set a floor for the Purchased Assets and, thus, insist that competing bids be materially higher or otherwise better than the Buyer's bid, a clear benefit to the Debtors' estates.  Potential bidders are benefited by the negotiations and due diligence already undertaken by the Buyer and will thus be more likely to bring their own competing bids and increase competition, and potentially, value to the estate, at the Auction.

23.     Further, it is appropriate and reasonable to compensate the Buyer for undertaking the efforts and expenditures to establish a "floor" bid for the Purchased Assets, as well as establishing the terms for the sale and assignment of such assets in the event a sale is made to another purchaser.  Moreover, the Debtors do not believe the Buyer would agree to act as a stalking horse bidder without the Bid Protections.  In fact, greater Bid Protections were sought by Buyer in negotiations; those agreed upon represent a compromise negotiated at arms-length.

24.     The Debtors believe that the Bid Protections will not stifle bidding.  To the contrary, the Debtors believe that in the event of an Auction, the Bid Protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  In re Integrated Res., Inc., 147 B.R. 650, 662 (S.D.N.Y. 1992).  In other words, if the Purchased Assets are sold to a competing bidder, it will – in all likelihood – be because of Buyer's crucial role as an initial bidder generating interest in the Purchased Assets.

25.     In addition, the Debtors, in their business judgment, believe that a Break-Up Fee in the amount of $400,000 as contemplated by the Purchase Agreement is fair and reasonable because of risk, effort and expenses undertaken and incurred by the Buyer in entering into the

Purchase Agreement. "A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. The Break-Up Fee of approximately 3% of the Purchase Price, is within the range of fees typically paid in other significant sales transactions that have been consummated in the past. See, e.g., In re Maxide Acquisition, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale).

26.     For these reasons, and given the benefits to the Debtors' estates conferred by the Buyer, the Debtors submit that extending the Bid Protections to the Buyer as proposed in the Purchase Agreement is an exercise of sound business judgment. Accordingly, the Debtors respectfully request that this Court approve the Bid Protections, subject to the terms and conditions described herein.

**B.     ASSUMPTION AND ASSIGNMENT; CURE AMOUNTS**

27.     Pursuant to the Sale Motion, the Debtors seek to assume and assign, pursuant to section 365 of the Bankruptcy Code, those Assumed Contracts identified by the Buyer in the Purchase Agreement or identified by such other Successful Bidder as may be selected in accordance with the Bidding Procedures in the Modified Purchase Agreement, as applicable. Within ten (10) business days after entry of the Bidding Procedures Order, the Debtors shall serve a notice (the **"Assignment Schedule Notice"**) on all counterparties to all executory contracts and leases to which the Selling Debtors are a party, which shall include (i) a schedule

-21-

(the "**Assignment Schedule**") identifying all executory contracts and leases to which the Selling Debtors are a party and specifying the cure amounts (the "**Cure Amounts**") necessary to assume and assign such executory contracts and leases, and (ii) a written notification that such executory contracts and leases may be assumed and assigned by the Debtors and that failure to file a timely objection to such Assignment Schedule Notice shall constitute deemed consent to such assumption and assignment of such party's executory contract or lease, as may be selected and identified by the Buyer or other Successful Bidder. The Debtors and the Buyer, or such other Successful Bidder, reserve the right to add or delete contracts or leases from the Assignment Schedule. The assumption and assignment of any Assumed Contract shall not be binding on the Debtors or the Buyer or other Successful Bidder until the Debtors file a notice of occurrence of the Closing, which shall be filed within two business days after completion of the Closing and shall be served on all counter-parties to the Assumed Contracts.

28.     Except as may otherwise be agreed to by the parties to an Assumed Contract, at the Closing of the Sale, the Selling Debtors and/or the Buyer or other Successful Bidder shall cure those defaults under the Assumed Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by payment of the Cure Amounts. The Bid Procedures set out proposed objection deadlines to assumption/assignment and cure, as well as providing that such objections will be heard at the Sale Hearing or such other time as may be determined.

## C.     REQUEST TO SCHEDULE AUCTION

29.     The Debtors propose that the Auction be scheduled at 10:00 a.m. (Eastern Time), on the date that is one (1) business day prior to the Sale Hearing, at the offices of Klehr, Harrison, Harvey, Branzburg LLP, 919 N. Market St., Ste. 1000, Wilmington, Delaware 19801, (which time, date and location may be modified in accordance with the Bidding Procedures).

-22-

The Debtors believe this is sufficient time for the potential purchasers to conclude due diligence, comply with other requirements of the Bidding Procedures and determine whether to participate in the Auction.

**D.      REQUEST TO SCHEDULE SALE HEARING AND OBJECTION DEADLINE**

30.      The Debtors request that this Court schedule the hearing on the Sale Motion (the "Sale Hearing") for a date which is approximately 40 days following entry of the Bid Procedures Order, in order to prevent any failure of a condition under the Purchase Agreement.

31.      The Debtors request that objections, if any, to the relief requested in the Sale Motion must:  (a) be in writing and filed with the Court; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) set forth the names of the objecting party and the nature and the amount of any claim or interest alleged by such objecting party against the Debtors' estates or property; and (d) be served upon (such as to be **received** by) the following parties **on or before 12:00 p.m. (Eastern Time) five (5) business days prior to the Sale Hearing**:  (i) Cosmolab, Inc., Attn: Michael J. Musso, 1100 Garrett Parkway, Lewisburg, Tennessee 37091; (ii) counsel for the Debtors, Frost Brown Todd LLC, Attn: Robert A. Guy, Jr., Esq., 424 Church Street, Suite 1600, Nashville, Tennessee 37219-2308; (iii) local counsel for the Debtors, Domenic E. Pacitti, Klehr Harrison Harvey Branzburg LLP, 919 N. Market St., Ste. 1000, Wilmington, Delaware 19801, (iv) counsel for Bank of America, Mayer Brown LLP , Attn: Thomas S. Kiriakos, Esq., 71 South Wacker Drive, Chicago, Illinois 60606-4637; (v) local counsel for Bank of America, Edwards Angell Palmer & Dodge LLP, Attn: Stuart M. Brown, 919 North Market Street, 15th Floor, Wilmington, Delaware 19801; (vi) counsel for the Buyer, Timothy T. Brock, Esq., Satterlee Stephens Burke & Burke, LLP, 230 Park Avenue, Suite 1130, New York, NY  10169; (v) counsel for the Committee; and, (vii) the Office of the United States

-23-

Trustee for District of Delaware, Attn: Thomas Patrick Tinker, 844 King Street, Room 2313, Wilmington, DE 19801.

## VII. THE SALE:

### NECESSITY OF AND AUTHORITY TO APPROVE SALE OF THE PURCHASED ASSETS; THE SALE IS IN THE BEST INTERESTS OF THE DEBTORS

32.     Entry of the Sale Order approving the final Sale of the Purchased Assets at the conclusion of the Sale Hearing is authorized and appropriate under the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." Section 1107(a) of the Bankruptcy Code grants a debtor-in-possession the powers of a trustee in respect to various matters including sales under section 363(b) of the Bankruptcy Code.

33.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at 3 (Bankr. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3rd Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2nd Cir. 1983).

34.     The key consideration is the Court's finding that a good business reason exists for the sale. Stephens Industries, Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); see also, Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999).

-24-

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets of the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

In re Walter, 83 B.R. 14, 19-20 (9th Cir. Bankr. 1988), citing In re Lionel Corporation, 722 F.2d 1063, 1070-71 (2nd Cir. 1983).

35.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bonier. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

36.     In light of circumstances that precipitated the commencement of these chapter 11 proceedings and in view of the constraints of the Post-Petition Lending Facility, the Debtors, in their business judgment, believe that a prompt sale of the Purchased Assets, pursuant to section 363(b) of the Bankruptcy Code, will maximize the value of the Purchased Assets for the benefit

-25-

of the Debtors' creditors and bankruptcy estates. Several sound business reasons support the Debtors' position.

37.     Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all of the substantially all of the Selling Debtors' assets as a going concern in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries and ensure that the value of the Debtors' assets is maintained for the benefit of creditors and their estates. Maximization of asset value is a sound business purpose, warranting authorization of the Sale.

38.     The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer for the Purchased Assets. The Bidding Procedures provide potential bidders an opportunity to perform due diligence and determine a reasonable price at which they would be interested in acquiring the Purchased Assets. Competing bidders will have the opportunity to bid at the Auction (if they become Qualified Bidders, as defined in the Bidding Procedures Motion), thus ensuring that the sale of the Purchased Assets will be effected through an arm's-length transaction. Accordingly, the proposed auction procedure will allow the highest and best bidder to purchase the Purchased Assets, thereby maximizing the return to the Debtors' estates.

39.     The Debtors believe that the Bidding Procedures for the Auction are commercially reasonable and are in the best interest of the Debtors, their estates and creditors and will maximize the value obtained from the sale of the Purchased Assets. The Sale of the Purchased Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Purchased Assets. An auction is sufficient to establish that one has

-26-

paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith. In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3rd Cir. 1986). Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

40.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth in the Bidding Procedures Motion. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 cases, those parties potentially interested in bidding on the Purchased Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their creditors.

41.     Finally, the timing of the Sale is critical. The Buyer's Purchase Agreement provides that the Sale must be approved, and an order entered, by (i) fifty (50) days after entry of the Bid Procedures Order, or (ii) April 15, 2010, whichever is earlier. Further, the Closing of the Sale is to occur, at the very latest, by May 1, 2010. In order to avoid the loss of the Buyer's offer and to maximize the benefit to the Debtors' creditors and bankruptcy estates, it is important that the Debtors proceed with the sale process as quickly as possible.

42.     The Debtors are also operating under limited funding, and have insufficient cash flow to continue to the Debtors' operations without the Post-Petition Lending Facility, which is premised on a successful culmination of the sale process per this general time frame. Without financing to continue operations, the only alternative to a going concern sale is to liquidate the Debtors' assets. The Debtors believe that the proposed Sale will provide a greater return to the

-27-

Debtors' estates and their creditors than the liquidation of the Debtors' assets. For each of the

foregoing reasons, the Debtors, in their business judgment, believe that a prompt sale of the

Purchased Assets, pursuant to section 363(b) of the Bankruptcy Code, is in the best interest of

the Debtors, their estates, creditors and other parties in interest.

## A.  REQUESTED PROTECTION PURSUANT TO SECTION 363(m) OF THE BANKRUPTCY CODE AS A GOOD FAITH PURCHASER

43.     The Debtors seek the protections afforded under section 363(m) of the

Bankruptcy Code, which provide in pertinent part:

> (m)  The reversal or modification on appeal of an authorization under
> section (b) or (b) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an
> entity that purchased or leased such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending appeal.

11 U.S.C. 363(m).

44.     The Debtors submit that the Sale of the Purchased Assets to such Successful

Bidder as may be selected in accordance with the Bidding Procedures, warrants a finding that the

Purchased Assets were acquired in good faith within the meaning of section 363(m) of the

Bankruptcy Code.  The Debtors' have and will continue to aggressively market the Sale of the

Purchased Assets.  Any parties who have expressed any meaningful interest in the acquiring the

business and assets of the Selling Debtors will be given notice of the Sale and have an

opportunity to bid at the Auction.  No subjectivity in evaluating bids will be at issue.  The

highest bidder will purchase the Purchased Assets.  No "special treatment" will be afforded any

purchaser.  The Third Circuit has recognized that the type of misconduct that would destroy a

purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  In re Abbotts

-28-

<u>Dairies of Pa., Inc.</u>, 788 F.2d 143, 147 (3rd Cir. 1986) (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978)).

45. Accordingly, the Sale Order will include a provision that the Successful Bidder for the Purchased Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Purchased Assets and closing of the Sale will occur promptly.

## B. THE SALE FREE AND CLEAR OF ALL LIENS IS APPROPRIATE

46. The Debtors also request that the Sale Order provide that the sale of the Purchased Assets is free and clear of any interest held by any third party in any of the assets to be sold. Specifically, it is contemplated that upon the Closing, the Buyer or to such other Successful Bidder as may be selected in accordance with the Bidding Procedures will take title to and possession of the Purchased Assets, except as otherwise provided herein, in the Purchase Agreement and the Sale Order, free and clear of all liens, claims, interests and encumbrances, provided however, that the Buyer or to such other Successful Bidder shall not be relieved of the Assumed Liabilities or any liability with respect to obligations accruing under the Assumed Contracts from and after the Closing.

47. Section 363(f) of the Bankruptcy Code authorizes the sale of property under section 363(b) of the Bankruptcy Code to be free and clear of interests in such property held by an entity if:

-29-

z

DEL1 73730-1

(a) Applicable non-bankruptcy law permits a sale of such property free and clear of such interests;

(b) Such entity consents;

(c) Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d) Such interest is in bona fide dispute; or

(e) Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11. U.S.C. § 363(f).

48.     Bank of America holds a first priority lien upon substantially all of the Debtors' assets not otherwise subject to a validly perfected unavoidable lien of a third party other than Bank of America and first priority senior priming perfected liens on all property of the Debtors on which Bank of America presently holds a first lien, including the Purchased Assets. The liens of Bank of America and any other third parties will attach to the sales proceeds with the same validity and priority as exist under state law pursuant to section 363(e) of the Bankruptcy Code and the net sale proceeds with will paid to Bank of America upon the consummation of the sale in satisfaction first of the DIP Facility Obligations and then, of the Prior Bank Obligations.

49.     The Sale of the Purchased Assets pursuant to the Bid Procedures will satisfy section 363(f) of the Bankruptcy Code because any entities holding liens, claims, interests or encumbrances against the Purchased Assets will have received notice of the Sale.   Upon information and belief, the Debtors believe that Bank of America will consent to the sale of the Purchased Assets.  All parties in interest, including Bank of America, will be given sufficient opportunity to object to the relief requested herein and any such entity that does not object to the Sale of the Purchased Assets should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits

-30-

the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (ED. Pa. 1988) (same); see also In re Enron Corp., 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no parties holding liens, claims, interests or encumbrances object to the relief requested in the Sale Order, the Sale of the Purchased Assets free and clear of all liens, claims, interests and encumbrances except any liabilities expressly assumed by the Buyer or other Successful Bidder satisfies section 363(f)(2) of the Bankruptcy Code.

50. Moreover, a sale of the Purchased Assets free and clear may proceed pursuant to section 363(f) of the Bankruptcy Code because creditors with an interest in the sale assets can be compelled to accept money satisfaction of their claims pursuant to section 363(f)(5) of the Bankruptcy Code. See Scherer v. Fed. Nat'l Mortgage Assoc. (In re Terrace Chalet Apartments, Ltd.), 159 B.R. 821, 829 (N.D. Ill. 1993) (holding that pursuant to section 363(f)(5) of the Bankruptcy Code courts may authorize sales free and clear of a secured creditor's lien if such creditor's interest could be crammed down pursuant to section 1129(b)(2) of the Bankruptcy Code); In re Healthco Int'l, Inc., 174 B.R. 174, 176 (Bankr. D. Mass. 1994) (same); In re WPRV-TV, Inc., 143 B..R. 315, 321 (D. P.R. 1991), vacated on other grounds, 165 B.R. 1

(1995), rev'd on other grounds, 983 F.2s 336 (1st Cir. 1993) (same). These courts have also held that, for purposes of section 363(f)(5), a "cram down" proceeding under section 1129(b) of the Bankruptcy Code is a "typical legal proceeding which compels a creditor to receive less than full money satisfaction" because a secured creditor may be compelled to accept payments equal only to the value of the collateral rather than the creditor's entire claim. Healthco, 174 B.R. at 176; WPRV-TV, 143 B.R. at 315. Therefore, the Court may authorize the Sale pursuant to section 363(f)(5) of the Bankruptcy Code.

51.     The Debtors also believe that other provisions of section 363(f) of the Bankruptcy Code may be applicable to and would permit the sale of the Purchased Assets. Thus, the sale of the Purchased Assets is appropriately free and clear of all liens, claims, interests or encumbrances pursuant to section 363(f) of the Bankruptcy Code.

## C. ASSUMPTION AND ASSIGNMENT, CURE AMOUNTS AND ADEQUATE ASSURANCE

52.     Section 365(a) of the Bankruptcy Code provides as follows:

> Except as provided in section 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

53.     Section 365 of the Bankruptcy Code authorizes the assumption or rejection of any executory contract or unexpired lease of a debtor except for open contracts of commodity brokers that are covered by Bankruptcy Code sections 765 and 766.

54.     The Bankruptcy Code provides little guidance as to the standards to be applied by the Court in approving an assumption or rejection. Drawing on pre-Code law, the predominant

-32-

test is described as the "business judgment" rule or business judgment test. In re Kong, 162 B.R. 86, 94 (Bankr. E.D.N.Y. 1993); In re Minges, 602 F.2d 38 (2nd Cir. 1979); In re Child World, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); In re Stable Mews Assocs., 41 B.R. 594 (Bankr. S.D.N.Y. 1984). The business judgment test is the same test applied to judicial review of corporate decisions outside bankruptcy. Johnson v. Fairco Corp., 61 B.R. 317 (N.D. Ill. 1986). This test analyzes the impact that continued performance under the executory contract or unexpired lease will have on the estate. Assumption or rejection of the contract or lease will be approved upon a mere showing that the action will benefit the estate. In re Chestnut Ridge Plaza Assocs., L.P., 156 B.R. 477 (Bankr. W.D. Pa. 1993) (test is best interest of the estate); Bezanson v. Metropolitan Ins. & Annuity Co., 952 F.2d 1 (1st Cir. 1991).

55.     In addition to the business judgment test, section 365(b)(1) of the Bankruptcy Code further provides that the debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor: (a) cures defaults; (b) compensates the non-debtor party to the lease or contract for any actual pecuniary loss resulting from defaults; and (c) provides adequate assurance of future performance. See 11 U.S.C § 365(b)(1).

56.     In the present case, the Debtors seek not only to assume the Assumed Contracts, but also to assign the identified Assumed Contracts to the Buyer or such other Successful Bidder as may be selected in accordance with the Bidding Procedures. Section 365(f) of the Bankruptcy Code addresses assumption and assignment of executory contracts and unexpired leases and provides, in pertinent part:

> (1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection
> . . . .

-33-

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

        (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

        (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(1)-(2).

57.      Section 365(f) of the Bankruptcy Code provides that the assignment of a properly assumed contract or lease is to be permitted by the Court only if the debtor has assumed the contract or lease in compliance with all of the terms of section 365 of the Bankruptcy Code and if the debtor provides the other party to the contract or lease with adequate assurance of future performance by the assignee of the contract or lease. 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical a pragmatic construction" in "light of the proposed assumption." In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola v. Scharffenberger, 248 F.3d 110, 120, n.10 (3d Cir. 2001). See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); In re Nalco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

58.      As part of this Motion, the Debtors seek authority to assume and assign the identified Assumed Contracts to the Buyer or such other Successful Bidder as may be selected in

accordance with the Bidding Procedures. With respect to any other contracts and leases of the Debtors, the Debtors will file a motion to assume or reject such contacts and leases at the appropriate point in these Chapter 11 cases. The assumption and assignment of the Assumed Contracts shall not be binding on the Debtors or the Buyer or other Successful Bidder until the Debtors file a notice of occurrence of the Closing, which shall be filed within two business days after completion of the Closing and shall be served on all counter-parties to the Assumed Contracts.

59.     Any assumption and assignment of the Assumed Contracts will be subject to any applicable provisions of the Bankruptcy Code. The proposed terms and conditions set forth herein and in the Bidding Procedures Motion are designed to ensure that the assignees, if any, are financially able and prepared to undertake all of the obligations of the Assumed Contracts. In addition, the availability of the Sale Hearing gives the Court and other parties in interest an appropriate opportunity to evaluate any assignment issues.

60.     The Debtors assert that under the circumstances, the Assumed Contracts can be properly assumed in compliance with section 365 of the Bankruptcy Code. First, the assumption of the Assumed Contracts by the Debtors complies with the requirements of section 365 because assumption clearly satisfies the "business judgment test". The Debtors' satisfaction of the business judgment test is demonstrated by the benefit to the Debtors' estates which will accrue as a result of the Debtors' ability to close the Sale on the terms to be set forth in the Purchase Agreement and from the savings realized as a result of: (a) the Buyer's assumption of the Debtors' obligations under the Assumed Contracts; and (b) the avoidance of a potential rejection damages claims and possible administrative expense claims.

-35-

61.     Second, defaults under the Assumed Contracts will be cured by payment of the Cure Amounts at the time of assumption.

62.     Third, it is contemplated that the Buyer or such other Successful Bidder as may be selected in accordance with the Bidding Procedures will be capable of satisfying the adequate assurance conditions of sections 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.  Adequate assurance of future performance is to be determined on a case by case basis to insure that the other party to the contact or lease gets the benefit of the bargain for which he has contracted.  Chera v. 991 Blvd. Realty Corp. (In re National Shoes, Inc.), 20 B.R. 55,59 (Bankr. S.D.N.Y. 1982); See In re Bygaph, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("Congress intended that the words 'adequate assurance' be given a practical, pragmatic construction, and is to be determined under the facts of each particular case").  A landlord or a party to a contract, however, is not entitled to greater rights than are given by the lease or contract.  In re Lafayette Radio Electronics Corp., 9 B.R. 993 (Bankr. E.D.N.Y. 1981).  The Debtors submit, and will demonstrate at the Sale Hearing, that there are adequate business justifications for the assumption and assignment of the Assumed Contracts and that all requirements to assumption and assignment, including adequate assurance of future performance by any Successful Bidder(s), have been met.

D.     **RELATED RELIEF: REQUEST TO CHANGE NAME OF DEBTORS COSMOLAB, INC. AND COSMOLAB NEW YORK, INC.**

63.     Debtors Cosmolab, Inc. and Cosmolab New York, Inc. are corporations organized under the laws of the state of Delaware.  Pursuant to the Purchase Agreement, the Selling Debtors must, within three (3) business days after the termination of the Interim Management Agreement or earlier following Closing upon Buyer's request, file an amendment to their

-36-

organizational or constituting documents changing its name to a name that shall not include the word "Cosmolab" or any confusingly similar word. See Section 7.6 of the Purchase Agreement.

64.     Accordingly, in compliance with the terms of the Purchase Agreement and in furtherance of the Sale, the Debtors hereby requests authority to change the names of "Cosmolab, Inc." and "Cosmolab New York, Inc." respectively and to execute and file any documents and take any actions as may be necessary and appropriate to implement the change of the Debtors' names. Proposed new names for these entities will be provided at the Sale Hearing.

65.     Section 105(a) of the Bankruptcy Code states, in pertinent part, that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

66.     The Debtors submit that the proposed name change will have no substantive effect on the Debtors' estates in these chapter 11 cases and the Debtors do not believe that any parties in interest will be prejudiced, confused or mislead by the proposed name change since these cases are filed under the lead caption of Specialty Packaging Holdings, Inc., and as all future pleadings and notices from the Debtors will refer to the Debtors' former name (e.g., "_____" f/k/a "Cosmolab, Inc." and "_____ f/k/a Cosmolab New York, Inc."). Accordingly, the Debtors request entry of an order, pursuant to this Court's equitable authority under section 105(a) of the Bankruptcy Code, authorizing "Cosmolab, Inc." and "Cosmolab New York, Inc." to change their names as indicated.

**E.     REQUEST TO WAIVE THE FOURTEEN DAY STAY PERIODS REQUIRED BY RULES 6004(H) AND 6006(D) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

67.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

-37-

automatically stayed for 14 days after entry of the order, see FED. R. BANKR. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the court orders otherwise.

68.     To preserve the value of the Purchased Assets and limit the costs of administering and preserving such assets, and, indeed for the parties to comply with the express terms of the Purchase Agreement, it is critical that the Debtors close the Sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d). The Debtors submit that the relief requested is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

## VIII.   NOTICE OF MOTION; OPPORTUNITY TO OBJECT

69.     No trustee or examiner has been appointed in these cases. Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' 40 largest unsecured creditors on a consolidated basis; (iii) counsel for Bank of America; and, (iv) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors. Because of the exigencies of the circumstances and the irreparable harm to the Debtors that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

70.     Objections, if any, to the proposed relief requested related to approval of the Bid Procedures and entry of the Bid Procedures Order must: (a) be in writing and filed with this Court; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) set forth the names of the objecting party and the nature and the amount of any claim

-38-

or interest alleged by such objecting party against the Debtors' estates or property; and (d) be served upon (such as to be **received** by) the following parties **within ten (10) days of service of this Motion**: (i) Cosmolab, Inc., Attn: Michael J. Musso, 1100 Garrett Parkway, Lewisburg, Tennessee 37091; (ii) counsel for the Debtors, Frost Brown Todd LLC, Attn: Robert A. Guy, Jr., Esq., 424 Church Street, Suite 1600, Nashville, Tennessee 37219-2308; (iii) local counsel for the Debtors, Domenic E. Pacitti, Klehr Harrison Harvey Branzburg LLP, 919 N. Market St., Ste. 1000, Wilmington, Delaware 19801, (iv) counsel for Bank of America, Mayer Brown LLP , Attn: Thomas S. Kiriakos, Esq., 71 South Wacker Drive, Chicago, Illinois 60606-4637; (v) local counsel for Bank of America, Edwards Angell Palmer & Dodge LLP, Attn: Stuart M. Brown, 919 North Market Street, 15th Floor, Wilmington, Delaware 19801; (vi) counsel for the Buyer, Timothy T. Brock, Esq., Satterlee Stephens Burke & Burke, LLP, 230 Park Avenue, Suite 1130, New York, NY 10169; (v) counsel for the Committee; and, (vii) the Office of the United States Trustee for District of Delaware, Attn: Thomas Patrick Tinker, 844 King Street, Room 2313, Wilmington, DE 19801.

71.     Objections, if any, to the proposed relief related to entry of the Sale Approval Order, assignment or assumption of any executory contracts or unexpired leases, or cure amounts, shall be handled as set out in the Bid Procedures Order and the Sale Notice.

## IX.     NO PRIOR RELIEF REQUESTED

72.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

## X.     CONCLUSION

73.     The Debtors submit that the approval of the Bidding Procedures, as proposed herein, will allow the Debtors to sell the Purchased Assets and assume and assign the Assumed

Contracts for the maximum benefit of the Debtors' estates and creditors. The Debtors believe that the procedures for authorizing the Sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts described herein are in the best interests of their creditors and other interested parties and will facilitate and expedite the sale process for the benefit of all creditors in these cases.

WHEREFORE, the Debtors respectfully request that this Court immediately enter an order (i) approving the Bidding Procedures set forth herein; (ii) approving the Bid Protections; (iii) scheduling the Auction as requested; (iv) scheduling the Sale Hearing; (v) approving the form and matter of notice of the Sale. Further, Debtors respectfully request that, at the conclusion of Sale Hearing, this Court enter the Sale Approval Order in substantially the form attached hereto as **Exhibit D**, granting the Debtors authority to sell the Purchased Assets to the Buyer or such other Successful Bidder as may be selected in accordance with the Bidding Procedures. Debtors request such other and further relief as this Court deems just and appropriate under the circumstances.

DEL1 73730-1

Dated:     January 20, 2010                    Respectfully submitted,

By:   /s/ Domenic E. Pacitti
      Domenic E. Pacitti (Bar No. 3989)
      Michael Yurkewicz (Bar No. 4165)
      KLEHR HARRISON HARVEY BRANZBURG LLP
      919 North Market Street, Suite 1000
      Wilmington, Delaware 19801-3062
      Telephone: 302.426.1189
      Facsimile: 302.426.9193
      E-mail: dpacitti@klehr.com
      E-mail: myurkewicz@klehr.com

              - and -

      Robert A. Guy, Jr.*
      J. Matthew Kroplin*
      FROST BROWN TODD LLC
      424 Church Street, Suite 1600
      Nashville, Tennessee 37219
      Telephone: 615.251.5550
      Facsimile: 615.251.5551
      E-mail: bguy@fbtlaw.com
      E-mail: mkroplin@fbtlaw.com

              - and -

      Ronald E. Gold*
      Beth A. Buchanan*
      Lindsey F. Baker*
      FROST BROWN TODD LLC
      2200 PNC Center
      201 East Fifth Street
      Cincinnati, Ohio 45202
      Telephone: 513.651.6800
      Facsimile: 513.651.6981
      E-mail: rgold@fbtlaw.com
      E-mail: bbuchanan@fbtlaw.com
      E-mail: lbaker@fbtlaw.com
      *Pro Hac Vice Motion Pending

      **PROPOSED CO-COUNSEL FOR
      DEBTORS AND DEBTORS-IN-
      POSSESSION**