# EXHIBIT A

# AGREEMENT FOR THE SALE AND PURCHASE OF ASSETS

Among

## ALL4 COSMETICS, INC.
## AS BUYER

and

## COSMOLAB, INC.,
## COSMETICS SPECIALTIES, INC.
### and
## COSMOLAB NEW YORK, INC.
## AS SELLERS

Dated January 15, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................................1

ARTICLE II PURCHASE AND SALE OF PURCHASED ASSETS ......................................9
- 2.1     Purchase of Assets. ....................................................................................9
- 2.2     Consideration.............................................................................................10
- 2.3     Expenses and Taxes of Transfer. .............................................................10
- 2.4     Deposit......................................................................................................10
- 2.5     Allocation of Purchase Price. ...................................................................10

ARTICLE III ASSUMED LIABILITIES .............................................................................11
- 3.1     Assumed Contracts. ..................................................................................11
- 3.2     Excluded Liabilities..................................................................................11

ARTICLE IV THE CLOSING...............................................................................................11
- 4.1     Time and Place. ........................................................................................11
- 4.2     Deliveries at Closing by Buyer.................................................................12
- 4.3     Deliveries at Closing by Sellers................................................................12

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLERS .............14
- 5.1     Representations And Warranties As To The Sellers. ................................14
  - 5.1.1    Organization And Good Standing.................................................14
  - 5.1.2    Authority; No Conflict..................................................................14
  - 5.1.3    Powers............................................................................................15
  - 5.1.4    Binding Agreement........................................................................15
  - 5.1.5    Taxes..............................................................................................15
  - 5.1.6    Employee Benefits..........................................................................16
  - 5.1.7    Compliance With Legal Requirements. ........................................18
  - 5.1.8    No Collective Bargaining Agreements, etc...................................18
  - 5.1.9    Environmental Matters. .................................................................19
  - 5.1.10   Product Warranty; Products Liability, ..........................................19
  - 5.1.11   Title to and Sufficiency of Assets and Equipment, etc. ...............20
  - 5.1.12   Certain Claims. ..............................................................................20

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ...........................20
  - 6.1.1    Organization And Good Standing.................................................20
  - 6.1.2    Authority; No Conflict; Competing Business................................20
  - 6.1.3    Certain Claims. ..............................................................................21

ARTICLE VII ADDITIONAL COVENANTS AND AGREEMENTS................................21
- 7.1     Conduct of the Business. ..........................................................................21
- 7.2     Investigation by Buyer. ............................................................................22
- 7.3     Consents....................................................................................................23
- 7.4     Fulfillment of Conditions. ........................................................................23

i

| | | |
|---|---|---|
| 7.5 | Announcements. | 23 |
| 7.6 | Change of Cosmolab, Inc. Name. | 23 |
| 7.7 | Further Assurances; Access to Records. | 23 |
| 7.8 | Additional Financial Information. | 24 |
| 7.9 | Prorations. | 24 |
| 7.10 | Bankruptcy Filing; Bankruptcy Court Approval; Break-Up Fee and Bidding Procedures. | 24 |
| 7.11 | Limited Power of Attorney and Interim Management Agreement. | 27 |
| 7.12 | Collection of Accounts. | 28 |
| 7.13 | Certain Actions. | 28 |

**ARTICLE VIII CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE** .... 28

| | | |
|---|---|---|
| 8.1 | Accuracy of Representations. | 28 |
| 8.2 | Sellers' Performance. | 29 |
| 8.3 | Consents; Authorizations. | 29 |
| 8.4 | No Claims. | 29 |
| 8.5 | No Prohibition. | 29 |
| 8.6 | Bankruptcy Case. | 29 |
| 8.7 | Contracts. | 29 |
| 8.8 | Seller Deliverables. | 30 |
| 8.9 | Certain Actions. | 30 |

**ARTICLE IX CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE** 30

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations. | 30 |
| 9.2 | Buyer's Performance. | 30 |
| 9.3 | Consents. | 30 |
| 9.4 | No Injunction. | 30 |
| 9.5 | Sale Approval Order. | 31 |

**ARTICLE X SURVIVAL OF REPRESENTATIONS AND COVENANTS** .................. 31

| | | |
|---|---|---|
| 10.1 | Nonsurvival of Representations and Warranties. | 31 |
| 10.2 | Survival of Covenants Requiring Post-Closing Activity. | 31 |

**ARTICLE XI TERMINATION** ......................................................................... 31

| | | |
|---|---|---|
| 11.1 | Termination. | 31 |
| 11.2 | Effect of Termination and Abandonment. | 32 |
| 11.3 | Damages. | 33 |

**ARTICLE XII GENERAL PROVISIONS** .......................................................... 33

| | | |
|---|---|---|
| 12.1 | Expenses. | 33 |
| 12.2 | Notices. | 33 |
| 12.3 | Further Assurances. | 34 |
| 12.4 | Waiver. | 35 |
| 12.5 | Entire Agreement And Modification. | 35 |

ii

| | | |
|---|---|---|
| **12.6** | Schedules. | 35 |
| **12.7** | Assignments, Successors, And Third-party Rights. | 35 |
| **12.8** | Severability. | 36 |
| **12.9** | Section Headings; Construction. | 36 |
| **12.10** | Governing Law. | 36 |
| **12.11** | Jurisdiction; Court Proceedings; Waiver of Jury Trial. | 36 |
| **12.12** | No Presumption Against Drafting party. | 36 |
| **12.13** | Counterparts. | 37 |
| **12.14** | Confidentiality. | 37 |

**THIS ASSET PURCHASE AGREEMENT** (together with all Schedules, Exhibits, amendments and supplements thereto, the "Agreement") is made as of January 15, 2010 by and between All4 Cosmetics, Inc., a Tennessee corporation ("Buyer"), Cosmolab, Inc., a Delaware corporation ("Cosmolab"), Cosmetics Specialties, Inc., a California corporation ("CSI") and Cosmolab New York, Inc., a Delaware corporation ("CNY").

## RECITALS:

**WHEREAS**, Sellers own certain assets used by Sellers in the business of manufacturing and selling cosmetic products (the "Business"); and

**WHEREAS**, the Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers the assets of Sellers that are used by Sellers in connection with the Business, and Sellers are willing to sell the same to Buyer, upon the terms and conditions hereinafter set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and of the respective representations and warranties hereinafter set forth, the covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Article I:

1.1     "Accounts" -- shall mean the Sellers' trade accounts receivable from the Business as of the Closing Date.

1.2     "Accounts Shortfall" -- means the amount, if any, by which the sum of all Eligible Accounts as of the Closing Date is less than Three Million Dollars ($3,000,000).

1.3     "Accounts Threshold" – means the lesser of (x) the sum of all Eligible Accounts as of the Closing Date and (y) Three Million Dollars ($3,000,000).

1.4     "Affiliate" – of any Person means any Person that controls, is controlled by, or is under common control with such Person. As used herein, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or other interests, by contract or otherwise.

1.5     "Agreement" – as defined in the introductory paragraph above.

1.6     "Ancillary Agreements" -- shall mean all the agreements and other documents required to be executed and delivered by the Sellers under this Agreement.

1.7 "Assignment and Assumption Agreement" – as defined in Section 4.3(b) below.

1.8 "Assumed Contracts" -- shall mean those Contracts and Leases listed on Schedule 3.1 as the same may be amended from time to time before the Sale Approval Date with the consent of Buyer that are assigned to and assumed by Buyer at the Closing under Section 3.1.

1.9 "Assumed Liabilities" – as defined in Section 3.1 below.

1.10 "Bankruptcy Case" – as defined in Section 7.10(a) below.

1.11 "Bankruptcy Code" – as defined in Section 7.10(a) below.

1.12 "Bankruptcy Court" – as defined in Section 7.10(a) below.

1.13 "Bid Deadline" – as defined in Section 7.10(d) below.

1.14 "Bidding Order" – as defined in Section 7.10(d) below.

1.15 "Break-Up Fee" – as defined in Section 7.10(d) below.

1.16 "Business" – as defined in the first recital.

1.17 "Business Day" -- any day (other than a Saturday, Sunday or public holiday in the Borough of Manhattan, City of New York) on which banking institutions in New York City are not required or permitted by law to close.

1.18 "Buyer" -- as defined in the introductory paragraph above.

1.19 "CNY" -- as defined in the introductory paragraph above.

1.20 "Claim" --any claim (including any "claim" as defined by section 101(5) of the Bankruptcy Code), interest (as set forth in section 363 of the Bankruptcy Code), demand, action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal), or other proceeding.

1.21 "Closing" – as defined in Section 4.1 below.

1.22 "Closing Date" – as defined in Section 4.1 below.

1.23 "Consent"—any consent, approval, authorization (including any Governmental Authorization) from, or notification to, any Person.

1.24 "Contemplated Transactions" -- all of the transactions contemplated by this Agreement and the Ancillary Agreements, including, without limitation, the performance by the parties hereto of their respective covenants, agreements and obligations hereunder and thereunder.

1.25 "Contracts" -- all agreements, contracts, undertakings, and obligations of Sellers (written or oral) relating to the Business.

2

1.26    "Cosmolab" -- as defined in the introductory paragraph above.

1.27    "CSI" -- as defined in the introductory paragraph above.

1.28    "Cure Cost" means the amount necessary to cure any default under any Contract pursuant to Section 365 of the Bankruptcy Code and to allow such Contract to be assumed by the applicable Seller and assigned to Buyer in accordance with the provisions of Sections 365 and 1123 of the Bankruptcy Code.

1.29    "Deposit" – shall equal and not exceed the sum of One Million Dollars ($1,000,000).

1.30    "Eligible Accounts" – shall mean all Accounts other than any Account:

(a)    which (i) is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date, or (ii) has been written off the books of a Seller or otherwise designated as uncollectible;

(b)    which (i) does not arise from the sale of goods or performance of services in the Ordinary Course of Business, (ii) is not evidenced by an invoice or other documentation which has been sent to the Account debtor, (iii) represents a progress billing, (iv) is contingent upon a Seller's completion of any further performance, or (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis;

(c)    for which the goods giving rise to such Account have not been shipped to the Account debtor or for which the services giving rise to such Account have not been performed or if such Account was invoiced more than once;

(d)    with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(e)    which is owed by an Account debtor which has become insolvent or ceased operation of its business; or

(f)    which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute.

1.31    "Employee Benefit Plan" -- shall mean any "employee benefit plan" as such term is defined in Section 3(3) of ERISA and any other employee benefit plan, program or arrangement of any kind.

1.32    "Encumbrance"--any charge, Claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

3



1.33    "Environment" -- soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwater, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

1.34    "Environmental Laws" -- means all Legal Requirements, common law, guidelines, Governmental Authorizations, agreements, licenses, by-laws and restrictions by any Governmental Body relating to pollution or protection of human health or the Environment, including all Occupational Health and Safety Laws and Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, transport or handling of Hazardous Materials or the clean-up thereof.

1.35    "Equipment" -- shall mean all of Sellers' equipment, machinery, furniture, fixtures, motor vehicles or rolling stock and other tangible personal property (other than Inventory) owned by the Sellers, and all spare parts for the above described machinery and equipment, including, for this purpose, spare parts for leased machinery and equipment, including all such items listed on Schedule 1.35.

1.36    "ERISA" -- the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

1.37    "ERISA Affiliate" -- any corporation or other trade or business treated as a single employer with a Seller under Section 414 of the IRC or Section 4001(a)(14) or 4001(b) of ERISA.

1.38    "Escrow Agent" – Wells Fargo Bank, National Association, a national banking association, or its successors under the Escrow Agreement or such other escrow agent as may be mutually agreed by Buyer and Sellers.

1.39    "Escrow Agreement" – the Escrow Agreement between Buyer, Sellers and the Escrow Agent of even date herewith.

1.40    "Escrow Fund" – as defined in the Escrow Agreement.

1.41    "Excluded Assets" -- shall mean all properties and assets owned by Sellers identified on Schedule 1.41.

1.42    "Excluded Liabilities" – as defined in Section 3.2 below.

1.43    "Facilities" -- any real property, or other interests owned by any Seller and any buildings, plants, and structures owned by any Seller as described in Schedule 1.43.

1.44    "Filing Date" -- as defined in Section 7.10(b) below.

1.45    "Final Order" – as defined in Section 7.10(f) below.

1.46    "Foreign Plans" – as defined in Section 5.1.6(a) below.

1.47 "GAAP"-- generally accepted United States accounting principles consistently applied.

1.48 "Governmental Authorization" -- any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

1.49 "Governmental Body" -- any nation, state, county, city, town, village, district, or other jurisdiction of any nature; federal, state, local, municipal, foreign, or other government; governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); multi-national organization or body; or body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

1.50 "Hazardous Materials"-- means (i) all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. 300.5, or defined as such by, or regulated as such under, any Environmental Law or (ii) wastes, pollutants, contaminants and substances listed, classified or regulated as such and that form the basis for a Claim under any Environmental Law.

1.51 "Intangible Assets" -- shall mean (a) all Governmental Authorizations utilized by Sellers in connection with the Business, (b) all Intellectual Property of Sellers, and (c) all other intangible assets of Sellers used in the Business that are not included in the Excluded Assets.

1.52 "Intellectual Property" -- means all domestic and foreign intellectual property and proprietary rights, including all (i) inventions (whether or not patentable and whether or not reduced to practice), and all improvements thereto, (ii) all patents, patent applications, and patent disclosures, together with all provisionals, reissues, continuations, continuations-in-part, divisions, revisions, extensions, and reexaminations thereof ("Patents"); (iii) trademarks, service marks, trade names, domain names, trade dress, logos, corporate names, brand names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith ("Trademarks"); (iv) works of authorship (whether or not published), and all copyrights, designs and mask works, and all registrations, applications and renewals in connection therewith ("Copyrights"); (v) Software; (vi) domain names and URL sites and website content ("Net Names"); (vii) trade secrets and rights in confidential and proprietary business information (including ideas, know-how, formulas, compositions, processes and techniques, research and development information, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, pricing and cost information, business and marketing plans and proposals and customer and supplier lists and information, including all databases and related information and profiles) ("Trade Secrets"); (viii) all good will and Claims arising out of or related to infringement or misappropriation of any of the foregoing; and (ix) other proprietary or intellectual property rights now known or hereafter recognized in any jurisdiction.

1.53 "Interim Management Agreement" -- as defined in Section 7.11 below.

5

1.54 "Inventory" -- shall mean all of Sellers' finished goods products, raw materials, work-in-process, pallets and supplies on hand, in transit or on order as of the Closing Date.

1.55 "IRC" -- the Internal Revenue Code of 1986, as amended to the date hereof and regulations issued by the IRS pursuant to the IRC.

1.56 "IRS" -- the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

1.57 "Knowledge" – means (with respect to any Person other than an individual) the actual awareness of a particular fact or circumstance by any individual who is serving as a director or officer. An individual shall be deemed to have "Knowledge" of a particular fact or circumstance if such individual is actually aware of such fact or circumstance or has possession of documents (including emails) describing such fact or circumstance (regardless of whether such individual has read such documents) or such fact or circumstance has been verbally communicated to such individual.

1.58 "Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by Sellers.

1.59 "Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which any Seller holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Sellers.

1.60 "Legal Requirement" -- any federal, state, provincial, territorial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, rule, statute, or treaty.

1.61 "Limited Power of Attorney" – as defined in Section 7.11 below.

1.62 "Material Adverse Effect" -- shall mean (a) a material adverse effect on (i) the ability of the Sellers to consummate the Contemplated Transactions or to perform their obligations under this Agreement or any Ancillary Agreement, (ii) the Purchased Assets in the hands of Buyer, or (iii) the operation of the Business by Buyer as operated by Sellers prior to the Closing, or (b) the imposition of a material liability or obligation on Buyer as a result of its purchase of the Purchased Assets.

1.63 "Minimum Upset Bid" – as defined in Section 7.10(d) below.

1.64 "Miscellaneous Assets" -- shall mean all of Sellers' Technology, promotion and advertising materials and literature, business records and books of account relating to the Business, personnel records, records relating to the research and development of products sold or being developed for sale..

1.65 "Pre-petition" -- shall mean the period before the day of filing a voluntary petition for relief under the Bankruptcy Code

1.66 "Post-petition" -- shall mean the period on and after the day of filing a voluntary petition for relief under the Bankruptcy Code.

1.67 "Occupational Safety and Health Laws" -- any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

1.68 "Order" -- any assessment, decree, citation, award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any Governmental Body or by any arbitrator.

1.69 "Ordinary Course of Business" -- an action taken by any Seller will be deemed to have been taken in the "Ordinary Course of Business" only if (a) such action is consistent with the past practices of such Seller and is taken in the ordinary course of its normal day-to-day operations; and (b) such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors or stockholders, in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Seller; *provided*, however, that no action shall be considered outside the Ordinary Course of Business if such action is (i) required by the Bankruptcy Code, (ii) ordered by the Bankruptcy Court or (iii) customary in a case under Chapter 11 of the Bankruptcy Code.

1.70 "Person" -- any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

1.71 "Proceeding" -- Any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

1.72 "Purchase Price" -- as defined in Section 2.2 below.

1.73 "Purchased Assets" -- shall mean all assets of Sellers owned on the Closing Date other than the Excluded Assets, including, without limitation:

      (g)    the Facilities;

      (h)    the Assumed Contracts;

      (i)    the Equipment;

      (j)    the Intangible Assets;

7

(k)     the Inventory;

(l)     the Miscellaneous Assets;

(m)     all Accounts (subject to Section 7.12 below);

(n)     all goodwill associated with Sellers, the Business and the Purchased Assets; and

(o)     all other property, other than the Excluded Assets, of every kind, character or description owned by Sellers and used in connection with the Business, whether or not reflected on the Sellers' financial statements, wherever located and whether or not similar to the items specifically set forth above.

1.74    "Recall" - - as defined in Section 5.1.10 below.

1.75    "Qualifying Bid" – a bid that meets the requirements of Section 7.10(d) below

1.76    "Release" -- means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the Environment or into or out of any property, including the movement of Hazardous Materials through or in the Environment.

1.77    "Representative" -- with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

1.78    "Sale" – as defined in Section 7.10(b) below.

1.79    "Sale Approval Deadline" – as defined in Section 7.10(c) below.

1.80    "Sale Approval Order" -- as defined in Section 7.10(b) below.

1.81    "Sale Motion" – as defined in Section 7.10(b) below.

1.82    "Secured Lenders" -- means Bank of America, N.A., as agent, and any lender party to the Second Amended and Restated Credit Agreement dated as of December 1, 2008 (as amended, supplemented or otherwise modified from time to time) with The Specialty Packaging Group, Inc., in respect of which the Sellers are guarantors, all holders of hedging obligations or cash management obligations secured by the collateral securing such credit agreement, and/or any lender providing a debtor-in-possession lending facility pursuant to the 11 U.S.C. Section 364.

1.83    "Seller" -- means each of Cosmolab, CSI or CNY individually and "Sellers" means Cosmolab, CSI and CNY collectively.

1.84    "Seller Cure Cost Limit" – defined in Section 3.1(d) below.

1.85    "Software" -- means (i) software, firmware, middleware, and computer programs, including software implementations of algorithms, models and methodologies, whether in source

code, object code, executable or binary code, (ii) databases and compilations, including data and collections of data, whether machine readable or otherwise, and (iii) documentation, such as user manuals and training materials relating to any of the foregoing.

1.86 "Successor Taxes" – as defined in Section 7.1(i) below.

1.87 "Tax" or "Taxes" -- means all (i) United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature, including all income, gross receipts, employment, franchise, profits, capital gains, capital stock, Transfer Tax, sales, use, occupation, property, excise, severance, windfall profits, stamp, stamp duty reserve, license, payroll, withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest; (ii) any liability for the payment of any amount of a type described in clause (i) arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax Return related thereto; and (iii) any liability for the payment of any amount of a type described in clause (i) or clause (ii) as a result of any obligation to indemnify or otherwise assume or succeed to the liability of any other Person.

1.88 "Tax Return" -- means any return, declaration, report, estimate, statement, form, information return or other document filed with or supplied to or required to be provided to a Governmental Body with respect to Taxes, including any schedule or attachment thereto and any amendment thereof.

1.89 "Technology" -- means tangible embodiments of Intellectual Property, whether in electronic, magnetic, optical, written or other media, including Software, technical documentation, specifications, designs, bills of material, build instructions, test reports, schematics, databases, lab notebooks, processes, prototypes, samples, studies, or other know-how and other works of authorship.

1.90 "Termination Date" – as defined in Section 7.10(f) below.

1.91 "Transfer Tax" -- means all transfer, real property transfer, stock transfer, documentary, sales, use, stamp, registration and other similar Taxes (including penalties and interest).

1.92 "Treasury Regulations" -- means the income tax regulations, including temporary regulations, promulgated under the IRC, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE II
## PURCHASE AND SALE OF PURCHASED ASSETS

2.1 **Purchase of Assets.** Subject to the terms and conditions herein set forth, on the Closing Date, Buyer will purchase and acquire, and Sellers will sell, assign, convey and transfer

to Buyer, the Purchased Assets. To the extent that any Assumed Contract hereunder is not assignable without the Consent of another Person that has not been obtained, this Agreement shall not constitute an assignment or an attempted assignment thereof to Buyer or an assumption of Sellers' obligations thereunder by Buyer if such assignment or attempted assignment and assumption would constitute a breach thereof. If any such Consent cannot be obtained, Sellers will cooperate with Buyer in any commercially reasonable effort designed to secure for Buyer the benefits heretofore available to Sellers under the relevant Assumed Contract.

2.2 **Consideration.** The consideration for the purchase of the Purchased Assets and the Business as provided herein and Sellers' other obligations under this Agreement is Thirteen Million Dollars ($13,000,000) in cash <u>minus</u> any Accounts Shortfall <u>plus</u> Buyer's obligations under Article III below <u>plus</u> Buyer's obligation under 4.2(c) below (collectively, the "<u>Purchase Price</u>").

2.3 **Expenses and Taxes of Transfer.** All Taxes and recording fees arising out of or relating to the Purchased Assets shall be borne and paid for by the party who pursuant to applicable Legal Requirements bears (or who is deemed to bear) the cost, fee or Tax. Nothing contained in this Agreement shall be construed to obligate or require the Buyer to pay, or be liable for, any business, occupation, real or personal property, use, withholding, income or similar Taxes or any Tax of any kind related to any period prior to the Closing Date.

2.4 **Deposit.**

Within one (1) Business Day of the date hereof, Buyer has deposited the Deposit with the Escrow Agent pursuant to the Escrow Agreement.

2.5 **Allocation of Purchase Price.**

Sellers and Buyer shall use reasonable efforts to mutually agree on an allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets according to the relative fair market values of such assets on the Closing Date in compliance with the requirements of Section 1060 of the Code. If Sellers and Buyer are unable to agree on such fair market values within twenty (20) days after the Closing Date, Sellers and Buyer shall select a mutually acceptable qualified independent appraisal firm to determine such fair market values. The conclusions of such appraisal firm shall be conclusive and binding. The fees and expenses of such appraisal firm shall be shared equally by Sellers and Buyer. If Sellers and Buyer are unable to select any such appraisal firm within such twenty (20) day period, either Sellers or Buyer may apply to the Bankruptcy Court for the appointment of such firm and the decision of such Court shall be final and binding on the parties. Any adjustments to the Purchase Price and the Assumed Liabilities shall be reflected in a manner consistent with Section 1060 of the Code. Sellers and Buyer agree that they shall (a) cooperate in good faith in preparing Internal Revenue Service Form 8594; (b) furnish a copy of such Form 8594 to the other in draft form within a reasonable period of time prior to its filing due date, (c) file all Tax Returns in a manner consistent with such allocation and (d) not take any position inconsistent with such allocation on any of their Tax Returns, in any refund claim, in any litigation or otherwise.

10

## ARTICLE III
## ASSUMED LIABILITIES

**3.1     Assumed Contracts.**

(a)     Subject to the terms and conditions of this Agreement, and except as set forth in Section 3.1(d), Sellers shall assign or cause to be assigned, and Buyer shall assume, pay, perform and discharge all of Sellers' undischarged obligations incurred or arising under the Assumed Contracts listed in Schedule 3.1, with respect to the period commencing on the day following the Closing Date (such undischarged obligations hereinafter referred to as the "Assumed Liabilities").

(b)     Schedule 3.1 may, at Buyer's sole discretion, be amended to delete any item set forth therein by written notice to Sellers at any time up to two (2) days before issuance of the Sale Approval Order.

(c)     Schedule 3.1 may, at Buyer's sole discretion, be amended to add items thereto by written notice to Sellers at any time up to two (2) days before issuance of the Sale Approval Order.

(d)     At Closing, Sellers will pay (i) all Cure Costs for Assumed Contracts set forth on the initial Schedule 3.1 prepared on the date hereof, and (ii) Cure Costs of up to an aggregate total of $25,000 (the "Seller Cure Cost Limit") for any Assumed Contracts added to Schedule 3.1 at Buyer's direction or with Buyer's consent after the date hereof and Buyer will pay any such Cure Costs in excess of the Seller Cure Cost Limit.

(e)     Buyer shall not be liable for (i) any Claims arising from Sellers' assignment and Buyer's assumption of the Assumed Contracts; and/or (ii) rights or remedies claimed by third parties under any of the Assumed Contracts which broaden or vary the rights and remedies such third parties would have had against Sellers if the sale and purchase of the Purchased Assets were not to occur.

**3.2     Excluded Liabilities.** Except for the Assumed Contracts, Buyer shall not assume and under no circumstances shall Buyer be obligated to pay or assume, and none of the assets of Buyer or any Affiliate shall be or become liable for or subject to, any liability, cost, damage, expense, indebtedness, commitment, or obligation of Sellers or any of their Affiliates, whether known or unknown, fixed or contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise (collectively, the "Excluded Liabilities").

## ARTICLE IV
## THE CLOSING

**4.1     Time and Place.** The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place after all conditions in ARTICLE VIII below have been satisfied or waived on the date provided in Section 7.10(f) below at the offices of Cosmolab's local counsel in Wilmington, Delaware or at such other time and place as may be mutually agreed upon in writing between Buyer and Cosmolab. The date on which the Closing

occurs is referred to herein as the "Closing Date". The transactions contemplated by this Agreement shall be effective as of at 12:01 a.m. local time on the Closing Date.

**4.2    Deliveries at Closing by Buyer.** At the Closing, unless otherwise waived in writing by Seller, Buyer shall deliver to Sellers the following:

(a)    The cash portion of the Purchase Price, less the Escrow Fund, by wire transfer of immediately available funds to Cosmolab (or to or on behalf of the Secured Lenders as set forth in the Sale Approval Order);

(b)    Release of the Escrow Fund to Sellers;

(c)    Reimbursement for Post-petition payments of Pre-petition debts owed by a Seller to essential suppliers (which essential suppliers will be pre-approved by Buyer) in a total aggregate amount not to exceed One Million Dollars ($1,000,000), with such reimbursement to be made by wire transfer of immediately available funds to Cosmolab (or to or on behalf of the Secured Lenders as set forth in the Sale Approval Order) upon written request therefor delivered at least three (3) Business Days prior to Closing, which request shall be accompanied with a description in reasonable detail including suppliers' names, total paid amount and date of all such payments, and all relevant back-up documentation, including a written statement of the respective supplier confirming that no Pre-petition debts will be claimed against the Buyer (it being understood and agreed that a lack of documentation for a specific supplier will only relieve Buyer of its reimbursement obligation with respect to that supplier);

(d)    The Assignment and Assumption Agreement (as defined below), fully executed by Buyer;

(e)    Copies of resolutions duly adopted by the Board of Directors of Buyer, authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force as of the Closing, by an appropriate officer of Buyer;

(f)    A certificate of the President or a Vice President of Buyer certifying the satisfaction of the conditions in Sections 9.1 and 9.2 below;

(g)    A certificate of incumbency for the officers of Buyer executing this Agreement or making certifications for the Closing;

(h)    A certificate of existence and good standing of Buyer from the state of Tennessee, dated the most recent practical date prior to the Closing; and

(i)    Such other instruments and documents as Sellers reasonably deem necessary to effect the Contemplated Transactions.

**4.3    Deliveries at Closing by Sellers.** At the Closing and unless otherwise waived in writing by Buyer, Sellers shall deliver to Buyer the following:



(a)     A General Assignment, Conveyance and Bill of Sale, in the form attached as Exhibit A (the "General Assignment, Conveyance and Bill of Sale"), fully executed by each Seller;

(b)     An Assignment and Assumption Agreement, in the form attached as Exhibit B (the "Assignment and Assumption Agreement"), fully executed by each Seller;

(c)     An Assignment of Trademarks and Trademark Rights in the form attached as Exhibit C (the "Assignment of Trademarks and Trademark Rights") fully executed by each Seller;

(d)     An Assignment of Patents and Patent Rights in the form attached as Exhibit D (the "Assignment of Patents, Design Patents, Patent and Design Rights") fully executed by each Seller;

(e)     An Assignment of General Intangibles in the form attached as Exhibit E (the "General Assignment of Intangibles") fully executed by each Seller;

(f)     An Assignment of Internet Domain Names in the form attached as Exhibit F (the "Assignment of Internet Domain Names") fully executed by each Seller;

(g)     A Copyright Assignment in the form attached as Exhibit G (the "Copyright Assignment")

(h)     A letter agreement in the form attached as Exhibit H (the "Letter Agreement") executed by each of Specialty Packaging Corporation, a Cayman Islands company, Cosmolab Europe AG, a Swiss company, Cosmolab Asia, Ltd., a Cayman Islands company, Cosmolab (Far East) Limited, a Hong Kong company and Cosmolab (Suzhou) Cosmetics Co. Ltd., a Suzhou PRC WOFE.

(i)     If required pursuant to Section 7.11 below, the Limited Power of Attorney fully executed by each Seller;

(j)     If required pursuant to Section 7.11 below, the Interim Management Agreement fully executed by each Seller;

(k)     Copies of resolutions duly adopted by the Board of Directors of each Seller, authorizing and approving its performance of the Contemplated Transactions and the execution, delivery and performance of this Agreement, the Ancillary Agreements and the documents described herein, certified as true and of full force as of the Closing, by the appropriate officers of such Seller;

(l)     Certificates of the President or a Vice President of each Seller, certifying the satisfaction of the conditions in Sections 8.1 and 8.2 below;

(m)     A certificate of the President or a Vice President of Cosmolab, certifying (i) the aggregate amount of Eligible Accounts as of a date within two (2) Business Days prior to the Closing Date and (ii) the pro rations required to be paid by Sellers at Closing pursuant to Section 7.9 below, i.e., the estimated prorated Sellers' share of any Successor Taxes that are due and payable on or after the Closing Date and all Post-petition costs, including for salaries, electricity, employee

13

benefits and/or rents relating to Assumed Contracts, with respect to periods encompassing before the Closing Date;

(n)     Certificates of incumbency for the officers of each Seller executing this Agreement or making certifications for the Closing;

(o)     Certificates of existence and good standing of each Seller from the state in which it is incorporated, dated the most recent practical date prior to the Closing;

(p)     All certificates of title and other documents evidencing an ownership interest conveyed as part of the Purchased Assets;

(q)     A copy of the Sale Approval Order;

(r)     Proof that all cure amounts owing under the Assumed Contracts up to the Seller Cure Cost Limit have been paid, or instructions providing for the wiring of funds at Closing to make payment of such cure amounts up to the Seller Cure Cost Limit; and

(s)     Such other instruments and documents as Buyer reasonably deems necessary to effect the Contemplated Transactions.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

**5.1     Representations And Warranties As To The Sellers.** The Sellers hereby jointly and severally represent and warrant to Buyer as follows:

5.1.1     Organization And Good Standing.     Each Seller is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted. Each Seller is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction where the failure so to qualify would have a material adverse effect on the financial condition, business, assets or results of operations of such Seller. Each Seller has made available to Buyer copies of its charter and bylaws, as currently in effect.

5.1.2     Authority; No Conflict.

(a)     This Agreement has been duly executed and delivered by the Sellers.

(b)     Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time or both):

(i)     contravene, conflict with, or result in a violation of (A) any provision of the charter and bylaws of any of the Sellers, or (B) any resolution adopted by the board of directors or the stockholders of any of the Sellers; or

14



(ii)     contravene, conflict with, or result in a violation of, any Legal Requirement or any Order to which any Seller, or any of the Purchased Assets, is subject;

(c)     Except as set forth in Schedule 5.1.2(c) and subject to Bankruptcy Court approval, no Seller is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions in all material respects which has not been previously given or obtained.

5.1.3     <u>Powers</u>. The execution, delivery, and performance of this Agreement by Sellers and all Ancillary Agreements to which Sellers are party, and the consummation of the Contemplated Transactions by Sellers have been duly authorized by all appropriate corporate action.

5.1.4     <u>Binding Agreement</u>. This Agreement and all Ancillary Agreements are and will constitute the valid and legally binding obligations of Sellers, and are and will be enforceable against Sellers, in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium or other laws affecting creditors' rights and general equitable principles.

5.1.5     <u>Taxes</u>. Except as set forth in Schedule 5.1.5:

(a)     Each of the Sellers has timely filed all Tax Returns that it was required to file either separately or as a member of a group of corporations pursuant to applicable Legal Requirements. All such Tax Returns were correct and complete in all respects and were prepared in substantial compliance with all applicable Legal Requirements. All Taxes owed by each Seller (whether or not shown or required to be shown on any Tax Return) have been paid. None of the Sellers currently is the beneficiary of any extension of time within which to file any Tax Return. No Claim has ever been made by an authority in a jurisdiction where any Seller does not file Tax Returns that any Seller is or may be subject to taxation by that jurisdiction. There are no existing, or to Sellers' Knowledge threatened, Encumbrances on any of the Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)     Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 (or similar forms under any foreign Legal Requirements) required with respect thereto have been properly completed and timely filed.

(c)     No director or officer (or employee responsible for Tax matters) of any Seller expects any authority to assess any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax liability of any Seller either (A) claimed or raised by any authority in writing or (B) as to which any Seller has Knowledge based upon personal contact with any agent of such authority. Schedule 5.1.5(c) lists all federal, state, local, and foreign income Tax Returns filed with respect to each Seller for taxable periods ended on or after December 31, 2006, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. Sellers have delivered or made available to Buyer correct and

complete copies of all income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by Sellers since December 31, 2006.

(d)     No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     The unpaid Taxes of each Seller (i) did not, as of the most recent fiscal month end, exceed the reserve for Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Sellers balance sheet (rather than in any notes thereto), and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of each Seller in filing its Tax Returns.

(f)     None of the Assumed Liabilities is an obligation to make a payment that is not deductible under IRC § 280G or similar provision of foreign Legal Requirement. Each Seller has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of IRC § 6662. No Seller is a party to any Tax allocation or sharing agreement. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was Specialty Packaging Holdings, Inc. and (ii) has any liability for the Taxes of any Person under Treasury Regulations § 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(g)     No Seller has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by IRC § 355 or IRC § 361.

5.1.6     Employee Benefits.

(a)     Schedule 5.1.6 sets forth a correct and complete list of all Employee Benefit Plans that are maintained by each Seller and identifies all Employee Benefit Plans that are maintained in a jurisdiction outside the United States (the "Foreign Plans"). Neither the Sellers nor any ERISA Affiliate has maintained or contributed to any plans subject to Title IV of ERISA, including any "multiemployer plan" as defined in Section 3(37) of ERISA.

(b)     Correct and complete copies of the following documents with respect to each of the Employee Benefit Plans have been made available to Buyer by the Sellers, to the extent applicable: (i) any plan documents and related trust documents, insurance contracts or other funding arrangements, and all amendments thereto; (ii) the Forms 5500 (or similar annual report) and all schedules thereto for the three most recent years; (iii) the most recent actuarial report, if any; (iv) the most recent IRS determination letter (or similar determination letter or ruling issued by any Governmental Body with respect to any Foreign Plan); (v) the most recent summary plan descriptions; and (vi) written descriptions of all non-written agreements relating to the Employee Benefit Plans.

16

(c)     The Employee Benefit Plans have been maintained, funded and administered in accordance with their terms and comply in all material respects with all applicable provisions of ERISA, the IRC and all other Legal Requirements.

(d)     Each Employee Benefit Plan that is intended to meet the requirements for tax-favored treatment under Subchapter B of Chapter 1 of Subtitle A of the IRC meets such requirements. Each Foreign Plan that is intended to have tax-favored status under any applicable foreign Law meets the requirements of such foreign Law. No event has occurred with respect to the operation of the Employee Benefit Plans that would cause the imposition of any material liability, penalty or tax under ERISA, the IRC or any other applicable law, excluding any benefits properly payable under or any income or employment taxes properly withheld or properly accrued or paid with respect to any Employee Benefit Plan.

(e)     Each Employee Benefit Plan that is intended to be a qualified plan under Section 401(a) of the IRC meets the requirements for such qualification and the related trusts are exempt under Section 501(a) of the IRC. Each Foreign Plan has obtained from the Governmental Body having jurisdiction over such plan any required determinations that such plans are in compliance with the Legal Requirements of such Governmental Body.

(f)     All contributions (including all employer contributions and employee contributions) required to have been made under any of the Employee Benefit Plans (including workers compensation) or by Legal Requirement have been timely made.

(g)     None of the Sellers , any ERISA Affiliate nor any organization to which any of the Sellers or any ERISA Affiliate is a successor or parent corporation within the meaning of Section 4069(b) of ERISA has engaged in any transaction within the meaning of Section 4069 or 4212(c) of ERISA.

(h)     There are no pending investigations, actions, Claims or lawsuits that have been asserted in writing or instituted against the Employee Benefit Plans, the assets of any of the trusts under the Employee Benefit Plans or the sponsor or administrator of any of the Employee Benefit Plans, or against any fiduciary of the Employee Benefit Plans with respect to the operation of any of the Employee Benefit Plans (other than benefit claims).

(i)     There have been no "prohibited transactions" (within the meaning of section 406 of ERISA and section 4975 of the IRC) with respect to any Employee Benefit Plan. No fiduciary has any liability for material breach of fiduciary duty or any other material failure to act or comply in connection with the administration or investment of the assets of any such Employee Benefit Plan. No action, suit, proceeding, hearing or investigation with respect to the administration or the investment of the assets of any such Employee Benefit Plan (other than routine claims for benefits) is pending or, to the Knowledge of the Sellers, threatened.

(j)     None of the Employee Benefit Plans provides for post-employment life insurance or health benefits coverage, except as may be required under Part 6 of Subtitle B of Title I of ERISA (or any similar requirement of any other Legal Requirements) at the expense of the

17

participant or the participant's beneficiary, or coverage through the last day of the month following the date of termination of employment.

(k)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee under any Employee Benefit Plan; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits under any Employee Benefit Plan.

(l)     Each Employee Benefit Plan which is a "group health plan" as defined in Section 5000(b)(1) of the IRC has been operated in compliance with the requirements of Section 4980B of the IRC and Sections 601 through 608 of ERISA ("<u>COBRA</u>"), and each Employee Benefit Plan, to the extent applicable, is in compliance with the privacy, security and other provisions of the Health Insurance Portability and Accountability Act of 1996.

(m)     Each Employee Benefit Plan which is a nonqualified deferred compensation plan, within the meaning of Section 409A of the IRC has been operated in good faith compliance with the requirements of Section 409A (or an available exemption therefrom) and has been amended to comply with Section 409A such that amounts of compensation deferred or payable thereunder will not be includible in gross income under Section 409A prior to the distribution of benefits in accordance with the terms of the plan and will not be subject to the interest and additional tax under Section 409A(a)(1)(B) of the IRC.

5.1.7     <u>Compliance With Legal Requirements</u>. Subject to the Bankruptcy Code:

(a)     each Seller is, and at all times since December 31, 2008 has been, in compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

(b)     no event has occurred or circumstance exists that (with or without notice or lapse of time or both) (A) constitutes or resulted in a violation by any Seller of, or a failure on the part of any Seller to comply with, any Legal Requirement or Governmental Authorization, or (B) will give rise to any obligation on the part of any Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

(c)     none of the Sellers has received any notice or other communication from any Governmental Body or any other Person regarding (A) any violation of, or failure to comply with, any Legal Requirement, or (B) any obligation on the part of the Sellers to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

5.1.8     <u>No Collective Bargaining Agreements, etc.</u>

(a)     No Seller is, and no Seller has been since December 31, 2008, a party to any collective bargaining agreement; and

(b)     (i) since December 31, 2008, there has not been, there is not presently pending or existing, and to Sellers' Knowledge, there is not threatened, any strike, slowdown, sick out,

picketing, work stoppage or employee grievance process involving any Seller; (ii) to Sellers' Knowledge, no event has occurred or circumstance exists that could provide the basis for any material work stoppage, slowdown or other labor dispute; (iii) there is not pending or, to Sellers' Knowledge, any organizational activity or other labor dispute against or affecting any Seller or the Facilities; (iv) no application or petition for an election of or for certification of a collective bargaining agent is pending; (v) no material grievance or arbitration Proceeding exists that might have a Material Adverse Effect; (v) there is no lockout of any employees by any Seller, and no such action is contemplated by any Seller; and (vi there has been no material charge of discrimination filed against or, to Sellers' Knowledge, threatened against any Seller with the Equal Employment Opportunity Commission, the Department of Labor or similar Governmental Body.

5.1.9 <u>Environmental Matters</u>. To the Knowledge of Sellers, and except as described on Schedule 5.1.9:

(a) Each of the Sellers is in compliance with all applicable Environmental Laws in all material respects;

(b) Each of the Sellers is in material compliance with all Governmental Authorizations that are required pursuant to Environmental Laws for the ownership and use of the Purchased Assets and the operation of the Business as currently being conducted;

(c) There has been no Release of any Hazardous Materials into the Environment by any Seller or any Person for whom any Seller may be legally responsible since December 31, 2008 which would reasonably be expected to result in liability to the Seller under any applicable Environmental Law;

(d) None of the Sellers is in default under, or in violation of, any binding Order pursuant to any applicable Environmental Law; and

(e) The Sellers have not entered into any consent decree or other written agreement with any Governmental Body in settlement of any alleged violation of or liability under any applicable Environmental Law, under which decree or agreement the Sellers have any unfulfilled material obligations.

The representations and warranties in this Section 5.1.9 are the sole and exclusive representations and warranties of the Sellers concerning environmental matters, including, without limitation, any matters arising under any Environmental Laws.

5.1.10 <u>Product Warranty; Products Liability</u>.

(a) Each product designed, developed, manufactured, distributed, shipped, delivered, sold, serviced or supported by or on behalf of the Sellers (i) has been designed, developed, manufactured, distributed, shipped, delivered, sold, serviced or supported, as applicable, in material conformity with all applicable contractual commitments (including all applicable warranties and representations), and (ii) is free from material defects in design, material and workmanship.

19

(b)     There are not presently pending, or to Sellers' Knowledge threatened, any Proceedings or Claims relating to any alleged hazard or alleged defect in design or manufacture relating to any product designed or manufactured by any Seller included in the Purchased Assets, excluding warranty claims made in the Ordinary Course of Business. Schedule 5.1.10 sets forth a true and complete list of all product recalls or written post-sales warnings involving any product designed or manufactured by any Seller since December 31, 2008 included in the Purchased Assets, excluding warranty claims in the Ordinary Course of Business (each, a "Recall") and any pending investigations being conducted by any Seller or, to the Sellers' Knowledge, by any other Person or Governmental Body concerning a Recall relating to any product designed or manufactured by any Seller included in the Purchased Assets. To Sellers' Knowledge, no Seller has any liability (and to Sellers' Knowledge there is no basis for any present or future action against it giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession or use of any service or product delivered by any Seller included in the Purchased Assets.

5.1.11     Title to and Sufficiency of Assets and Equipment, etc. Except as set forth in Schedule 5.1.11 and except with respect to the Excluded Assets, (i) the Sellers have good and marketable title to the Purchased Assets which constitute all of the assets necessary to operate the Business in all material respects in the manner presently operated by Sellers, (ii) the Assumed Contracts are in full force and effect and, subject to the effects of the Bankruptcy Case, to Sellers' Knowledge none of the other parties thereto are in breach or have threatened termination of any thereof, and (iii) all of the Equipment included in the Purchased Assets is in good repair and condition consistent with the requirements and normal conduct of the Business, ordinary wear and tear excepted.

5.1.12     Certain Claims. There is no pending, or to Sellers' Knowledge threatened, Claim or Proceeding against Buyer by a Governmental Authority or other Person that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

6.1.1     Organization And Good Standing. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Tennessee.

6.1.2     Authority; No Conflict; Competing Business.

(a)     This Agreement has been duly executed and delivered by Buyer. This Agreement and all Ancillary Agreements are and will constitute a legal, valid, and binding obligation of Buyer, and are and will be enforceable against Buyer in accordance with their terms, subject to bankruptcy, insolvency, moratorium or other laws affecting creditors' rights and general equitable principles. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and all Ancillary Agreements and to perform its obligations hereunder and

thereunder and the entry into this Agreement and each Ancillary Agreement has been duly authorized by all necessary action on the part of Buyer.

(b)     Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the Contemplated Transactions pursuant to:

(i)     any provision of Buyer's organizational documents;

(ii)     any resolution adopted by the board of directors or the stockholders of Buyer;

(iii)     any Legal Requirement or Order to which Buyer may be subject; or

(iv)     any contract to which Buyer is a party or by which Buyer may be bound.

(c)     Except as set forth in Schedule 6.1.2, Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

6.1.3     <u>Certain Claims</u>. There is no pending, or to Buyer's Knowledge threatened, Claim or Proceeding against Buyer by a Governmental Authority or other Person that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

## ARTICLE VII
## ADDITIONAL COVENANTS AND AGREEMENTS

7.1     **Conduct of the Business.** During the period from the date hereof through the Closing Date, except as otherwise consented to by Buyer, except if prohibited by the Bankruptcy Code or an Order of the Bankruptcy Court and except as otherwise contemplated herein, Sellers will:

(a)     conduct the Business in the Ordinary Course of Business;

(b)     without making any commitment on Buyer's behalf, use commercially reasonable efforts to preserve the Business and Purchased Assets substantially intact and maintain existing relations and goodwill with all customers, suppliers and distributors, provided that Sellers shall not be required to make any payments of Pre-petition amounts due which Seller is not permitted to pay under the Bankruptcy Code, except as required or permitted by an Order of the Bankruptcy Court or a confirmed plan of reorganization, or make material changes to their rights or obligations, in order to maintain such relations and goodwill;

(c)     pay all required Post-petition payments through the Closing Date and pay all Cure Costs up to the Seller Cure Cost Limit pursuant to Section 3.1(d) above;

21

(d)     maintain for the benefit of Sellers the insurance policies in effect on the date hereof until the Closing Date;

(e)     not sell or dispose of any material Purchased Assets other than sales of Inventory in the Ordinary Course of Business;

(f)     maintain the Purchased Assets in a state of good repair and condition consistent with the requirements and normal conduct of the Business, ordinary wear and tear excepted;

(g)     comply with all Legal Requirements and contractual obligations applicable to the operation of the Business and the ownership and use of the Purchased Assets;

(h)     cooperate with Buyer and assist Buyer in identifying the Governmental Authorizations required by Buyer to operate the Business from and after the Closing Date and, if required, either transferring existing Governmental Authorizations of the Sellers to Buyer, where permissible, or aiding Buyer in obtaining new Governmental Authorizations for Buyer;

(i)     account for, make appropriate filing of Tax Returns with respect to, and pay when due all Taxes, assessments and other governmental charges that are due and payable before the Closing Date and that (i) could impose a lien on the Purchased Assets or (ii) result in successor liability on the Buyer, including real property Taxes or the Tennessee Franchise and Excise Tax, or (iii) are not dischargeable in bankruptcy (collectively, "Successor Taxes");

(j)     pay all Post-petition trade accounts payable as required by the Bankruptcy Code; and

(k)     pay all fees which are due as of the date hereof or become due prior to Closing and which are necessary to maintain or renew, and take all necessary actions to maintain or renew, each item of Intellectual Property.

**7.2     Investigation by Buyer.** During the period from the date hereof through the Closing Date, Buyer and its Representatives shall, upon reasonable notice, (i) have full and complete access during normal business hours to all Facilities, other properties, assets, books, financial and operating data, records, Governmental Authorizations, Contracts and documents related to the Business, the Assumed Contracts, the Assumed Liabilities or included in the Purchased Assets, (b) be furnished with copies of all such Contracts, Governmental Authorizations, books, files and records and other existing documents and data as Buyer may reasonably request, and (c) be furnished with such additional financial, operating and other relevant data and information as Buyer may reasonably request. Sellers shall otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the Business, Facilities, other properties, Purchased Assets, Assumed Contracts, Assumed Liabilities, assets and financial condition related to each Seller. In addition, Buyer shall have the right to have the Facilities, Equipment and Inventory inspected by Buyer and its Representatives, at Buyer's sole cost and expense, for purposes of determining the physical condition and legal



characteristics of the Facilities, Equipment and Inventory. For avoidance of doubt, any such inspection shall not involve any invasive, destructive or subsurface testing.

7.3    **Consents.** As soon as practicable after the date hereof, Sellers and Buyer shall use commercially reasonable efforts to obtain all Consents, in form and substance reasonably acceptable to Buyer, as are or may be necessary to permit the assignment of the Contracts and the transfer of the Purchased Assets to the Buyer and the consummation of the Contemplated Transactions and to enable Buyer to conduct the Business from and after the Closing as currently conducted by Sellers, provided that Sellers shall not be required to make any material payments or material changes to their rights or obligations in order to obtain any such Consents.

7.4    **Fulfillment of Conditions.** Each of Sellers and Buyer shall take all commercially reasonable actions within its control to fulfill as soon as practicable the conditions set forth in Articles VIII and IX hereof, respectively.

7.5    **Announcements.** Sellers and Buyer agree that no announcement or press release shall be made by either Sellers or Buyer relating to the transactions contemplated hereby unless approved in writing in advance by the other party hereto, except that any party hereto may, upon not less than three (3) Business Days prior written notice to the other party hereto, make such announcement, press release or other report as may be required by any applicable Legal Requirement.

7.6    **Change of Cosmolab, Inc. Name.** Each Seller covenants and agrees that, within three (3) Business Days after the termination of the Interim Management Agreement or earlier following Closing upon Buyer's request, such Seller will file with appropriate Governmental Bodies an amendment to its organizational or constituting documents changing its name to a name that shall not include the word "Cosmolab" or any confusingly similar word. Certified copies of all such filed amendments shall be promptly furnished to Buyer.

7.7    **Further Assurances; Access to Records.**

(a)    Sellers hereby agree that they will at any time and from time to time following the Closing Date, upon the reasonable request of Buyer, execute, acknowledge and deliver, or will cause to be executed, acknowledged and delivered, all such further acknowledgments, deeds, assignments, transfers, conveyances and assurances as may be reasonable and necessary for the better assigning, conveying and transferring to Buyer and to its successors and assigns, or for aiding and assisting in collecting and reducing to possession, any and all of the Purchased Assets to be conveyed to Buyer as provided herein. Sellers shall also furnish Buyer with such information and documents in its possession or under its control, or which Sellers can execute or cause to be executed, as will enable Buyer to prosecute any and all petitions, applications, claims, and demands relating to or constituting a part of the Business or the Purchased Assets.

(b)    Buyer hereby agrees that from and after the Closing, Sellers, their Representatives, any Official Committee of Unsecured Creditors, any trustee or Representative acting on behalf of the Debtors' estates or any trusts created therefrom (upon agreeing to be bound by the provisions of Section 12.14 below) and representatives of federal and state Taxing authorities

23

shall have access during normal business hours and upon reasonable advance notice to all books, records and documents delivered to Buyer by Sellers at Closing or which otherwise concern transactions related to the Business prior to the Closing for purposes of inspection and copying thereof.

**7.8     Additional Financial Information.**  Within two (2) Business Days after they are created (but in any event no later than thirty (30) days following the end of each calendar month prior to Closing), Sellers shall deliver to Buyer true and complete copies of their consolidated unaudited balance sheets and the related unaudited statements of income (collectively, the "Interim Statements") for each month then ended, together with a year-to-date compilation and the notes, if any, related thereto, which presentation shall be true, correct and complete in all material respects, shall have been prepared from and in accordance with the books and records of Sellers, and shall fairly present the financial position and results of operations of Sellers as of the date and for the period indicated, all in accordance with GAAP.

**7.9     Prorations.**

(a)     Real and personal property and use Taxes attributable to the Purchased Assets shall be allocated between Sellers and Buyers on the basis of the number of days in the applicable Tax period of Sellers elapsed to the Closing Date (which portion shall be allocated to Sellers) as compared with the number of days in such tax period elapsing on and after the Closing Date (which portion shall be allocated to Buyer).  At Closing, Sellers shall pay their estimated prorated share of any Successor Taxes that are due and payable on or after the Closing Date.

(b)     All Post-petition costs, including for salaries, electricity, employee benefits and/or rents relating to Assumed Contracts with respect to periods encompassing before and after the Closing Date shall be prorated between the parties in relation and on the basis of the number of Business Days for each party in the applicable period.  Any such prorations shall be estimated as of the Closing Date and any net amount due to or due from Sellers or Buyer, as applicable, shall be added to or subtracted from the cash portion of the Purchase Price.

**7.10     Bankruptcy Filing; Bankruptcy Court Approval; Break-Up Fee and Bidding Procedures.**

(a)     On or before January 22, 2010, Sellers shall commence a bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the Bankruptcy Court for the District of Delaware or for the Middle District of Tennessee (as applicable, the "Bankruptcy Court");

(b)     Within one (1) day of the date of commencement of the Bankruptcy Case (the "Filing Date") Sellers shall file a motion or application (the "Sale Motion") with the Bankruptcy Court pursuant to inter alia, Bankruptcy Code sections 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006, in form and substance satisfactory to Buyer and Sellers in their reasonable discretion, seeking entry of an order, in form and substance satisfactory to Buyer in its reasonable discretion, incorporating the following provisions (the "Sale Approval Order"):

24

(i)      pursuant to Bankruptcy Code sections 105(a) and 363(b), (f) and (m), (A) approving the terms and conditions of this Agreement, and (B) authorizing and empowering the Sellers to enter into this Agreement and to sell to Buyer (or any other successful bidder) all of the Purchased Assets, free and clear of any and all Claims and Encumbrances, with all such Claims and Encumbrances which are to attach to the net proceeds of the sale of the Purchased Assets in the order of their priority and having the same validity, force and effect (if any) which they now have against the Purchased Assets (the "Sale");

(ii)      finding that (A) due and proper notice has been afforded in accordance with the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court and the Orders of the Bankruptcy Court and all aspects of the Contemplated Transactions have been adequately disclosed; (B) the Purchase Price under this Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code for the Purchased Assets; (C) Buyer is a good faith purchaser as that term is used in Section 363(m) of the Bankruptcy Code; (D) the Sale has not been entered into fraudulently and Buyer has not engaged in collusive bidding or otherwise violated the provisions of Section 363(n) of the Bankruptcy Code; (E) title to the Purchased Assets shall vest in Buyer free and clear of all Claims and Encumbrances of any type or nature including any Claims against Sellers and all Encumbrances on the Purchased Assets for, and Buyer shall not be liable for, any and all liabilities or Claims related to Sellers' pre-closing operations of any type or nature whatsoever, except for the Assumed Liabilities, to the maximum extent permitted by applicable law; (F) Buyer shall not be liable for any claims or debts of Sellers, except the Assumed Liabilities; (G) the Bankruptcy Court will retain jurisdiction over enforcement of the Sale Approval Order and to determine any disputes arising out of the Sale Approval Order; and (H) Buyer is not intended to be and shall not be deemed to be a successor to any Seller; and

(iii)      granting other and related relief reasonably consistent with the Sale Motion.

(c)      Sellers shall request that the Bankruptcy Court enter the Sale Approval Order as soon as practicable but in no event after the earlier of (i) fifty (50) days after the date of entry of the Bidding Order (as defined below) or (ii) April 15, 2010 (the "Sale Approval Deadline"), it being expressly agreed that this Agreement will not be binding upon the Buyer if the Sale Approval Order is not entered prior to the Sale Approval Deadline;

(d)      In connection with the filing of the Sale Motion and any hearing thereon, Sellers shall request the Bankruptcy Court hold an expedited hearing  within 15 days, and enter, as soon as practicable but in no event later than 30 days after the filing of the Sale Motion, an order (the "Bidding Order"), in form and substance acceptable to Buyer in its reasonable discretion, (x) setting forth a date on which any claims in respect of Sellers' leases and executory contracts will be heard and adjudicated and thereafter be barred of assertion and (y) approving a break-up fee (the "Break-Up Fee") of $400,000 that shall become due and payable by wire transfer of immediately available

funds to an account designated by Buyer, without further order of the Bankruptcy Court, in the event that all or any significant part of the Purchased Assets are sold to a party or parties other than the Buyer as well as setting forth the following bidding procedures:

      (i)     All bids for the Purchased Assets must offer an aggregate price for the Purchased Assets of not less than the sum of (a) the value of the consideration to be provided by the Buyer under this Agreement, plus (b) the Break-Up Fee, plus (c) $200,000.00 (the "Minimum Upset Bid").

      (ii)     The Bidding Order shall provide that, on the Auction Date, competing bids must be for substantially all of the Purchased Assets, and not for any individual parts. Competing bids by third parties must be submitted prior to the Auction by not later than two (2) Business Days (and potentially earlier in Seller's discretion, the "Bid Deadline"), must be accompanied by a cash deposit in an amount of at least the greater of (x) $1,000,000 or (y) 7.5% of the competing bid and an asset purchase agreement with substantially the same terms and conditions as this Agreement and showing any proposed changes from this Agreement, and the bidder must provide sufficient information to Sellers to satisfy Sellers of the potential bidder's ability to consummate a purchase of the Purchased Assets upon becoming the successful bidder (as defined below).

      (iii)     All competing bidders for the Purchased Assets shall complete their due diligence on the Purchased Assets by no later than the Bid Deadline. After the Bid Deadline, any and all due diligence with respect to the Purchased Assets shall be deemed waived by all bidders, and all bids shall be non-contingent and unconditional.

      (iv)     If the Sellers receive bids from one or more qualified bidders for all of the Purchased Assets, the Sellers will conduct the Auction for the Purchased Assets on the Auction Date.

      (e)     Pursuant to the terms set out in Section 11.2(c) below, Sellers shall pay Buyer the Break-Up Fee if all or any significant part of the Purchased Assets are sold hereunder to any Person other than the Buyer or an Affiliate of Buyer, and Buyer is not in material breach of this Agreement.

      (f)     Provided that the Sale Approval Order contains a finding of fact by the Bankruptcy Court that Buyer is a "good faith purchaser" as that term is used in Section 363(m) of the Bankruptcy Code, and the Sale Approval Order is not stayed, then at the discretion of Buyer, the closing of a Sale to Buyer will occur at any time up to twenty (20) calendar days after entry of the Sale Approval Order in favor of Buyer but in no event later than May 15, 2010 (as used herein, the "Termination Date"). In the event that the Sale Approval Order does not contain a finding of fact by the Bankruptcy Court that Buyer is a "good faith purchaser" as that term is used in Section 363(m) of the Bankruptcy Code, or in the event of a stay which prevents the Closing, then the Buyer's obligation to consummate the Closing shall terminate as of the Termination Date and Buyer shall be entitled to the return of the Deposit, unless Buyer opts to extend the Termination Date during the stay

(a "Stay Extension"). If the Buyer chooses a Stay Extension, then Buyer shall close within five (5) business days of any cessation of the stay. Buyer shall have the right to terminate any Stay Extension and get the return of the Deposit at any time upon five (5) business days notice, except after entry of an Order terminating the stay, in which event Buyer shall be obligated to consummate the Closing (unless the Sale Approval Order has been overturned).

(g)     Sellers shall send notices, in form and substance reasonably satisfactory to Buyer, regarding the proposed Sale and the actual Sale of the Purchased Assets to such parties as Buyer may designate, in addition to all Persons who are entitled to receive notice of the Bankruptcy Case by virtue of the Bankruptcy Code, the local rules of the Bankruptcy Court, any order of the Bankruptcy Court or any other applicable Legal Requirement, or which Sellers reasonably believe have or may assert a Claim or Encumbrance against or related to the Purchased Assets(collectively, the "Notice Parties"), in each case, within the time periods required by, and otherwise in accordance with the provisions of applicable Legal Requirements. Sellers shall take such further action in its Bankruptcy Case, as Buyer may reasonably request, in order to (i) reduce the risk of any successor liability to Buyer relating to Sellers' or their Affiliates' conduct or action or inaction (including providing notice of the sale of Sellers' assets to any known potential claimants, with Buyer to pay the costs of any additional noticing or publication notice), and (ii) otherwise effect the sale of the Purchased Assets to Buyer. Sellers shall provide notice of (x) the Sale Motion (including the form of the proposed Sale Approval Order to be included therein) and the Bidding Order to all of the Notice Parties, and (y) entry of the Sale Approval Order to all Notice Parties. Sellers shall use their best efforts to obtain the Consent of any and all parties to Contracts to the assignment of such Contracts to Buyer, to the extent such Consent is required under the Bankruptcy Code (including Section 365(c) thereof). Sellers shall not include in any plan of reorganization (or in any order confirming any such plan) which it seeks to confirm in the Bankruptcy Case any provision or term which would limit, prejudice or modify any rights of Buyer hereunder or any obligations of Sellers hereunder.

(h)     Buyer acknowledges that this Agreement and the sale of the Purchased Assets under this Agreement is subject the terms and conditions of the Bidding Order and approval by the Bankruptcy Court.

(i)     Sellers and Buyer reserve the right to seek a bond from any third-party attempting to stay the sale for an objection or appeal, with such bond to be in the full amount of the sales price and any and all other damages, costs, fees, and amounts otherwise allowable for such bond.

(j)     Sellers shall provide Buyer or its counsel (with CM/ECF court electronic notices to be sufficient) with all pleadings and notices in the Bankruptcy Case.

**7.11    Limited Power of Attorney and Interim Management Agreement.** In the event that Buyer has not obtained all Governmental Authorizations required to operate the Business by the Closing Date, Buyer and Sellers agree to enter into a Limited Power of Attorney (the "Limited Power of Attorney") and Interim Management Agreement (the "Interim Management Agreement") in a form to be reasonably agreed and in accordance with all Legal Requirements for the purpose of allowing Buyer to operate the Business for its benefit under the Governmental Authorizations of Sellers and to receive all the economic benefits associated therewith. Sellers

27

agree that following Closing, during any time that the Limited Power of Attorney and Interim Management Agreement are in effect, Sellers will not convert the Bankruptcy Case to Chapter 7 without the consent of Buyer, and further agree that the Limited Power of Attorney and Interim Management Agreement shall remain in place and shall not be subject to rejection in the event of any Chapter 7 conversion until Buyer has obtained all such Governmental Authorizations.

**7.12    Collection of Accounts.**

(a)    Following the Closing, Buyer shall use commercially reasonable efforts in the ordinary course of its business to collect all Accounts. Upon request and provision of completed forms by Buyer, Sellers will execute and deliver to Buyer notices to Account debtors in form reasonably acceptable to Sellers informing such Account debtors of the sale of the Accounts to Buyer and directing them to remit payment as directed by Buyer.

(b)    Buyer shall remit all collections of Accounts in excess of the Accounts Threshold to Cosmolab. Any such amounts will be transferred at least once per month within five (5) days after the end of the preceding month. For purposes of this Section 7.12, all amounts received by Buyer from an Account debtor shall be applied to the oldest Accounts of such account debtor first (regardless of whether such Account debtor has accounts receivable owing to Buyer for post-Closing transactions) unless such Account debtor specifically directs a different application in writing due to a good faith dispute over the validity or amount of an Account.

(c)    Buyer shall not grant or agree to any reduction, discount, concession, forgiveness or other modification of an Account without Cosmolab's express written consent.

(d)    Six months after the Closing Date, Buyer and Cosmolab will review any uncollected Accounts. At the request of Cosmolab, Buyer shall turn over any uncollected Accounts to a collection agency designated by Cosmolab.

(e)    If any Seller receives proceeds from an Account prior to Buyer having collected the Accounts Threshold, such Seller shall remit such proceeds to Buyer within one (1) Business Day.

**7.13    Certain Actions.** Sellers shall use commercially reasonable efforts to complete the actions described on Schedule 7.13 to Buyer's reasonable satisfaction.

### ARTICLE VIII
### CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to purchase the Purchased Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

**8.1    Accuracy of Representations.** All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate as of the date of this Agreement, and must be



accurate as of the Closing Date as if made on the Closing Date, except for such inaccuracies as would not be reasonably likely to cause a Material Adverse Effect.

**8.2     Sellers' Performance.** All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

**8.3     Consents; Authorizations.** Each of the Consents identified in Schedule 8.3, must have been obtained and must be in full force and effect. Buyer either (i) shall have obtained documentation or other evidence satisfactory to Buyer in its reasonable discretion that Buyer has received confirmation from all applicable Governmental Bodies that upon the Closing all Governmental Authorizations required to operate the Business as currently operated will be transferred to, or issued or reissued in the name of, Buyer, or (ii) shall be able to operate the Business in all material respects and in compliance with all Legal Requirements (including all Environmental Laws) pursuant to the Limited Power of Attorney and the Interim Management Agreement.

**8.4     No Claims.** There must not have been commenced and be continuing against Buyer or any Seller, or against any Affiliate of Buyer or any Seller, any Claim or Proceeding (other than the Bankruptcy Case and any objections or proceedings pending therein which have been overruled or denied) (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

**8.5     No Prohibition.** Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a violation of, or cause Buyer or any Affiliate of Buyer to suffer any material adverse consequence under, any applicable Legal Requirement or Order.

**8.6     Bankruptcy Case.** Sellers shall have successfully commenced the Bankruptcy Case and the Sale Approval Order directing the sale of the Purchased Assets to Buyer in accordance with the provisions of this Agreement shall have been duly entered and shall not be subject to any stay. At Buyer's option, such order shall also be a Final Order, but Buyer shall be entitled to close in the event of entry of the Sale Approval Order which is unstayed unless in its sole discretion it determines to require fulfillment of these other conditions as well.

**8.7     Contracts.** Any and all defaults arising prior to the Closing with respect to any Assumed Contract shall have been cured or waived without any material modifications to the subject Assumed Contract unless expressly authorized by Buyer in its absolute discretion to the full extent required by Section 365(b)(1)(A) and other applicable provisions of the Bankruptcy Code and any order of the Bankruptcy Court, *provided*, however, that this condition shall be

29

deemed satisfied in full if Sellers have satisfied or provided for the satisfaction at Closing of their obligation in Section 3.1(d) above.

**8.8** **Seller Deliverables.** Buyer shall have received copies of all of the documents required to be delivered to Buyer pursuant to Section 4.3 of this Agreement which shall have been duly completed, dated and executed as contemplated by Section 4.3.

**8.9** **Certain Actions.** Sellers shall have completed the actions described on Schedule 7.13 to Buyer's reasonable satisfaction.

# ARTICLE IX
## CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE

Sellers' obligation to sell the Purchased Assets, and to take the other actions required to be taken by them at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers, in whole or in part):

**9.1** **Accuracy of Representations.** All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

**9.2** **Buyer's Performance.**

(a) All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b) Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 4.2 and must have made the cash payments required to be made by Buyer pursuant to Section 4.2.

**9.3** **Consents.** Each of the Consents identified in Schedule 9.3 must have been obtained and must be in full force and effect.

**9.4** **No Injunction.** Since the date of this Agreement, there shall not have been adopted or issued, and there shall not otherwise be in effect, any injunction, Order or other Legal Requirement that prohibits the sale of the Purchased Assets by Sellers to Buyer, or the consummation of any of the other Contemplated Transactions hereunder.

**9.5** **Sale Approval Order.** The Sale Approval Order directing the sale of the Purchased Assets to Buyer in accordance with the provisions of this Agreement shall have been duly entered and shall not be subject to any stay.

## ARTICLE X
## SURVIVAL OF REPRESENTATIONS AND COVENANTS

**10.1** **Nonsurvival of Representations and Warranties.** All representations and warranties in this Agreement and any other certificate or document delivered pursuant to this Agreement will not survive the Closing and will terminate as of the Closing Date.

**10.2** **Survival of Covenants Requiring Post-Closing Activity.** The respective covenants of the parties hereto will survive the Closing in accordance with their respective terms, but only with respect to the obligation to perform specific actions post-Closing (such as, without limitation, further assurances, management agreements and the like).

## ARTICLE XI
## TERMINATION

**11.1** **Termination.** Notwithstanding anything herein to the contrary, this Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing:

(a) by the mutual written consent of Sellers and Buyer;

(b) (i) by Buyer, if through no fault of Buyer, (x) there has been a breach of any representation, warranty, covenant or agreement made by Sellers in this Agreement, or (y) any such representation and warranty shall have become untrue after the date of this Agreement, in either case such that the conditions set forth in Section 8.1 or Section 8.2 would not be satisfied and such breach or condition is not curable or, if curable, is not cured to Buyer's reasonable satisfaction prior to the earlier of (A) thirty (30) days after written notice thereof is given by Buyer to Cosmolab or (B) two Business Days prior to the Termination Date or (ii) by Cosmolab, if through no fault of Cosmolab, (x) there has been a breach of any representation, warranty, covenant or agreement made by Buyer in this Agreement, or (y) any such representation and warranty shall have become untrue after the date of this Agreement, in either case such that the conditions set forth in Section 9.1 or Section 9.2 would not be satisfied and such breach or condition is not curable or, if curable, is not cured prior to the earlier of (A) thirty (30) days after written notice thereof is given by Cosmolab to Buyer or (B) two Business Days prior to the Termination Date;

(c) by Buyer or Cosmolab, if (i) the transactions contemplated by this Agreement have not been consummated by the Termination Date, (ii) the Bidding Order has not been entered within thirty (30) days of the filing of the Sale Motion, (iii) the Sale Approval Order has not been entered by the Sale Approval Deadline, or (iv) any Order permanently enjoining or otherwise prohibiting consummation of the transactions contemplated by this Agreement shall become final and non-appealable; provided, that, in each of the foregoing cases, the right to terminate this

Agreement pursuant to this clause (c) of Section 11.1 shall not be available to any party that is responsible for a breach of its obligations under this Agreement in any manner that has proximately contributed to the occurrence of the failure of a condition to the consummation of the transactions contemplated by this Agreement on or prior to the Termination Date; or

(d)     by Cosmolab if the Bankruptcy Court enters an order approving a Qualifying Bid other than a bid submitted by Buyer as the winning bid at auction.

The party desiring to terminate this Agreement pursuant to clause (b), (c) or (d) of this Section 11.1 shall give written notice of such termination to the other party, which in the case of a termination by Sellers under clause (d) must be accompanied by written instructions signed by Sellers to the Escrow Agent to distribute the Escrow Fund to Buyer.

**11.2     Effect of Termination and Abandonment.**  In the event of termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to Section 11.1, this Agreement shall become void and of no effect with no liability to any Person on the part of any party (or of any of its affiliates); provided, that:

(a)     if Buyer terminates this Agreement pursuant to Section 11.1(b)(i)(x) above, then Sellers shall be obligated, jointly and severally, to pay not later than three Business Days after the termination date to Buyer the Break-Up Fee without any further action of the Bankruptcy Court;

(b)     if Buyer terminates this Agreement pursuant to Section 11.1(b)(i)(y) above and if within three (3) months of such termination, Sellers sell all or any significant part of the Purchased Assets to a Person that is not an Affiliate of Buyer, then Sellers shall be obligated, jointly and severally, to pay to Buyer the Breakup Fee not later than three Business Days after the completion of such sale without any further action of the Bankruptcy Court;

(c)     if Cosmolab terminates this Agreement pursuant to Section 11.1(d) above and within three (3) months of such termination, Sellers shall sell all or any significant part of the Purchased Assets to a Person that is not an Affiliate of Buyer, then Sellers shall be obligated, jointly and severally, to pay to Buyer the Breakup Fee not later than three Business Days after the completion of such sale without any further action of the Bankruptcy Court;

(d)     if (i) Buyer and Cosmolab terminate this Agreement pursuant to Section 11.1(a) above, (ii) Buyer terminates this Agreement pursuant to Section 11.1(b)(i) above, (iii) Buyer or Cosmolab terminate this Agreement pursuant to Section 11.1(c) above, or (iv) Cosmolab terminates this Agreement pursuant to Section 11.1(d) above, then Buyer shall be entitled to receive the Escrow Fund and Sellers will execute immediately and deliver without undue delay written instructions to the Escrow Agent to distribute the Escrow Fund to Buyer without any further action of the Bankruptcy Court;

(e)     if Cosmolab terminates this Agreement pursuant to Section 11.1(b)(ii)(x), then Sellers shall be entitled to receive the Escrow Fund and Buyer will execute immediately and deliver without undue delay written instructions to the Escrow Agent to distribute the Escrow Fund to Sellers without any further action of the Bankruptcy Court;

32

(f)     ARTICLE XII, this Section 11.2 and Section 11.3 below shall survive the termination of this Agreement; and

(g)     Sellers shall provide the information required by Section 7.10(j) above.

### 11.3   Damages.

(a)     The parties agree that the amount of Sellers' and Buyer's damages for a breach by the other would be difficult and inordinately expensive to calculate and that liquidated damages are therefore appropriate for this scenario. In the event of an uncured material breach of this Agreement by Buyer, and Sellers determine not to Close the Sale under this Agreement, then absent fraud Sellers' sole remedy shall be to retain the Escrow Fund as full and liquidated damages. In the event of an uncured material breach of this Agreement by Sellers, and Buyer determines not to Close the Sale under this Agreement, then in all cases, absent fraud Sellers' maximum obligation shall be the Break-Up Fee as liquidated damages and the return of the Escrow Fund. In the event of a Closing, Buyer and Sellers shall be deemed to waive any claims for prior breaches of any kind.

(b)     In no event shall any director, officer, employee or Representative of a party or any Affiliate of any party have any liability for any acts or omissions in connection with or arising out of or under this Agreement or any Ancillary Agreement, or the performance or negotiation thereof.

### ARTICLE XII
### GENERAL PROVISIONS

**12.1   Expenses.** Except as otherwise provided in this Agreement, each of the parties hereto will bear the expenses incurred by them in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of Representatives.

**12.2   Notices.** All notices, consents and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered by hand or by Federal Express or a similar internationally recognized overnight courier, in either case if delivered by 5:00 pm local time on a Business Day, otherwise the next Business Day; (b) five days after being deposited in any United States Post Office enclosed in a postage prepaid, registered or certified envelope addressed; or (c) when successfully transmitted by facsimile or by e-mail (with a confirming copy of such communication to be sent as provided in clauses (a) or (b) above), if delivered by 05:00 pm local time on a Business Day, otherwise the next Business Day, in each case, to the party for whom intended, at the address, e-mail address or facsimile number for such party set forth below (or at such other address, e-mail address or facsimile number for a party as shall be specified by like notice, provided, however, that any notice of change of address, e-mail address or facsimile number shall be effective only upon deemed receipt):

If to the Sellers:

>Cosmolab, Inc.
>1100 Garrett Road
>Lewisburg, TN 37091
>United States of America
>Attn: Michael J. Musso
>Facsimile No.:
>Email: MMusso@MorrisAnderson.com

>with a required copy to:

>Frost Brown Todd LLC
>424 Church Street, Suite 1600
>Nashville, TN 37219-2308
>United States of America
>Attention: Robert A. Guy, Esq.
>Facsimile No.: (615) 251-5551
>Email: BGuy@fbtlaw.com

If to Buyer:

>All4 Cosmetics, Inc.
>c/o Schwan-STABILO Cosmetics GmbH & Co. KG
>Schwanweg 1 - 90562 Heroldsberg - Germany
>Attention Ulrich Griebel
>Facsimile No 0049-911- 567 2011
>Email. Ulrich.Griebel@schwancosmetics.com

with a required copy to:

>Satterlee Stephens Burke & Burke LLP
>230 Park Avenue, Suite 1130
>New York, NY 10169
>Attention: Timothy B. Brock, Esq.
>Facsimile No.: (212) 818-9606
>Email: tbrock@ssbb.com

**12.3 Further Assurances.** Each of the parties agrees that it shall, and shall cause its Affiliates to (a) furnish upon request to each other party such further information, (b) execute, acknowledge, seal, file, record and deliver to each other party such other acknowledgements, deeds, assignments, transfers, conveyances or other documents, and (c) do such other acts and things, all as the other party may reasonably request for the purpose of better assigning, conveying and transferring any of the Purchased Assets to Buyer and otherwise carrying out the intent of this Agreement, the Ancillary Agreements and the documents referred to herein and therein.



**12.4    Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be waived except by an express waiver in a written instrument delivered pursuant to Section 12.2 above executed by the party to be charged with such waiver; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement, any Ancillary Agreements or the documents referred to herein or therein.

**12.5    Entire Agreement And Modification.** This Agreement together with the Ancillary Agreements and the documents referred to herein and therein supersedes all prior agreements among the parties with respect to the subject matter thereof and constitutes (along with the Ancillary Agreements and the documents referred to herein and therein) a complete and exclusive statement of the terms of the agreement between the parties with respect to the subject matter thereof. This Agreement may not be amended except by a written instrument executed by the party to be charged with the amendment delivered to the other parties hereto.

**12.6    Schedules.** In the event of any inconsistency between the statements in the body of this Agreement and those in the Schedules (other than an exception expressly set forth as such in the Schedules with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

**12.7    Assignments, Successors, And Third-party Rights.** None of the parties may assign any of their rights under this Agreement without the prior consent of the other parties, except that (a) Buyer may assign all of its rights under this Agreement to an Affiliate of Buyer, <u>provided</u> that (i) Buyer also assigns its rights under the Escrow Agreement to such Affiliate, (ii) such Affiliate assumes all of Buyer's obligations under this Agreement and the Escrow Agreement, and (iii) any such assignment shall not release Buyer from any of its obligations hereunder or under the Escrow Agreement, and (b) Sellers may assign their rights but not their obligations hereunder to the Secured Lenders. This Agreement will apply to, be binding in all respects upon the parties hereto and their assigns and inure to the benefit of the successors and permitted assigns of the parties hereto. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement or their successors and permitted assignees any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and permitted assigns.

CINLibrary 2049000v.10

**12.8    Severability.** If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**12.9    Section Headings; Construction.** The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" shall mean "including, without limitation" and does not limit the preceding words or terms. The words "hereof," "hereunder" and "herein" shall refer to the entire Agreement. Unless otherwise specified herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP.

**12.10    Governing Law.** THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

**12.11    Jurisdiction; Court Proceedings; Waiver of Jury Trial.** ANY CLAIM AGAINST EITHER PARTY TO THIS AGREEMENT ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND EACH PARTY HEREBY SUBMITS TO THE JURISDICTION OF SUCH COURT FOR THE PURPOSE OF ANY SUCH CLAIM. A FINAL JUDGMENT IN ANY SUCH CLAIM SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. TO THE EXTENT THAT SERVICE OF PROCESS BY MAIL IS PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS IN ANY SUCH CLAIM IN SUCH COURTS BY THE MAILING OF SUCH PROCESS BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, AT ITS ADDRESS FOR NOTICES PROVIDED FOR HEREIN. EACH PARTY IRREVOCABLY AGREES NOT TO ASSERT (A) ANY OBJECTION WHICH IT MAY EVER HAVE TO THE LAYING OF VENUE OF ANY SUCH CLAIM IN THE BANKRUPTCY COURT AND (B) ANY CLAIM THAT ANY SUCH CLAIM BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY, TO THE EXTENT LAWFUL, AND AGREES THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY CLAIM WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**12.12    No Presumption Against Drafting party.** Each party acknowledges that each party has been represented by counsel in connection with this Agreement and the transactions contemplated herein. Accordingly, any rule of law or any legal decision that would require

interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

**12.13 Counterparts.** This Agreement may be executed and delivered in counterparts with facsimile or .pdf copies of signatures (provided, originally executed copies are couriered to the parties as soon as practicable thereafter), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**12.14 Confidentiality.** Subject to any disclosures required or reasonable in connection with the Bankruptcy Case, it is understood by the parties hereto that the information, documents, and instruments delivered to Buyer by Sellers and its Representatives and the information, documents, and instruments delivered to Sellers by Buyer and its Representatives are of a confidential and proprietary nature. Each of the parties hereto agrees that prior to the Closing it will, and post-Closing Sellers and their Affiliates will, maintain the confidentiality of all such confidential information, documents, or instruments in their possession or control regarding the Business, the Purchased Assets and the Assumed Liabilities or delivered to it by each of the other parties hereto or their agents in connection with the negotiation of this Agreement or in compliance with the terms, conditions, and covenants hereof and will only disclose such information, documents, and instruments to its duly authorized Representatives and applicable Governmental Bodies in connection with any required notification or application for consent therefrom. Each of the parties hereto further agrees that if the Contemplated Transactions are not consummated, it will return (or certify the destruction of) all such documents and instruments and all copies thereof in its possession to the other parties to this Agreement. Each of the parties hereto recognizes that any breach of this Section 12.14 would result in irreparable harm to the other party to this Agreement and its Affiliates and that therefore either Sellers or Buyer shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash, or otherwise, in addition to all of its other legal and equitable remedies. Nothing in this Section 12.14, however, shall prohibit the use of such confidential information, documents, or information for such filings with any Governmental Body as in the opinion of Sellers' counsel or Buyer's counsel are required to be disclosed pursuant to applicable Legal Requirements.

[The next page is the signature page.]

[Signature page to Asset Purchase Agreement dated as of January 15, 2010 by and between the undersigned]

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**

**ALL4 COSMETICS, INC.**

By:_____

Title:_____

**THE SELLERS:**

**COSMOLAB, INC.**

By:_____

Title:_____

**COSMETICS SPECIALTIES, INC.**

By:_____

Title:_____

**COSMOLAB NEW YORK, INC.**

By:_____

Title:_____

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BUYER:

ALL4 COSMETICS, INC.

By: _____

Title: _____ *Managing Director*

THE SELLERS:

COSMOLAB, INC.

By: *Michael J. Musso*

Title: *Chief Executive Officer - Interim*

COSMETICS SPECIALTIES, INC.

By: *Michael J. Musso*

Title: *Chief Executive Officer - Interim*

COSMOLAB NEW YORK, INC.

By: *Michael J. Musso*

Title: *Chief Executive Officer - Interim*